SCHIFF HARDIN LLP
William J. Carroll (Bar No. 118106)
*wcarroll@schiffhardin.com*
Jean-Paul P. Cart (Bar No. 267516)
*jcart@schiffhardin.com*
Matthew W. Callahan (Bar No. 307782)
*mcallahan@schiffhardin.com*
One Market, Spear Street Tower
Thirty-Second Floor
San Francisco, CA 94105
Telephone: (415) 901-8700
Facsimile:  (415) 901-8700

Attorneys for Defendants
PRADEEP KHOSLA, DANIEL JUAREZ,
and JUSTIN PENNISH

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE KOALA, an unincorporated student association,<br><br>Plaintiff,<br><br>v.<br><br>PRADEEP KHOSLA, in his official capacity as Chancellor of the University of California, San Diego; DANIEL JUAREZ, in his official capacity as President of the Associated Students of the University of California, San Diego; and JUSTIN PENNISH, in his official capacity as Financial Controller of the Associated Students of the University of California, San Diego,<br><br>Defendants. | Case No.  3:16-cv-01296-JM-BLM<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS**<br><br>Case Filed:       May 31, 2016<br>Judge:             Hon. Jeffrey T. Miller<br>Hearing Date:   Sept. 19, 2016<br>Hearing Time:   10:00 a.m. |

1
2

# TABLE OF CONTENTS

I.   INTRODUCTION..................................................................................................1

II.  STANDARD ON MOTION TO DISMISS........................................................2

III. STATEMENT OF FACTS.....................................................................................2

    A.   Organization Of Associated Students....................................................2

    B.   Associated Students' Revenue And Budget. ..........................................3

    C.   Funding Of Student Media.......................................................................4

    D.   Amendment To Standing Rules Regarding Print Media
          Funding. .........................................................................................................5

IV.  SUMMARY OF PLAINTIFF'S CLAIMS. ..........................................................6

V.   ARGUMENT. .............................................................................................................7

    A.   Plaintiff's Suit Is Barred By The Eleventh Amendment..........................7

    B.   Associated Students Had The Inherent Right To Close The
          Limited Public Forum For Campus Activity Fee Funded
          Print Publications. ......................................................................................9

         1.   Print Media funding was a limited public forum for
             First Amendment purposes. ..........................................................9

         2.   Associated Students was entitled to close the forum. ................13

    C.   Even If Associated Students' Action Is Viewed As A
          Restriction Rather Than A Closure Of The Relevant Forum,
          There Is No First Amendment Violation. ..............................................14

         1.   The reallocation of print media funding was
             viewpoint neutral. ........................................................................14

         2.   Reallocating Print Media funds was reasonable in
             light of the purposes of the forum. .............................................21

    D.   Plaintiff Has Failed To State A Claim Under The Free Press
          Clause. .........................................................................................................22

VI.  CONCLUSION. .........................................................................................................25

1

## TABLE OF AUTHORITIES

2

**CASES**

*Abdu-Brisson v. Delta Air Lines, Inc.*,
    239 F.3d 456 (2d Cir. 2001) ............................................................... 20

*ACLU v. Mineta*,
    319 F. Supp. 2d 69 (D.D.C. 2004) ....................................................... 18

*Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of Chicago*,
    45 F.3d 1144 (7th Cir. 1995) .............................................................. 12

*Almond Hill Sch. v. U.S. Dep't of Agric.*,
    768 F.2d 1030 (9th Cir. 1985) ............................................................... 8

*Arkansas Writers' Project, Inc. v. Ragland*
    481 U.S. 221 (1987) ........................................................................... 23

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................... 2, 12

*Assoc. Film Distrib. Corp. v. Thornburgh*,
    800 F.2d 369 (3rd Cir. 1986) ............................................................. 23

*Ave. 6E Investments, LLC v. City of Yuma*,
    818 F.3d 493 (9th Cir. 2016) ............................................................. 20

*Balistreri v. Pacifica Police Dep't*,
    901 F.2d 696 (9th Cir. 1990) ............................................................... 2

*Bd. of Ed. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*,
    458 U.S. 176 (1982) ........................................................................... 22

*Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls*,
    536 U.S. 822, n.4 (2002) .................................................................... 22

*Bloedorn v. Grube*,
    631 F.3d 1218 (11th Cir. 2011) ......................................................... 12

*Brockett v. Spokane Arcades, Inc.*,
    472 U.S. 491 (1985) ........................................................................... 23

*BV Engineering v. University of California, Los Angeles*,

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

858 F.2d 1394 (9th Cir. 1988) ...................................................................... 7

*Capitol Square Review & Advisory Bd. v. Pinette,*
515 U.S. 753 (1995) ................................................................................... 16

*Christian Legal Soc'y Chapter of the Univ. of Cal.,*
*Hastings Coll. of the Law v. Martinez,*
561 U.S. 661 (2010) ................................................................. 11, 15, 22, 23

*Christian Legal Soc'y v. Eck,*
625 F. Supp. 2d 1026 (D. Mont. 2009) .................................................... 11

*City of Las Vegas v. Foley,*
747 F.2d 1294 (9th Cir. 1984) ................................................................. 20

*Coalition to Defend Affirmative Action v. Brown,*
674 F.3d 1128 (9th Cir. 2012) ................................................................... 9

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
473 U.S. 788 (1985) ............................................................................ 10, 13

*Council 31 of the American Federation of State,*
*County & Municipal Employees, AFL-CIO v. Quinn,*
680 F.3d 87 (7th Cir. 2012) .................................................................... 8, 9

*Currier v. Potter,*
379 F.3d 716 (9th Cir. 2004) ................................................................... 13

*DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.,*
196 F.3d 958 (9th Cir. 1999) ............................................................ passim

*Edelman v. Jordan,*
415 U.S. 668 (1974) ................................................................................... 8

*Ex Parte Young,*
209 U.S. 123 (1908) .............................................................................. 7, 8, 9

*Flint v. Dennison,*
488 F.3d 816 (9th Cir. 2007) ................................................................... 12

*Gay Guardian Newspaper v. Ohoopee Reg'l Library Sys.,*
235 F. Supp. 2d 1362 (S.D. Ga. 2002) .............................................. 12, 18

*Golden State Transit Corp. v. City of Los Angeles,*

686 F.2d 758 (9th Cir.1982) ...................................................................17

*Gregoire v. Centennial Sch. Dist.*,
907 F.2d 1366 (3rd Cir. 1990) ..............................................................10

*Griffin v. Cty. Sch. Bd. of Prince Edward Cty.*,
377 U.S. 218 (1964) ...............................................................................20

*Grossbaum v. Indianapolis–Marion Cty. Bldg. Auth.*,
100 F.3d 1287 (7th Cir. 1996) .................................................15, 16, 18

*Hardie v. NCAA*,
97 F. Supp. 3d 1163 (S.D. Cal. 2015) ...................................................20

*Hazelwood Sch. Dist. v. Kuhlmeier*,
484 U.S. 260 (1988) ...............................................................................11

*Hoeppner v. Town of Stettin*,
No. 14-CV-162-BBC, 2015 WL 3658192,
at *1-2 (W.D. Wis. June 12, 2015)........................................................18

*Hunter v. Underwood*,
471 U.S. 222 (1985) ...............................................................................20

*Husain v. Springer*,
494 F.3d 108 (2nd Cir. 2007) ................................................................11

*J–R Distributors, Inc. v. Eikenberry*,
725 F.2d 482 (9th Cir. 1984) .................................................................23

*Kelley v. Metro. Cnty. Bd. of Educ.*,
836 F.2d 986 (6th Cir. 1987) ...................................................................8

*Kincaid v. Gibson*,
236 F.3d 342 (6th Cir. 2001) .................................................................11

*Lone Star Sec. & Video, Inc. v. City of Los Angeles*,
_ F.3d _, 2016 WL 3632375, at *5 (9th Cir. July 7, 2016) ...................14

*McDonough Assocs., Inc. v. Grunloh*,
722 F.3d 1043 (7th Cir. 2013) .................................................................8

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) .................................................................2

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*
    460 U.S. 575 (1983) ................................................................. 23

*Navarro v. Block*,
    250 F.3d 729 (9th Cir. 2001) ...................................................... 2

*Pacific Shores Props., LLC v. City of Newport Beach*,
    730 F.3d 1142 (9th Cir. 2013) .................................................... 20

*Pennhurst State Sch. and Hosp. v. Halderman*,
    465 U.S. 89 (1984) ................................................................... 7

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
    460 U.S. 37 (1983) ............................................................. 10, 13

*Planned Parenthood of S. Nev., Inc. v. Clark Cty. Sch. Dist.*,
    941 F.2d 817 (9th Cir. 1991) ..................................................... 11

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995) .......................................................... 10, 11

*RUI One Corp. v. City of Berkeley*
    371 F.3d 1137 n. 7 (9th Cir. 2004) .............................................. 17

*Saldana v. Occidental Petroleum Corp.*,
    774 F.3d 544 (9th Cir. 2014) ...................................................... 2

*Santa Monica Food Not Bombs v. City of Santa Monica*,
    450 F.3d 1022 (9th Cir. 2006) ................................................ 13, 14

*Seattle Mideast Awareness Campaign v. King Cty.*,
    781 F.3d 489 (9th Cir. 2015) ..................................................... 10

*Sons of Confederate Veterans, Va. Div. v. City of Lexington, Va.*,
    722 F.3d 224 (4th Cir. 2013) ..................................................... 17

*The Pitt News v. Pappert*,
    379 F.3d 96 (3d Cir. 2004) .............................................. 23, 24, 25

*Tipton v. Univ. of Hawaii*, 15 F.3d 922, 926 (9th Cir. 1994) .................... 22

*Ulaleo v. Paty*,
    902 F.2d 1395 (9th Cir. 1990) ..................................................... 8

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case No.  3:16-cv-01296-JM-BLM

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

*United States v. Bjerke,*
796 F.2d 643 (3rd Cir. 1986) .................................................................. 13

*United States v. O'Brien,*
391 U.S. 367 (1968) ........................................................ 16, 17, 19, 20

*Va. Office for Prot. & Advocacy v. Stewart,*
563 U.S. 247 (2011) ............................................................................ 8

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.,*
135 S. Ct. 2239 (2015) ................................................................. 10, 11

*Widmar v. Vincent,*
454 U.S. 263 (1981) .......................................................................... 11

*Will v. Michigan Dept. of State Police,*
491 U.S. 58 (1989) ............................................................................. 7

*Wisc. Interscholastic Athletic Ass'n v. Gannett Co.,*
658 F.3d 614 (7th Cir. 2011) ............................................................. 23

## I.    **INTRODUCTION.**

By this lawsuit, Plaintiff, *The Koala*, seeks to perpetuate its receipt of funds from the Associated Students of the University of California, San Diego ("Associated Students" or "A.S."), apparently in perpetuity.  Plaintiff maintains that, once the government extends its largesse to a media recipient, the First Amendment requires it to continue to do so, regardless of other funding priorities or exigencies, unless and until it is able to show that a compelling governmental interest justifies ending the subsidy.  This is not the law, nor should it be, since the only rational response to such a requirement would be to refrain from extending any subsidy in the first place.

Plaintiff's claims fail at the outset, in that they are barred by Defendants' Eleventh Amendment immunity.  Defendants are all sued in their official capacity and, as such, are entitled to assert the sovereign immunity of The Regents of the University of California, an arm of the State.  Because Defendants have not waived this immunity and no exception applies, Plaintiff's claims must be dismissed.

Plaintiff's First Amendment claims suffer from further deficiencies as well. These claims take aim at a vote by twenty-two members of the A.S. Council to cease funding for all student print media at the University of California, San Diego ("UCSD"), thus freeing those funds for allocation to other student organizations, activities, and events.  In First Amendment parlance, the Council "closed the forum" for print media funding, as was its right to do.  Beyond the Council's exercise of this inherent right, which itself suffices to defeat Plaintiff's First Amendment claims, lays the fact – conceded by Plaintiff – that the funding decision impacted *all* student print media, across-the-board.  Because the Council's legislative action was indisputably neutral in its effect, Plaintiff's attempt to probe the motives of the student legislators who voted for it is, simply put, beside the point. The Council was entitled under applicable First Amendment jurisprudence not only to "close the forum," but to limit it by making viewpoint neutral funding decisions, which is precisely what it did.  For these and the other reasons discussed below, Plaintiff's Free Speech Clause claim fails

1  as a matter of law.

2          Plaintiff's alternative attempt to mount a facial challenge to the Council's

3  action as a violation of the Free Press Clause relies upon a novel and unsupportable

4  extension of that Clause, which has been applied to government actions imposing

5  discriminatory taxes or other financial burdens on the press.  Plaintiff maintains that

6  the Free Press Clause prohibits the government from the "discriminatory" withdrawal

7  of subsidies from media recipients – an interpretation that would effectively prevent

8  the government from eliminating, or even reducing,  subsidies to a media recipient,

9  unless it can demonstrate a compelling government interest. The Free Press Clause

10  imposes no such impediments.  For these and the other reasons discussed below,

11  Plaintiff's Free Press Clause must be dismissed.

12  **II.    STANDARD ON MOTION TO DISMISS.**

13          A motion to dismiss under Fed. R. Civ. P. Rule 12(b)(6) challenges the legal

14  sufficiency of the pleadings.  *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir.

15  2001).  The court should grant relief under Rule 12(b)(6) if the complaint lacks either

16  a cognizable legal theory or facts sufficient to support such a theory.  *See Balistreri v.*

17  *Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  In considering a motion to

18  dismiss, the court "must take all of the factual allegations in the complaint as true,"

19  but is "not bound to accept as true a legal conclusion couched as a factual allegation."

20  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The court's review "is limited to the

21  complaint, materials incorporated into the complaint by reference, and matters of

22  which the court may take judicial notice."  *Metzler Inv. GMBH v. Corinthian*

23  *Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).  Courts "need not accept as true

24  allegations that contradict matters properly subject to judicial notice or by exhibit."

25  *Saldana v. Occidental Petroleum Corp.*, 774 F.3d 544, 551 (9th Cir. 2014).

26  **III.   STATEMENT OF FACTS.**

27          **A.    Organization Of Associated Students.**

28          The A.S. is a student government organization of the University of California,

San Diego whose stated mission is to: "exercise the rights and responsibilities of students to participate in the governance of the University; to manage, invest and maintain the assets of the Association; to create and execute programs which serve the collective interests of the undergraduate population; and to advocate for students within the University, the community, the state, and the nation." (Plaintiff's Request for Judicial Notice ("PRJN"), No. 8 (the "Constitution" or "Constit.") at Art. II.)  A.S. is organized into executive, legislative and judicial branches. (*Id*. at Art. IV § 1.)

The executive branch of the A.S. is led by the President, who serves as the chief executive officer. (*See id*. at Art. VI, §1.)  Former-defendant Dominick Suvonnasupa ("Suvonnasupa") served as President for the 2015-2016 academic year, and was succeeded by defendant Daniel Juarez ("Juarez") for the 2016-2017 academic year. (DE 1 ("Complaint"), ¶ 14, DE 10 ("FAC"), ¶¶ 14, 60.)  Also within the executive branch, the A.S.'s Financial Controller is responsible for advising the President and others on financial matters and overseeing enforcement of A.S.'s policies and procedures concerning expenditures. (Constit., Art. VI, § 4.)  Former-defendant Tristan Britt ("Britt") served as Financial Controller for the 2015-2016 academic year, and was succeeded by defendant Justin Pennish ("Pennish") for the 2016-2017 academic year. (FAC, ¶ 15.)

A.S.'s legislative branch is currently referred to as the Senate—though it was called the Council during the Fall 2015 quarter at issue here. (Constit., Art. V, § 1, Art. VII, § 1.)  Among other things, the Council/Senate is tasked with "represent[ing] the interests and opinions of the UCSD undergraduate students," and is responsible for "writ[ing] and maintain[ing] the rules, policies and procedures of [A.S.]." (*Id*. at Art. VII, § 4.)

**B.     Associated Students' Revenue And Budget.**

A.S.'s revenues are derived from a Campus Activity Fee paid by UCSD students on a quarterly basis, the proceeds of which are then distributed in accordance with A.S.'s annual budget. (FAC, ¶ 18.)  While the President and Financial Controller

1  are responsible for presenting an initial recommendation to the Senate (Const. Art. VI,

2  § 1(f)), the Senate ultimately has the "power to [] [c]ontrol all ASUCSD funds and

3  appropriate those funds as they see fit in consultation with the executive board unless

4  the students, through the fee referendum process, lock-in portions of ASUCSD funds

5  to certain financial areas." (*Id*. at Art. VII, § 4(a).)[1]

6          In the 2015-2016 academic year—as in prior years—the largest recipient of

7  discretionary funds was the Office of Concerts and Events, to which $796,873 was

8  allocated. (PRJN, No. 10 ("Funding Guide"); Defendants' Request for Judicial

9  Notice ("DRJN") Nos. 1-5.) The Office of Student Organizations was allocated

10 $432,236. (Funding Guide.) These funds were used to support student organization

11 programing, tournaments and competitions, sports clubs, various annual events, the

12 All Campus Transfer Association, and the All Campus Commuter Board, among

13 other things. (*Id*.) Within the Office of Student Organizations, Associated Students'

14 2015-2016 Budget contained a $17,000 line item for "media unallocated" (hereafter

15 "media funds"). (*Id*.)

16       **C.     Funding Of Student Media.**

17          Prior to the Senate's November 18, 2015 amendment to the Standing Rules (*see*

18 Section III(D), *infra*), UCSD's Registered Student Organizations ("RSOs") could

19 receive up to a maximum of $1,000 per quarter from A.S. for printed media costs.

20 (DRJN, No. 6 (the "Media Amendment") at Title V § 2.4(e)(1).)[2] Media funds

21 provided by A.S. were to be used for actual printing costs, and each RSO requesting

22 media funds was required to submit vendor estimates of such costs. (*Id*.) The

23

---

24 [1] A significant portion of A.S.'s annual budget is indeed "lock[ed]-in." (*See* PRJN No.
25 12 (the "2015-2016 Budget").) For example, Associated Students' budgeted revenues
   for the 2015-2016 academic year were $3,704,964; however, $1,432,185 was allocated
26 to Referendum and Return to Aid requirements. (*Id*.) Another $849,018 was allocated
   to career employees, administrative costs, stipends, etc. (*Id*.) Thus, only $1,456,798 in
27 funds remained to be allocated across the twelve offices in place at that time. (*Id*.)
   [2] As explained in Section III(D), the Media Amendment reflects the relevant
28 provisions of the Standing Rules that were deleted so as to remove funding for print
   media.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Funding Guide explicitly states that: "[n]othing in this provision constitutes a guarantee of funding for media organizations. Media organizations[3] may not be fully funded in every circumstance for budgetary or other reasons." (Funding Guide at 18.) In fact, RSOs were "urged to seek out funding sources other than [A.S.]." (*Id*.)

The number of RSOs that have requested media funding from A.S. has steadily declined. For example, while it was common for ten or more RSOs to receive quarterly media funding between 2010 and 2013, that number nearly dropped in half during the 2014-2015 academic year. (DRJN Nos. 10-25.) Only two RSOs applied for and received media funding for the Fall 2015 quarter.[4] (*Id*. at No. 10.) The total amount of funds allocated to the "Media Unallocated" line item in A.S.' annual budgets has also declined—falling from $45,000 in 2012-2013, to $37,000 in 2013-2014, and to $17,000 for 2014-2015 and 2015-2016. (DRJN Nos. 1-5.)[5] For at least the last several years, the amount of media funds allocated has exceeded the amount disbursed to RSOs. (*Id*.)

### D.   Amendment To Standing Rules Regarding Print Media Funding.

The A.S. Council held a meeting on November 18, 2015. (FAC, ¶ 61.) The Order of Business for the meeting reflected fourteen bills pending before the Finance Committee, and thirteen bills pending before the Legislative Committee. (DRJN No. 7.) One of the bills listed for discussion on November 18, 2015 was the Media Funds Fiscal Approval Realignment Act (the "Media Act"), sponsored by former Financial Controller Britt, which would have modified the process by which print media funding requests would be approved but which would not have removed media funding. (*Id*.) At the meeting, Juarez proposed an amendment to the Media Act,

---

[3] (*See* DRJN, No. 9 (defining requirements for "media organizations.")
[4] Plaintiff received $634.50 in funding for the Fall 2015 quarter, and was previously approved for $452.80 in funding for the Winter 2016 quarter. (FAC, ¶¶ 73-74.)
[5] Section II(C)(2) of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction contains a chart regarding media funding levels and allocations. All of the information contained within this chart is located in the Media Allocations, which are subject to judicial notice.

which passed on a 22-3 vote.  (*Id*., No. 8.)  The Media Act was then amended a second time on a 22-2 vote (with two abstentions) in response to a proposal by Britt. The amended Media Act ultimately passed on a 22-2 vote (with two abstentions) as ASUCSD Act #107 (*i.e.*, the Media Amendment defined *infra*).  (*See* Media Amendment.)  Juarez and Britt were non-voting members and did not vote on the Media Act or amendments thereto.  (*Id*.)  Eleven other non-voting members of the Council were present for the meeting, among other individuals who attended and/or spoke during the public comment portion of the meeting.  (*Id*.)

The Media Amendment modified the Standing Rules by removing various provisions regarding the process of obtaining funding for student print media.  (*See generally* Media Amendment.)  It also added the following language to the Standing Rules: "The Standing Rules supersede the Funding Guide with respect to media funding.  AS does not fund printed media."  (*Id*. at Title V, § 2.4(i); FAC, ¶ 71.) Since passage of the Media Amendment, the Standing Rules have been extensively revised and restructured.  (*Compare* Media Amendment and PRJN No. 9.)  The provision added by the Media Amendment can now be found at Section 10.4(f) of Title I.  (*See* PRJN No. 9 at Title I, Section 10.4(f).)

## IV.   SUMMARY OF PLAINTIFF'S CLAIMS.

In its operative Complaint, Plaintiff claims that Defendants are acting in violation of the Free Press Clause (FAC, ¶ 85) and Free Speech Clause (*id*. at ¶ 87) of the First Amendment by "categorically refusing to provide campus activity fee funding for the publication of student print media." Id.

Plaintiff's Free Speech Clause claim is based on its allegation that Defendants no longer provide funding for student print media "because of the viewpoint of *The Koala*'s speech."  (FAC, ¶ 87.)  Plaintiff purports to allege facts reflecting negative views about it, allegedly held by past student governments (*e.g.*, FAC ¶¶ 42-45), by certain UCSD administrators (*e.g.*, FAC ¶¶ 47-49), and by students, campus administrators, and others reacting to an "offensive and outrageous" article Plaintiff

1  published on November 16, 2015. (*e.g.*, FAC ¶¶ 50-60).  Plaintiff alleges that these

2  negative views about it motivated the A.S. Council to amend its Standing Rules at its

3  November 18, 2015 meeting, eliminating funding for publication of student print

4  media, including The Koala. (*e.g.*, FAC ¶¶ 61-67).

5  Plaintiff bases its Free Press Clause claim on its allegation that Defendants,

6  after defunding student print media, "continu[e] to fund other forms of speech and

7  activity by student organizations."  (*Id*. at ¶ 85.)  Plaintiff alleges that while the

8  University no longer funds printed media, it continues to fund, for example, the

9  hunger relief efforts of Alpha Epsilon Pi, the 2016 National Cognitive Science

10  Conference, and the Japanese Student Association's Matsuri Festival, among other

11  groups and events.  (*Id*. at ¶ 72.)

12  **V.**   **ARGUMENT.**

13  **A.**   **Plaintiff's Suit Is Barred By The Eleventh Amendment.**

14  Under the Eleventh Amendment to the Constitution, a State may not be sued in

15  federal court without its consent.  *Pennhurst State Sch. and Hosp. v. Halderman*, 465

16  U.S. 89, 100 (1984).  Eleventh Amendment immunity extends to state agencies and

17  instrumentalities, and to their employees acting in their official capacity, because a

18  suit against them is regarded as a suit against the State itself.  *Will v. Michigan Dept.*

19  *of State Police*, 491 U.S. 58, 71 (1989).  The Regents of the University of California is

20  considered an arm of the State of California and, as such, may not be sued in federal

21  court.[6]  *BV Engineering v. University of California, Los Angeles*, 858 F.2d 1394, 1395

22  (9th Cir. 1988).

23  *Ex Parte Young*, 209 U.S. 123 (1908) creates a "narrowly construed" exception

24  to the general rule of sovereign immunity.  *Pennhurst State Sch. & Hosp. v.*

_____

[6] Plaintiff alleges that A.S. is "an official unit of the University of California
exercising authority over student affairs with powers delegated by the Regents."
(FAC par. 13). Defendants Juarez and Pennish are each sued in their official
capacities as officers of A.S. These Defendants, no less than the Chancellor (also
sued in his official capacity) are entitled to the same immunity as The Regents. *Will
v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989).

*Halderman,* 465 U.S. 89, 114 n.25 (1984).  The *Ex Parte Young* exception provides that "when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011).  However, "*Ex parte Young* cannot be used to obtain an injunction requiring the payment of funds from the State's treasury…" *Id.* at 256–57.  To be sure, costs can be incurred to the state treasury as a "necessary consequence of compliance in the future with a substantive federal-question determination," but only if those costs are "ancillary" to the requested relief. *Edelman v. Jordan*, 415 U.S. 668 (1974); *see also Almond Hill Sch. v. U.S. Dep't of Agric.*, 768 F.2d 1030, 1034 (9th Cir. 1985) ("Fiscal effects on state treasuries are acceptable only to the extent they are necessarily incident to compliance with prospective orders.").  When "the object of the suit against a state officer is to reach funds in the state treasury," the *Ex Parte Young* exception does not apply.  *Stewart*, 563 U.S. at 258.

Here, Plaintiff seeks to enjoin the Defendants—all sued in their official capacity—from "categorically refusing to provide campus activity fee funding" to Plaintiff.  (FAC, Prayer for Relief § 2.)  While styled as a request for injunctive relief, Plaintiff is seeking nothing more than to compel payment of state funds.  There is no other action by Defendants to which the act of payment is "ancillary."  The relief is not truly injunctive if "[t]he order to pay is ancillary only to itself…" *Kelley v. Metro. Cnty. Bd. of Educ.,* 836 F.2d 986, 992 (6th Cir. 1987); *see also McDonough Assocs., Inc. v. Grunloh*, 722 F.3d 1043, 1051 (7th Cir. 2013).

The Ninth Circuit routinely bars claims seeking monetary relief for past harm. *See, e.g., Ulaleo v. Paty*, 902 F.2d 1395, 1399 (9th Cir. 1990).  While the Ninth Circuit has not directly confronted a *prospective* claim for purely monetary relief against a state defendant, the Seventh Circuit has found that the Eleventh Amendment bars such a suit.  In *Council 31 of the American Federation of State, County & Municipal Employees, AFL-CIO v. Quinn*, 680 F.3d 87 (7th Cir. 2012) ("*Quinn*"),  the

plaintiff brought suit challenging Illinois' pay freeze for state employees. Plaintiff sought an order enjoining the defendants from enforcing the rules that implemented the pay freeze.  The court found that the effect of the requested injunction would be to "force the defendants, in their official capacities, to extract funds from the State's treasury for the ultimate benefit of the plaintiffs." *Id*. at 884.  While plaintiff had adequately alleged an "ongoing violation of federal law," the court affirmed dismissal because "where a plaintiff's request for relief 'would have an effect upon the state treasury that is not merely ancillary but is the essence of the relief sought,' it is barred by the Eleventh Amendment." *Id*. at 882-83.  Here, as in *Quinn*, the "essence of the relief sought" consists of the payment of state funds, in this case, directly to the Plaintiff.  Accordingly, the *Ex Parte Young* exception does not apply, and Plaintiff's claims are barred by the Eleventh Amendment, in their entirety.

Plaintiff's claims against Chancellor Khosla are barred for the additional reason that, in order to fall within the *Ex Parte Young* exception, the state official must have a sufficiently direct connection with enforcement of the provision or practice that is the subject of the constitutional challenge.  "[T]hat connection 'must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit.'" *Coalition to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012).  Here, there are no fact allegations whatever establishing that Chancellor Khosla has any direct responsibility for enforcement or implementation of the A.S.'s Standing Rules challenged by Plaintiff.  In the absence of sufficient fact allegations establishing such responsibility, Plaintiff's claims against Chancellor Khosla must be dismissed.

**B.** **Associated Students Had The Inherent Right To Close The Limited Public Forum For Campus Activity Fee Funded Print Publications.**

1. Print Media funding was a limited public forum for First Amendment purposes.

A claim of infringement of First Amendment rights on government-owned

property implicates the three-part test of the Supreme Court's forum analysis doctrine. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799-800 (1985). This analysis recognizes the interest of the government as an owner of property, but balances this interest against the rights granted by the First Amendment. *Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366, 1371 (3rd Cir. 1990). The Supreme Court first articulated the three-part test of forum analysis in *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983).

Forum analysis applies when the government opens up government property to private speech. *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2250–51 (2015). A "traditional public forum" is a place "such as a street or a park" which has traditionally been used as a place of public assembly. *Id.* at 2250. A "designated public forum" exists where "government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose…" *Id.* at 2250. The third category is a "limited public forum," in which the government "has reserved a forum for certain groups or for the discussion of certain topics." *Id.* (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995)). [7]

When the government takes actions with a content-based effect on speech in a traditional or designated public forum, its actions must meet strict scrutiny, *i.e.* the action must be "narrowly tailored to serve a compelling state interest." *Seattle Mideast Awareness Campaign v. King Cty.*, 781 F.3d 489, 496 (9th Cir. 2015). By contrast, when a government's actions have a content-based effect on speech in a limited public forum, the government's actions need only meet the lower bar of being "reasonable in light of the purpose of the forum." *Id.* at 499. Under both standards of

---

[7] Some courts also use the term "nonpublic forum," but, as noted by the Ninth Circuit, the term is indistinguishable from "limited public forum" for First Amendment purposes. *Am. Freedom Def. Initiative v. King Cty.*, 796 F.3d 1165, 1169 (9th Cir. 2015), *cert. denied* 136 S. Ct. 1022 (2016).

scrutiny, the government's action must be viewpoint-neutral.  *Walker*, 135 S. Ct. at 2246.

 While traditionally addressing this balancing of interests in the context of a specified physical location, courts have adapted forum analysis to a broad array of contexts, including funding of student organizations at public universities. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995); *Widmar v. Vincent*, 454 U.S. 263, 278 (1981); *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 679 (2010).  Where, as here, the government has limited both who can apply for funds and the uses to which funds could be put, the Supreme Court has found the fund is properly analyzed as a limited public forum.  See *Rosenberger*, 515 U.S. at 829-31 (evaluating plaintiff's challenge to policy governing entire student activity fund under a limited public forum analysis); *Christian Legal Soc'y v. Eck*, 625 F. Supp. 2d 1026, 1044 (D. Mont. 2009) ("*Widmar* and *Rosenberger* make clear that the Court is to apply a limited public forum analysis when evaluating a university's decision denying a religious student group's request for recognition and funding.")  Plaintiff concedes that forum analysis is appropriate here.  (*See* DE 3-1 15:21-25).

 The relevant forum is defined with reference to "the access sought by the speaker."  *Cornelius*, 473 U.S. at 801; *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 965 (9th Cir. 1999).  Here, Plaintiff seeks access to funding for student print media in order to produce a printed version of *The Koala*.  The relevant forum, therefore, consists of A.S.-funded student print publications.  *See, e.g, Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 270 (1988) (high school newspaper); *Planned Parenthood of S. Nev., Inc. v. Clark Cty. Sch. Dist.*, 941 F.2d 817, 829 (9th Cir. 1991) (en banc) (finding "the advertising pages in the school district's school-sponsored publications are nonpublic forums…"); *Husain v. Springer*, 494 F.3d 108, 121 (2nd Cir. 2007) (student newspaper at public university is a limited public forum); *Kincaid v. Gibson*, 236 F.3d 342, 348 (6th Cir. 2001) (public

1    university yearbook is limited public forum).

2          Ignoring these authorities, Plaintiff seeks to define a forum far broader than the

3    one to which it seeks access.  Plaintiff alleges that University policy and the AS's

4    rules and "practices," taken together, broadly constitute a single limited public forum

5    for registered student organizations, apparently encompassing every funded activity

6    any such organization may engage in.  (FAC, ¶ 29.)  Plaintiff's definition is

7    demonstrably overbroad, at the very least because it sweeps in all sorts of activities,

8    restrictions, regulations and practices that have little or no bearing on the funding of

9    printed publications.  Courts have consistently rejected such overbroad definitions of

10   the relevant forum.  *See, e.g.*, *Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of

11   Chicago*, 45 F.3d 1144, 1151 (7th Cir. 1995) (in case challenging an airport's decision

12   not to run advertisement in airport advertising kiosks, court, noting that the plaintiff

13   "does not desire to use the greater airport concourse," concluded that the relevant

14   forum consisted of the kiosks themselves); *Flint v. Dennison*, 488 F.3d 816, 831 (9th

15   Cir. 2007) (in case challenging university bylaws governing student elections, Ninth

16   Circuit held that the relevant forum was "the [student] election itself" and "not the

17   University of Montana campus"); *Bloedorn v. Grube*, 631 F.3d 1218, 1232 (11th Cir.

18   2011) (holding that the court "cannot consider the [public university] campus as a

19   singular whole" because "any attempt to affix a single label on so large and diverse a

20   campus likely would render the forum analysis meaningless."); *Gay Guardian

21   Newspaper v. Ohoopee Reg'l Library Sys.*, 235 F. Supp. 2d 1362, 1368–73 (S.D. Ga.

22   2002), *aff'd* 90 F. App'x 386 (11th Cir. 2003) (table opinion), (finding relevant forum

23   for removal of newspaper from library lobby is the lobby, not the whole library, where

24   newspaper was still available in other parts of the library).

25          Plaintiff's allegations purporting to define the relevant forum here consist of

26   nothing more than legal conclusions, and are not binding on this court in addressing

27   the instant motion.  *See Iqbal*, 556 U.S. at 681.  Its overbroad definition should be

28   rejected.

2.     Associated Students was entitled to close the forum.

Having established a limited public forum for funding student print publications, A.S. was not constitutionally obliged to maintain that forum indefinitely. To the contrary, courts applying forum analysis have recognized that the government retains an inherent right to control its property – a right that includes closing the forum it has created.

When faced with anything other than a traditional public forum, the state "is not required to retain the open character of the facility." *Perry*, 460 U.S. at 46; *Cornelius*, 473 U.S. at 802.  Indeed, the Ninth Circuit, as well as others, has explicitly acknowledged that a public entity maintains the discretion to close a limited public forum "whenever it wants." *DiLoreto*, 196 F.3d at 970 ("The government has an inherent right to control its property, which includes the right to close a previously open forum."); *Currier v. Potter*, 379 F.3d 716, 728 (9th Cir. 2004) (observing that government may close designated public forum "whenever it wants"); *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1032 (9th Cir. 2006) (noting that designated public forum that was subject of prior challenge was "now closed" as a result of  changes to ordinance, and further noting that the government may close such a forum "whenever it wants."); *United States v. Bjerke,* 796 F.2d 643, 647 (3rd Cir. 1986) (observing that "officials may choose to close . . . a designated public forum at any time").

The government's broad discretion to close a designated public forum was also evident in *Santa Monica Food Not Bombs v. City of Santa Monica*, *supra,* 450 F.3d 1022.  There, the City of Santa Monica had enacted an ordinance that limited the practice of displaying street banners, providing exceptions for certain kinds of private speech, but not others. *Id*. at 1025-32.  A private advocacy group filed a First Amendment challenge, arguing that the distinctions drawn in the ordinance were unconstitutional. *Id*.  The City responded by amending the ordinance so as to preclude all private parties from putting up street banners, limiting such bannering to

the City itself.  *Id.*  The Ninth Circuit observed that in so doing, the City Council "has now closed the designated public forum in which appellants sought to exercise their rights," and by closing the forum, which it was entitled to do "whenever it wants," rendered any First Amendment challenge moot.  *Id.*  Here, by choosing to end funding for all printed publications, A.S. exercised its prerogative—its "inherent right"—to close the limited public forum it had established.  Plaintiff has no basis under the First Amendment to force the A.S. to re-open a forum it had the inherent right to close. Accordingly, Plaintiff's First Amendment claims should be dismissed in their entirety.

**C.      Even If Associated Students' Action Is Viewed As A Restriction Rather Than A Closure Of The Relevant Forum, There Is No First Amendment Violation.**

Plaintiff seeks to avoid application of the foregoing forum closure cases through an overbroad definition of the relevant forum, which, it contends, was limited but not closed.  For the reasons set forth above, Plaintiff's proposed definition ignores controlling principles defining the forum according to the access sought by the speaker, and should be rejected by this court.  But even if the Media Amendment is viewed as a restriction on the overbroad forum proposed by Plaintiff rather than as a forum closure, the result would be the same.  "In a limited public forum, restrictions that are viewpoint neutral and reasonable in light of the purpose served by the forum are permissible."  *DiLoreto*, 196 F.3d at 965 (citing *Rosenberger*, 515 U.S. at 829). Because the A.S.'s actions readily meet this standard, Plaintiff's First Amendment claims must fail, irrespective of whether the relevant forum was closed, or restricted.

1.      The reallocation of print media funding was viewpoint neutral.

a.      *Viewpoint discrimination is the differential treatment of speakers based on their viewpoints.*

The Media Amendment was both content neutral and viewpoint neutral. Content discrimination occurs when a regulation "defines regulated speech by a particular subject matter."  *Lone Star Sec. & Video, Inc. v. City of Los Angeles*, _ F.3d _, 2016 WL 3632375, at *5 (9th Cir. July 7, 2016).  A regulation is content-neutral if

it affects speech but "do[es] not single out a specific subject matter for differential treatment, nor…exempt[s] from regulation" a class of speaker.  A.S.'s decision to end funding for print publications applies to all such publications, without exception, and without regard to the message or content of the publication.  Thus, it is content-neutral.  Viewpoint discrimination is a kind of content discrimination that occurs when the "rationale for the restriction" is not just the specific subject or kind of speaker, but "the specific motivating ideology or the opinion or perspective of the speaker." *Rosenberger*, 515 U.S. at 829.  Because viewpoint discrimination is a subset of content discrimination, any state action that is content-neutral is by definition viewpoint-neutral.

Courts, including the Supreme Court, have found generally applicable regulations like the Media Amendment to be viewpoint-neutral under the First Amendment.  Because that Amendment "draws no distinction between groups based on their message or perspective" it "is textbook viewpoint neutral." *See Christian Legal Soc'y* [*Hastings*], 561 U.S. at 694-95, & n.25 (upholding policy as viewpoint-neutral because "[the] policy governs all [RSOs]; [the university] does not pick and choose which organizations must comply with the policy on the basis of viewpoint.").  Plaintiff alleges that A.S.'s decision was not viewpoint-neutral—but it has failed to allege a sufficient factual basis for this contention, because its efforts to do so depend entirely upon allegations of improper motive.  (FAC, ¶ 67.)  Where, as here, the alleged forum restriction is content-neutral, allegations of improper motive are beside the point, and do nothing to support allegations of viewpoint discrimination.

The Seventh Circuit's decision in *Grossbaum v. Indianapolis–Marion Cty. Bldg. Auth.*, 100 F.3d 1287, 1293 (7th Cir. 1996) ("*Grossbaum II*") is instructive.  There, the Seventh Circuit set out to resolve "the issue of what role a government body's motive plays in constitutional analysis when that body tries to regulate speech in a nonpublic forum." *Id*. at 1290.  In an earlier appeal, plaintiffs had successfully challenged the policy of a local building authority that prohibited religious displays

1   (including plaintiffs' menorah) in the lobby of its County Building.  Following that

2   decision, the building authority amended its rules to exclude *all* displays (religious or

3   otherwise) by any private group or individual.  Plaintiffs challenged the new rule,

4   asserting – much as *The Koala* does here – that while the rule was content-neutral, it

5   was motivated by viewpoint discrimination, aimed in that case at plaintiffs and their

6   expressed desire to display a menorah.  In rejecting this challenge, the Seventh Circuit

7   engaged in an extended inquiry into the role of motive in assessing a content-neutral

8   regulation of speech in a nonpublic forum.  The court observed that, while motive

9   may be relevant in reviewing content-based speech regulations, no such danger exists

10  where the government restricts speech in a content-neutral fashion.  Because a

11  content-neutral regulation makes no distinctions based on the communicative nature

12  or impact of the speech, all viewpoints are treated equally.  This remains true

13  "whatever the intent of the government actors," so that "content-neutral speech

14  regulations in nonpublic fora pass constitutional muster regardless of motive."  *Id*. at

15  1299.

16      The Seventh Circuit supported this conclusion by citation to *Capitol Square*

17  *Review & Advisory Bd. v. Pinette*, 515 U.S. 753 (1995), where the Supreme Court

18  suggested "that content-neutral regulations are free from motive inquiries even in

19  public forum cases."  *Grossbaum II* at 1298.[8]  The Seventh Circuit found further

20  support in *United States v. O'Brien*, 391 U.S. 367 (1968), a Free Speech Clause case

21  in which "the Supreme Court recognized that 'it is a familiar principle of

---

8   In *Capitol Square*, the Supreme Court addressed the denial of a permit to the Ku
Klux Klan for the erection of a Latin cross in a public forum, after the government
had granted permission for a Christmas tree and a menorah to be displayed.  The
Supreme Court observed that Ohio "could ban all unattended private displays in
[the forum] if it so desired."  *Id*. at 783. (Souter, J., concurring in part and
concurring in the judgment).  Justice Souter agreed with both the majority opinion
(at 761) and Justice Stevens' dissent (at 802-03), making eight justices who agreed
on this point; Justice Ginsburg, in dissent, did not reach the issue.  As the
*Grossbaum* court observed, such a ban on all private displays "would seem
impossible…if Ohio's undisputed desire to keep the Klan off of government
property would be sufficient to establish viewpoint discrimination."  *Grossbaum II*,
100 F.3d at 1299.

1    constitutional law that this Court will not strike down an otherwise constitutional

2    statute on the basis of an alleged illicit legislative motive.'"  *Grossbaum II* at 1293

3    (quoting *O'Brien* at 383); *see also Golden State Transit Corp. v. City of Los Angeles*,

4    686 F.2d 758, 759 (9th Cir.1982) (concluding that district court improperly inquired

5    into City's motive in denying taxicab franchise renewal and, citing *O'Brien*, stated

6    that courts "are not permitted to inquire into alleged motives of legislators.  Rather,

7    they must look to the effects of the legislative acts."); *RUI One Corp. v. City of*

8    *Berkeley* 371 F.3d 1137, 1146 n. 7 (9th Cir. 2004) (citing *O'Brien* in concluding that

9    facts regarding City's purported motive for adopting living wage ordinance were

10   "wholly irrelevant," because "our analysis of the constitutionality of an ordinance

11   must proceed from the text of the ordinance, not the alleged motives behind it.")

12           Other courts have, like the Seventh Circuit, concluded that allegedly censorious

13   motives underlying a content-neutral regulation closing or restricting speech in a

14   designated public forum cannot serve as a basis for a First Amendment challenge.  In

15   *Sons of Confederate Veterans, Va. Div. v. City of Lexington, Va.*, 722 F.3d 224, 231

16   (4th Cir. 2013), the Fourth Circuit affirmed dismissal of a First Amendment challenge

17   to a Lexington, Virginia ordinance prohibiting the display of private flags in City-

18   owned flag standards, and restricting use of the standard to display of the American

19   flag and the flags of the Commonwealth of Virginia and the City of Lexington.  Prior

20   to adoption of the ordinance, a fraternal organization, the Sons of Confederate

21   Veterans ("SCV"), had used the flag standards to display the Confederate flag during

22   a local parade.  That event had prompted public opposition to the display of the

23   Confederate flag, which was followed by enactment of the ordinance barring use of

24   the flag standards for display of any private flags.  Following adoption of the

25   ordinance, the SCV – much like *The Koala* here – raised a First Amendment

26   challenge, asserting that the ordinance was Lexington's response to the SCV's request

27   to display the Confederate flag and thus constituted viewpoint discrimination in

28   violation of the Free Speech Clause.  The Fourth Circuit rejected SCV's contention on

appeal that the motive behind the Ordinance dictates its constitutionality: "The Free Speech Clause only 'forbids Congress and ... the States from making laws abridging the freedom of speech'—a far different proposition than prohibiting the intent to abridge such freedom." *Id*. at 231 (quoting *Grossbaum II*, *supra* 100 F.3d at 1293). Regardless of what motivations underlie Lexington's adoption of the ordinance, because "it did not exclude either a specific speaker or a specific class of speech," the alleged motives of the legislators who enacted it were irrelevant. *Id*.

Similarly, in *Gay Guardian Newspaper*, a public library permitted a gay rights advocating publication to be distributed with other free publications on a front lobby table. 235 F. Supp. 2d 1362-64. After it received objections to having the publication in its lobby, the library restricted the table to government and library-generated materials only. The plaintiff asserted – much as *The Koala* does here – that the library was unconstitutionally censoring it "even at the expense of squelching other, non-gay speakers." *Id*. The court engaged in an extended discussion of whether the library could constitutionally exclude all private speech from the limited public forum that had been created on the lobby table, and concluded it could – even if it did so with an "impermissibly censorious motive." *Id*. at 1371-77. The facial neutrality of the closure, which "equally affects both gay and non-gay interests" was determinative, even in the face of allegations of "censorious" motives. *Id*. Other cases are to similar effect.[9]

The Ninth Circuit's decision in *DiLoreto* is also instructive, and entirely in line with the foregoing authorities. *See* 196 F.3d 958, 970. There, the Ninth Circuit

---

[9] *See ACLU v. Mineta*, 319 F. Supp. 2d 69, 83 (D.D.C. 2004) ("The question at issue here, however, is not whether WMATA can constitutionally prefer one viewpoint over another—the presumption is that it cannot—but whether WMATA can close itself as a designated public forum and thus constitutionally refuse to accept the advertisements in question by eliminating entire categories of advertisements. The answer is that it can."); *Hoeppner v. Town of Stettin*, No. 14-CV-162-BBC, 2015 WL 3658192, at *1-2 (W.D. Wis. June 12, 2015) (closure of town council meetings was not First Amendment violation "because the decision applied to everyone in the same way" even if the closure had a "hugely disproportionate effect" on plaintiff who used the forum more frequently than others).

upheld a school district's decision to close a nonpublic forum – an advertising space on a high school baseball field fence – to prevent the display of an advertisement containing the text of the Ten Commandments.  Because the *effect* of the school district's action was neutral, in that it excluded all advertisers, the fact that the district was motivated by the desire to exclude the plaintiff's religious message did not transform the action into an instance of viewpoint discrimination.  In short, the exclusionary motive did not matter, because the effect was neutral.  In reaching its conclusion, the court cited with approval *Grossbaum II* for its holding that it is not unconstitutional for the government to exclude *all* displays, in order to avoid allowing a religious display.  *DiLoreto* was, in turn, cited by the district court in *Gay Guardian Newspaper* as support for its conclusion that there is no viewpoint discrimination when all viewpoints are equally excluded – regardless of the motive for exclusion.[10]

b.   *Plaintiff's "overdiscrimination" cases do not apply to the First Amendment.*

Plaintiff argues that the conceded neutral effect of the Media Amendment should be disregarded because it allegedly "overdiscriminated" by inflicting "collateral damage" upon other recipients of funds for printed student publications.  (Plaintiff's Brief in Support of Motion for Preliminary Injunction ("Pltff's PI Brief") (DE 3-1) at 18:14-20)  In so doing, Plaintiff seeks an end-run around *O'Brien*, *Grossbaum II*, *DiLoreto*, and the other authorities cited above establishing that inquiry into the government's motive in adopting a content-neutral regulation is unnecessary, impractical, and improper.  In referring to the concept of overdiscrimination, Plaintiff relies upon inapposite Equal Protection Clause cases and

---

[10] As the Ninth Circuit recently observed in *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, _ F.3d _, 2016 WL 308269816 (9th Cir. 2016), motive is relevant as an element of proof in a claim alleging unlawful retaliation in violation of the First Amendment.  No such claim is asserted here, nor is there any basis for such a claim where, as here, the purported retaliation comes in the form of a legislative enactment.  *See e.g., Grossbaum II*, 100 F.3d at 1295 ("Nonetheless, courts will not sustain a retaliation claim where a plaintiff challenges only the enactment of a prospective, generally applicable rule.").

cases involving anti-discrimination statutes that explicitly require an inquiry into motive.  (*See, e.g.,* DE 3-1 at 17:7-13 (citing *Pacific Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142 (9th Cir. 2013) (considering claims under Fair Housing Act, Americans with Disabilities Act, and Equal Protection Clause).[11]  But the Ninth Circuit – in the very case Plaintiff relies upon – distinguished *O'Brien* – and by implication the Free Speech cases that follow it – by observing that "*O'Brien* does not apply to equal protection cases or cases involving statutory anti-discrimination law where the very nature of the legal inquiry is whether an action taken by the legislature was motivated by animus."  *Pacific Shores*, 730 F.3d at 1161 n.24; *see also City of Las Vegas v. Foley*, 747 F.2d 1294, 1298 (9th Cir. 1984) (acknowledging that under "extraordinary circumstances," inquiry is permitted into legislators' motive in cases "where a plaintiff must prove invidious purpose or intent, as in racial discrimination cases.")  The instant case falls under *O'Brien* and *City of Las Vegas*, not *Pacific Shores*.  Unlike the Equal Protection Clause and the anti-discrimination statutes at issue in *Pacific Shores*, there is no constitutional or statutory imperative under the Free Speech Clause to examine the government's motives.  To the contrary, the Supreme Court, the Ninth Circuit and other circuits have consistently rejected the asserted need for such inquiries.  "[T]he relevance of motive to constitutional adjudication varies by context."  *Grossbaum II* at 1294.  In the Free Speech Clause context presented here, Plaintiff's purported evidence of the motives of A.S. Council members who voted on the Media Amendment has no proper role to play, and does nothing to counter the unchallenged neutral effect of the amendment.  Because Plaintiff has failed to allege facts sufficient to show that the Media Amendment lacked the required viewpoint neutrality, its claims under the Free Speech Clause must

---

[11] (*See also* DE 3-1 at 16-18 (citing *Hunter v. Underwood*, 471 U.S. 222 (1985) (Equal Protection Clause); *Griffin v. Cty. Sch. Bd. of Prince Edward Cty.*, 377 U.S. 218 (1964) (Equal Protection Clause); *Ave. 6E Investments, LLC v. City of Yuma*, 818 F.3d 493 (9th Cir. 2016) (Fair Housing Act); *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456 (2d Cir. 2001) (New York State Human Rights Law); *Hardie v. NCAA*, 97 F. Supp. 3d 1163 (S.D. Cal. 2015) (Title II of Civil Rights Act)).)

fail.[12]

2. Reallocating Print Media funds was reasonable in light of the purposes of the forum.

Finally, to the extent the Media Amendment is viewed as a forum restriction rather than a forum closure, that restriction was plainly "reasonable in light of the purposes served by the forum." *Rosenberger*, 515 U.S. at 829. Like the Student Activity Funds at issue in *Rosenberger*, the allocation of Campus Activity Fees here are in furtherance of the University's "educational purpose." *Id*. at 824. By policy, the University requires that Campus Activity Fees be allocated by A.S. to RSOs "consistent with the University's educational purposes." (PRJN No. 7 at 86.10.) Those purposes are identified in the policies as follows: "(1) to provide opportunities for the educational benefits and personal and social enrichment that derive from participation in extracurricular programs and activities; and (2) to stimulate on-campus discussion and debate on a wide range of issues from a variety of viewpoints." (*Id*.) By withdrawing funding from print media, A.S. made those funds available for distribution in support of other activities of RSOs. Any such re-allocation is subject to the requirements and restrictions set forth in the applicable University and campus policies, as well as the Standing Rules. Under these policies, the fund re-allocations *must* be in furtherance of the University's educational purposes, as defined. Thus, in re-allocating funds pursuant to these policies and Rules, A.S.'s actions are by definition reasonable in light of the educational purposes of the forum. Courts and litigants are not in the position to second-guess the choices

---

[12] Plaintiff cites to *Church of the Lukumi Bablu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), without noting that the quoted portion of the opinion did not command a majority of the Court—and, indeed, had the support of only two justices. *See id*. at 540 (opinion of Kennedy, J.); DE 3-1 at 17. The application of the Equal Protection Clause jurisprudence to a First Amendment claim was explicitly mentioned by two of the justices as a reason for not joining that portion of the opinion. *See id*. at 558 (Scalia, J., dissenting). Rather than follow this two-justice opinion, the Supreme Court continued to apply *O'Brien* in First Amendment cases. *See, e.g., Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 652 (1994) (quoting *O'Brien*, at 383).

made by the student government as to *which* authorized recipients are more deserving. Indeed, courts defer to educational priorities set by public universities, including priorities governing administration of student fees for extracurricular activities. *See Christian Legal Soc'y* [*Hastings*] at 687, n.16 (stating that "courts should resist 'substituting their own notions of sound educational policy for those of the school authorities which they review'" and that "determinations of what constitutes sound educational policy or what goals a student-organization forum ought to serve fall within the discretion of school administrators and educators") (*quoting Bd. of Ed. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206 (1982); *Christian Legal Soc'y* [*Hastings*] at 686-87 ("A college's commission—and its concomitant license to choose among pedagogical approaches—is not confined to the classroom, for extracurricular programs are, today, essential parts of the educational process.") (citing *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls*, 536 U.S. 822, 831, n.4 (2002)); *Tipton v. Univ. of Hawaii*, 15 F.3d 922, 926 (9th Cir. 1994) ("the University has wide latitude in adopting a funding policy to allocate the limited resources available to promote students' extracurricular activities."). Plaintiff alleges no facts indicating that A.S. has engaged in or is contemplating any *ultra vires* re-allocation of funds previously directed to support printed publications. Because any such re-allocations continue to serve the purposes of the forum, the de-funding of printed publications was reasonable within the meaning of *Rosenberger*.

**D.    Plaintiff Has Failed To State A Claim Under The Free Press Clause.**

No doubt recognizing its vulnerability in staking its case upon an effort to probe the motives underlying A.S.'s legislative action, Plaintiff purports to plead a separate claim under the Free Press Clause, arguing there is no need to establish viewpoint discrimination or "censorial motive" in establishing a violation of this provision. (FAC, ¶¶ 84-85; *see* Plfft's PI Brief at 15.) Rather, Plaintiff argues, A.S. must be deemed to have violated the Free Press Clause by "singling out" student print

1   publications for de-funding without adequate justification.  (*Id*.)  Plaintiff misreads the

2   authorities recognizing that the Free Press Clause may be violated when the

3   government taxes or otherwise selectively imposes financial burdens on the press, by

4   arguing that these cases should extend to *any* form of differential treatment – even the

5   denial of a government subsidy.

6         The Supreme Court has applied the Free Press Clause in striking down

7   discriminatory taxes and other laws that impose special financial burdens on the

8   media. Differential taxes, in particular, have come under scrutiny due to the potential

9   for coercion or suppression.  *Arkansas Writers' Project, Inc. v. Ragland* 481 U.S. 221,

10   228 (1987) (noting the potential for government to "destroy a selected group of

11   taxpayers by burdensome taxation."); *Minneapolis Star & Tribune Co. v. Minn.*

12   *Comm'r of Revenue* 460 U.S. 575, 585 (1983) (the "threat of burdensome taxes

13   becomes acute" when applied differentially to the press).  Similar concerns arise

14   where the government "unjustifiably imposes a financial burden on a particular

15   segment of the media," (*The Pitt News v. Pappert,* 379 F.3d 96, 109 (3d Cir. 2004); or

16   where it singles out the press with costly and burdensome regulations, penalties, or

17   fines.  *Assoc. Film Distrib. Corp. v. Thornburgh*, 800 F.2d 369, 374–75 (3rd Cir.

18   1986); *J–R Distributors, Inc. v. Eikenberry*, 725 F.2d 482, 495 (9th Cir. 1984), *rev'd.*

19   *on other grounds sub nom. Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491 (1985).

20         The potential threats posed by such taxes, penalties, regulations, and fines do

21   not exist with regard to the administration of government subsidies such as the

22   Campus Activity Funds at issue here.  *See Christian Legal Soc'y* [*Hastings*], 561 U.S.

23   at 682-83 ("A refusal to fund protected activity, without more, cannot be equated with

24   the imposition of a 'penalty' on that activity."); *Wisc. Interscholastic Athletic Ass'n v.*

25   *Gannett Co.*, 658 F.3d 614, 629 (7th Cir. 2011) (holding that decision to award rights

26   to an athletic broadcast to one television station and not others was not "a special tax

27   on the press" for First Amendment purposes).  Nothing in the Free Press Clause

28   jurisprudence suggests that it was intended to promote, guarantee, or protect

1  affirmative government assistance to the press.  In short, Plaintiff seeks to deploy the

2  Free Press Clause for a purpose that is unrecognized in any of the cases it cites. [13]

3      In support of its sweeping assertion that "[t]he Free Press Clause prohibits *any*

4  *official action* that 'single[s] out the press for special treatment,'" Plaintiff quotes out

5  of context from the Supreme Court's decision in *Minneapolis Star*. (emphasis added)

6  (Pltff's PI Brief (DE 3-1) at 11:12-13)   Unlike the present case, *Minneapolis Star*

7  addresses a differential tax aimed at the press that "gives a government a powerful

8  weapon against the taxpayer selected."  460 U.S. at 585.  Contrary to Plaintiff's

9  citation, nothing in *Minneapolis Star* suggests its holding broadly extends to "any

10  official action" (including government subsidies), nor does it suggest that such

11  subsidies (as opposed to taxes, fines, or penalties) can be used as "a powerful

12  weapon" against recipients of the government's largesse.  Rather, *Minneapolis Star*

13  and the Supreme Court cases it cites address the potential for mischief arising out of

14  the government's power to tax and regulate, and to use these powers to threaten media

15  entities that are subjected to such measures. *See also Pitt News,* 379 F.3d at 110 (

16  "[C]ourts must be wary that taxes, regulatory laws, and other laws that impose

17  financial burdens are not used to undermine freedom of the press and freedom of

18  speech.  Government can attempt to cow the media in general by singling it out for

19  special financial burdens.  Government can also seek to control, weaken, or destroy a

20  disfavored segment of the media by targeting that segment.")  Neither *Pitt News*, nor

21

22  ───────────────
[13] Plaintiff erroneously suggests that the Free Press Clause serves as some kind of

23  bulwark against the "selective withdrawal of benefits" from student print media.
(Pltff's PI Brief (DE 3-1) at 14:11-12). As sole support, Plaintiff cites *Board of*

24  *County Commissioners v. Umbehr*, 518 U.S. 668, 674 (1996) for the proposition
that "the government 'may not deny a benefit to a person on a basis that infringes

25  his constitutionally protected ... freedom of speech' even if he has no entitlement to
that benefit." Pltff's PI Brief (DE 3-1) at p 14:12-14.)  *Umbehr* is completely

26  inapposite.  It does not discuss, or even mention, the Free Press Clause.  Rather, it
acknowledges that the First Amendment may be violated when the government

27  deprives an individual of a valuable government benefit in retaliation for her
exercise of her right free speech rights. Plaintiff contends here that the Free Press

28  Clause is violated by selectively depriving "the press" of a government benefit,
without regard to motive or intent.  *Umbehr* does nothing to support this contention.

1   any case cited by Plaintiff, suggest that such threats arise outside of governmental

2   exercise of the power to tax or regulate.

3          While acknowledging – as it must – that the government is not required to

4   subsidize media activities, Plaintiff nevertheless contends that the Free Press Clause

5   compels the government to maintain such subsidies, once they are granted, and to

6   continue to maintain them, apparently indefinitely.  Under Plaintiff's novel and

7   unsupported reading of the Free Press Clause, the government could never withdraw

8   such support, once given, unless it can prove it is necessary to achieve an "interest of

9   compelling importance."  (*See* Plfft's PI Brief at 12 (quoting *Pitt News*, 379 F.3d at

10  111).)  Thus, under Plaintiff's view, a public university would be *constitutionally*

11  *barred*, absent a showing that it is necessary to achieve a compelling state interest,

12  from singling out a subsidy to a student publication for reduction or elimination, even

13  if it decided that these funds might be better spent on awarding scholarships, funding

14  research, enhancing campus safety, or on other priorities.  Where the university also

15  funds other speech-related activities, it would, absent a showing that it is necessary to

16  achieve a compelling state interest, be *constitutionally compelled* to reduce funding to

17  these other activities in direct proportion to any funding reduction to the student

18  publication, so as to avoid any "discrimination" against "the press."  The Free Press

19  Clause does not imbue the press with such encompassing protections and privileges.

20  Rather, the relevant case law – indeed, the cases Plaintiff cites – reflect measured

21  protections against government taxes, fines, penalties and burdensome regulations

22  targeting and thereby threatening the press.   Because these protections are in no way

23  implicated by A.S.'s decision to re-allocate funds from student print media to other

24  projects, Plaintiff's claim under the Free Press Clause fails to state a claim.

## VI.   <u>CONCLUSION.</u>

26         For the foregoing reasons, Defendants respectfully request that Plaintiff's

27  Amended Complaint be dismissed in its entirety.

28

1

2

3      Dated:  August 15, 2016                    SCHIFF HARDIN LLP

4

5                                                By: */s/ William J. Carroll*
                                                    William J. Carroll
6                                                   Jean-Paul P. Cart
                                                    Matthew W. Callahan
7
                                                    Attorneys for Defendants
8                                                   PRADEEP KHOSLA, DANIEL
                                                    JUAREZ, and JUSTIN PENNISH
9

10

11

12

13     SF\321919938 9

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28