David Loy (SBN 229235)
**ACLU FOUNDATION OF SAN DIEGO &**
**IMPERIAL COUNTIES**
P.O. Box 87131
San Diego, CA 92138-7131
Telephone:   (619) 232-2121
Facsimile:   (619) 232-0036
E-mail:      davidloy@aclusandiego.org

Ryan T. Darby, Esq. (SBN 264357)
**THE LAW OFFICE OF RYAN T. DARBY**
525 B Street, Suite 1500
San Diego, CA 92101
Telephone:   (619) 858-4766
Facsimile:   (619) 243-7226
E-mail:      darby@darby.law

Attorneys for Plaintiff THE KOALA

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE KOALA,<br><br>        Plaintiff,<br><br>        v.<br><br>PRADEEP KHOSLA, et al.,<br><br>        Defendants. | **Case No.: 16cv1296 JM (BLM)**<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS** |

1

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STANDARD FOR DECIDING MOTION TO DISMISS ........................................2

ARGUMENT...........................................................................................................2

    A. The Eleventh Amendment does not bar this case for prospective relief, in which the Chancellor is a proper defendant with direct responsibility over the Media Disqualification. ......................................................................................2

        1.    This case properly seeks prospective relief against the Media Disqualification that would allow the student press to seek funds available to other student groups....................................................2

        2.    Chancellor Khosla is a proper defendant because he has personal responsibility over the Student Government's decisions on campus activity fees. .....................................................................8

    B. The Media Disqualification violates the Free Press Clause by selectively targeting the student press with a burden not imposed on other student organizations. ...............................................................................................9

    C. The Media Disqualification violates the Free Speech Clause by selectively expelling the student press from a forum that remains open to other organizations. ............................................................................................14

        1.    By university policy, the forum is funding for speech of all registered student organizations, and that forum remains open after expulsion of the student press...............................................15

        2.    The government may not selectively expel speakers from a forum designed for their speech..............................................16

        3.    The Media Disqualification is unreasonable because the student press serves the university's own purposes for a forum designed for student speech.....................................................................18

        4.    Under controlling precedent, the Media Disqualification is unconstitutional if motivated by viewpoint discrimination, notwithstanding its superficial neutrality....................................20

        5.    The Media Disqualification amounts to retaliation against *The Koala* under cover of superficial neutrality. ...............................24

CONCLUSION.....................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of Chi.*, 45 F.3d 1144 (7th Cir. 1995) ...................................................................................... 18

*Almond Hill Sch. v. U.S. Dep't of Agric.*, 768 F.2d 1030 (9th Cir. 1985) ............................................................................................................ 7

*Alvarez v. Hill*, 518 F.3d 1152 (9th Cir. 2008) ..................................... 17

*Am. Freedom Def. Initiative v. King Cty.*, 796 F.3d 1165 (9th Cir. 2015) .......................................................................................................... 18

*Anderson v. City of Hermosa Beach*, 621 F.3d 1051 (9th Cir. 2010) ................. 23

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858 (9th Cir. 2016) .................................................................................................... 4, 24

*Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998) .......................... 16

*Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987) ...................... 10, 11

*Badger Catholic, Inc. v. Walsh*, 620 F.3d 775 (7th Cir. 2010 .............................. 12

*Barker v. Riverside Cty. Off. of Educ.*, 584 F.3d 821 (9th Cir. 2009) .................... 2

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009) ......................... 2

*Bloedorn v. Grube*, 631 F.3d 1218, 1225 (11th Cir. 2011) .................................. 18

*Christian Legal Soc'y v. Martinez*, 561 U.S. 661 (2010) ..................................... 13

*Coal. to Defend Affirmative Action v. Brown*, 674 F.3d 1128 (9th Cir. 2012) ............................................................................................................ 8

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985) .............................................................................................. 16, 21, 22

*Council 31 of the Am. Fed'n of State, Cty. & Mun. Emps., AFL-CIO v. Quinn*, 680 F.3d 875 (7th Cir. 2012) ...................................................... 6

*Demmon v. Loudoun Cty. Pub. Sch.*, 342 F. Supp. 2d 474 (E.D. Va. 2004) ........................................................................................................ 15

*DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958 (9th Cir. 1999) .................................................................................................. 22

*Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836 (9th Cir. 1997) ................. 5

*Edelman v. Jordan* 415 U.S.651 (1974) ..............................................3, 4, 5, 6, 7

*Esperanza Peace & Justice Ctr. v. City of San Antonio*, 316 F. Supp. 2d 433 (W.D. Tex. 2001)............................................................................ 23

*Ex parte Young* 209 U.S. 123 (1908)..…………………………………3, 4, 5, 6, 8

*Flint v. Dennison*, 488 F.3d 816 (9th Cir. 2007) ........................................3, 18, 24

*Gay Guardian Newspaper v. Ohoopee Reg'l Library Sys.*, 235 F. Supp. 2d 1362 (S.D. Ga. 2002).......................................................................... 18

*Goldberg v. Town of Rocky Hill*, 973 F.2d 70 (2d Cir. 1992)........................... 20

*Grossbaum v. Indianapolis-Marion Cty. Bldg. Auth.*, 100 F.3d 1287 (7th Cir. 1996) .......................................................................................21, 22

iii

*Harris v. McRae*, 448 U.S. 297 (1980)..................................................................13

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) ....................................17

*Husain v. Springer*, 494 F.3d 108 (2d Cir. 2007)..................................................18

*In re Tam*, 808 F.3d 1321 (Fed. Cir. 2015) .............................................................9

*Johnson v. City of Shelby*, 135 S. Ct. 346 (2014)..................................................17

*Kelley v. Metro. Cty. Bd. of Educ.*, 836 F.2d 986 (6th Cir. 1987)..........................7

*Kincaid v. Gibson*, 236 F.3d 342 (6th Cir. 2001) ..................................................18

*L.A. Cty. Bar Ass'n v. Eu*, 979 F.2d 697 (9th Cir. 1992).........................................8

*Leathers v. Medlock*, 499 U.S. 439 (1991).......................................................9, 10

*McDonough Assoc., Inc. v. Grunloh*, 722 F.3d 1043 (7th Cir. 2013)......................7

*Milliken v. Bradley*, 433 U.S. 267 (1977)...........................................................4, 7

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983) ..........................................................................................9

*NAACP v. Button*, 371 U.S. 415 (1963) ..................................................................9

*Nat'l Council of La Raza v. Cegavske,* 800 F.3d 1032 (9th Cir. 2015) ..................2

*OSU Student All. v. Ray*, 699 F.3d 1053 (9th Cir. 2012) ............................2, 15, 19

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983)....................................................................................................16

*Pitt News v. Pappert*, 379 F.3d 96 (3d Cir. 2004) ..........................................11, 12

*Planned Parenthood of S. Nev., Inc. v. Clark Cty. Sch. Dist.*, 941 F.2d 817 (9th Cir. 1991) ...........................................................................17

*Price v. State of Haw.*, 764 F.2d 623 (9th Cir. 1985)..............................................5

*Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015)..................................................20

*Regan v. Taxation with Representation of Wash.*, 461 U.S. 540 (1983)...........9, 10

*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995)..................................................................12, 13, 16, 17, 18

*Rust v. Sullivan*, 500 U.S. 173 (1991) ..................................................................13

*Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203 (1963)............................14

*Seattle Mideast Awareness Campaign v. King Cty.*, 781 F.3d 489 (9th Cir. 2015)...............................................................................................18

*Sons of Confederate Veterans, Va. Div. v. City of Lexington, Va.*, 722 F.3d 224 (4th Cir. 2013)................................................................................22

*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011)........................................................2

*Tex. v. Johnson*, 491 U.S. 397 (1989)...................................................................23

*Tipton v. Univ. of Haw.*, 15 F.3d 922 (9th Cir. 1994) ..........................................19

*Transportation Alternatives, Inc. v. City of New York*, 218 F. Supp. 2d 423 (S.D.N.Y. 2002)...........................................................................19

*Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204 (9th Cir. 1996)...................19

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ........................................20

*U.S. v. Hamilton*, 699 F.3d 356 (4th Cir. 2012) ...................................................... 23

*U.S. v. O'Brien*, 391 U.S. 367 (1968) .................................................................. 23

*U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) .................................................. 2

*U.S. v. Swisher*, 811 F.3d 299 (9th Cir. 2016) ...................................................... 24

*Ulaleo v. Paty*, 902 F.2d 1395 (9th Cir. 1990) ........................................................ 6

*Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247 (2011) .................................... 5

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015) .................................................................................................. 13

*Warren v. Fairfax Cty.*, 196 F.3d 186, 193 (4th Cir. 1999) .................................. 17

*Widmar v. Vincent*, 454 U.S. 263 (1981) ........................................................ 12, 16

*Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989) ......................................... 3

*Wis. Interscholastic Athletic Ass'n v. Gannett Co.*, 658 F.3d 614 (7th Cir. 2011) .................................................................................................... 13

# INTRODUCTION

Shortly after *The Koala*'s publication of a controversial article, the student government at University of California, San Diego disqualified the student press from eligibility to seek revenue that continues to support the speech of other student organizations ("Media Disqualification").  On the facts pleaded, most of which are undisputed, the Media Disqualification violates the First Amendment.

The Eleventh Amendment does not prevent the Court from deciding the merits.  *The Koala* seeks an injunction against enforcement of the Media Disqualification that would allow the student press to resume seeking funds available to other student groups, subject to otherwise valid requirements.  Any fiscal impact of that order would be ancillary to compliance with a prospective decree and permitted by the Eleventh Amendment.  The Chancellor is a proper defendant because he has direct personal authority and responsibility over the Media Disqualification.

The Media Disqualification violates the Free Press Clause because it selectively targets the student press.  Defendants cannot escape liability by the semantic sleight-of-hand of claiming the Media Disqualification concerns a "subsidy" rather than "tax."  Tax rules create subsidies just as much as direct payments, and there is no principled reason to contend otherwise.  It violates the Free Press Clause to single out the press by stripping it of revenue available to other organizations, and it makes no constitutional difference whether that revenue derives from tax exemptions, direct grants, or any other source.

The Media Disqualification violates the Free Speech Clause because the Student Government expelled the student press from a forum designed for student speech that remains open to other speakers.  The Media Disqualification is unreasonable in light of the university's own purposes for the forum because the student press provides the same opportunities for extracurricular participation and robust debate as other student organizations.  The Media Disqualification was also

1   motivated by viewpoint discrimination and retaliation, and the Supreme Court has

2   held that superficial neutrality cannot immunize a selective restriction on speech

3   within an existing forum.  For these reasons, the motion to dismiss must be denied.

4                    **STANDARD FOR DECIDING MOTION TO DISMISS**

5          The Court takes the facts pleaded as true, along with any exhibits and matters

6   subject to judicial notice, and reads the complaint as a whole, drawing all inferences

7   in the light most favorable to the plaintiff, to determine if the complaint states a

8   plausible claim.  *OSU Student All. v. Ray*, 699 F.3d 1053, 1058 (9th Cir. 2012);

9   *Braden v. Wal-Mart Stores, Inc*., 588 F.3d 585, 594 (8th Cir. 2009); *Barker v.*

10  *Riverside Cty. Off. of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009); *U.S. v. Ritchie*, 342

11  F.3d 903, 908 (9th Cir. 2003).  If alternative explanations are plausible, the Court

12  may not dismiss the complaint.  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

13  Leave to amend must be granted unless amendment is futile.  *Nat'l Council of La*

14  *Raza v. Cegavske,* 800 F.3d 1032, 1041 (9th Cir. 2015).

15                                **ARGUMENT**

16  **A. The Eleventh Amendment does not bar this case for prospective**
    **relief, in which the Chancellor is a proper defendant with direct**
17  **responsibility over the Media Disqualification.**

18         The Eleventh Amendment does not bar an injunction against enforcing the

19  Media Disqualification, and Chancellor Khosla is a proper defendant.  As a result,

20  the Court may decide whether Defendants are violating the First Amendment by

21  continuing to enforce the Media Disqualification.

22        **1.  This case properly seeks prospective relief against the Media**
              **Disqualification that would allow the student press to seek**
23            **funds available to other student groups.**

24         This case seeks prospective relief allowed by the Eleventh Amendment.

25  The pleadings do not seek "purely monetary relief."  Mem. of Points & Auth. in

26  Support of Mot. to Dism. (Doc. 16-1) at 8 ("MTD").  The complaint asks for an

27  injunction against "categorically refusing to provide campus activity fee funding for

28  the publication of student media."  First Amended Complaint ("FAC") (Doc. 10)

Prayer for Relief ¶ 1.  *The Koala* moved to prohibit enforcement of any rule that "disqualifies registered student organizations … from eligibility to obtain funds derived from campus activity fees to publish student newspapers or other periodicals" and to prevent Defendants from "[c]ategorically refusing to disburse funds derived from campus activity fees … on the ground that Plaintiff would use such funds to publish a student newspaper or other periodical."  Amended Mot. for Prelim. Inj. (Doc. 5) at 2.  That relief complies with the Eleventh Amendment.

The complaint and motion do not seek retroactive compensation.  Instead, they seek a prospective order against disqualifying student media from seeking funds available to other student organizations.  The student press would still be subject to otherwise valid requirements.  The injunction would simply prevent Defendants from enforcing the categorical disqualification of student media from the same opportunity to seek funding as other student groups.

Properly understood, this case falls squarely within *Ex parte Young*, which allows "prospective injunctive relief" against state university officials "to prevent an ongoing violation of federal law."[1]  *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007).  The Eleventh Amendment does not bar prospective relief that might have some "impact on state treasuries."  *Edelman v. Jordan*, 415 U.S. 651, 667 (1974).  Though it bars "compensation" for funds "wrongfully withheld" in the past, the Eleventh Amendment does not prohibit injunctions that may result in fiscal impact as a "consequence of compliance in the future with a substantive federal-question determination."  *Id.* at 656, 668.  For example, the Court approved a case in which "officials were prohibited from denying welfare benefits to otherwise qualified recipients who were aliens," because any fiscal impact resulted

---

[1]  State officials sued in their official capacities for injunctive relief are persons under § 1983.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989).

1    from "compliance with decrees which by their terms were prospective." *Id.* at 667-

2    68.  The same is true for an injunction against the Media Disqualification.

3        This "prospective-compliance" rule "permits federal courts to enjoin state

4    officials to conform their conduct to requirements of federal law, notwithstanding a

5    direct and substantial impact on the state treasury." *Milliken v. Bradley*, 433 U.S.

6    267, 289 (1977); *see also Nat'l Res. Def. Council v. Cal. Dep't of Transp.*, 96 F.3d

7    420, 422 (9th Cir. 1996) ("[A]n injunction against the state officer is permitted,

8    even if it might require substantial outlay of funds from the state treasury, provided

9    that it does not award retroactive relief for past conduct.").

10       Under those principles, the Eleventh Amendment does not bar this case,

11   because *The Koala* seeks a prospective order against enforcing the Media

12   Disqualification, thereby allowing student media to seek funds available to other

13   student groups, subject to otherwise valid requirements.  Any "ancillary effect on

14   the state treasury is a permissible and … inevitable consequence of the principle

15   announced in *Ex parte Young*." *Edelman*, 415 U.S. at 668.

16       Following *Edelman*, the Ninth Circuit recently reaffirmed that the Eleventh

17   Amendment "does not bar claims seeking prospective injunctive relief against state

18   officials to remedy a state's ongoing violation of federal law," and "[t]he *Young*

19   doctrine allows individuals to pursue claims against a state for prospective equitable

20   relief, including any measures ancillary to that relief." *Ariz. Students' Ass'n v. Ariz.

21   Bd. of Regents*, 824 F.3d 858, 865-66 (9th Cir. 2016).  The court held that Arizona

22   Students' Association ("ASA") could pursue a claim that state officials modified

23   their "policies to retaliate against the ASA's exercise of its First Amendment free

24   speech rights" by "depriving the ASA of its income" from student fees. *Id.* at 863.

25   While ASA could not obtain "money damages and other retrospective relief," it was

26   free to pursue "prospective injunctive and declaratory relief." *Id.* at 865.  Similarly,

27   the Eleventh Amendment does not bar a prospective injunction against enforcing

28   the Media Disqualification.

Previous Ninth Circuit decisions also undermine Defendants' position. For example, the Eleventh Amendment does not prohibit an order compelling reinstatement of a state employee, because "reinstatement would not serve as compensation," but "would simply prevent the prospective violation of [plaintiff's] rights which would result from denying him employment in the future." *Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 841 (9th Cir. 1997). Any salary paid after reinstatement "would have nothing to do with the alleged past violation," but would be paid "for his work after reinstatement." *Id.* Similarly, an injunction against enforcing the Media Disqualification would not compensate *The Koala* for past harm. Instead, it would prevent prospective violation of constitutional rights, and any funds *The Koala* might receive in the future would flow from resuming its participation in a program available to other student organizations.

In *Price v. State of Haw.*, 764 F.2d 623 (9th Cir. 1985), plaintiffs sued for violations of federal law requiring the use of certain funds for specified purposes. *Id.* at 625. The court held that plaintiffs could "seek prospective injunctive relief" for proper use of the funds, because any effect on the state "treasury of the requested injunctive relief" was "'the necessary result of compliance with decrees which by their terms [are] prospective in nature ... [and] an inevitable consequence of the principle announced in *Ex parte Young*.'" *Id.* at 629-30 (quoting *Edelman*, 415 U.S. at 667-68). Similarly, any fiscal effect of enjoining the Media Disqualification would necessarily result from compliance with a prospective decree allowing the student press to seek funds available to other student groups.

Defendants incorrectly rely on cases that address different issues. In *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247 (2011), the issue was whether a federal court may "hear a lawsuit for prospective relief against state officials brought by another agency of the same State." *Id.* at 249. In commenting that "*Ex parte Young* cannot be used to obtain an injunction requiring the payment of funds from the State's treasury," the Court referred to *Edelman* and thus reaffirmed the rule

allowing fiscal impact that is ancillary to compliance with a prospective decree.  *Id.* at 256-57 (citing *Edelman*, 415 U.S. at 666).  The Court's passing reference to a case where "the object of the suit against a state officer is to reach funds in the state treasury" must be taken in light of *Edelman*'s rule on ancillary impact.  *Stewart*, 563 U.S. at 258.  Nothing in *Stewart* remotely calls *Edelman* into question.

In *Ulaleo v. Paty*, 902 F.2d 1395 (9th Cir. 1990), the issue was whether by making a land exchange "in the past," defendants "injured the plaintiffs by violating the trust of which the plaintiffs are beneficiaries."  *Id.* at 1399.  There was "no allegation that the Board is continuing to violate its trust duties in other ways or that it is likely to do so in the future," and "[t]he immediate relief plaintiffs seek would require the state to purchase the lands from its present holder."  *Id.* at 1399-1400.  In those circumstances, the court held that "to grant the requested relief would be a retrospective remedy, as opposed to stopping an ongoing violation of federal law."  *Id.* at 1400.  Here, by contrast, *The Koala* seeks to enjoin an ongoing violation.

Nothing in *Council 31 of the Am. Fed'n of State, Cty. & Mun. Emps., AFL-CIO v. Quinn*, 680 F.3d 875 (7th Cir. 2012), prevents this Court from deciding the merits.  In *Quinn*, the state ignored "collective bargaining agreements" calling for wage increases, and plaintiff sought an order specifically "requiring the State to pay out wage increases as they came due."  *Id.* at 879-880.  The court found the Eleventh Amendment barred an injunction that "would force the defendants, acting in their official capacities, to extract funds from the State's treasury."  *Id.* at 884. Here, by contrast, *The Koala* does not seek an injunction directly forcing Defendants to extract funds from the state treasury.  Instead, *The Koala* seeks an injunction against enforcement of the Media Disqualification that prevents it from seeking funds available to other student groups.  Any fiscal effect of that injunction

would be properly "incident to compliance with prospective orders."[2]  *Almond Hill Sch. v. U.S. Dep't of Agric.*, 768 F.2d 1030, 1034 (9th Cir. 1985).

For similar reasons, *McDonough Assoc., Inc. v. Grunloh*, 722 F.3d 1043 (7th Cir. 2013), does not apply here, because *McDonough* was "in substance an effort to have a federal court order state officials to make payments from the state treasury to remedy past alleged breaches of contract." *Id.* at 1045.  *The Koala* is not claiming compensation for breach of contract.  Instead, *The Koala* seeks "injunctive relief ordering the state [officials] to stop violating federal law on an ongoing basis." *Id.* at 1050 (citing *Edelman*, 415 U.S. at 667-68).  *The Koala* is not "conducting a raid on the state treasury for an accrued monetary liability," *id.* (quoting *Milliken*, 433 U.S. at 290 n.22), but rather seeking to "enjoin ongoing behavior by state officials that violates federal law," which is proper though it "may cost the state money to implement" as "'a necessary consequence of compliance in the future.'" *Id.* (quoting *Edelman*, 415 U.S. at 668).

Finally, *Kelley v. Metro. Cty. Bd. of Educ.*, 836 F.2d 986 (6th Cir. 1987), has no bearing on this case.  In *Kelley*, a school district subject to a desegregation decree "filed a third-party complaint" against state officials, asking "in essence, that the state be required to pay the full cost of implementing the desegregation remedies ordered by the district court." *Id.* at 987.  The state officials were not "currently doing anything wrong" or sued "to prevent them from doing anything wrong." *Id.* at 990.  Here, by contrast, Defendants continue to enforce the Media Disqualification, and the Eleventh Amendment does not bar this action.

---

[2]  Because *Quinn* is distinguishable on its facts, the Court need not decide whether it conflicts with *Price* by prohibiting an injunction that requires prospective compliance with an obligation to disburse funds for a specific purpose.

### 2. Chancellor Khosla is a proper defendant because he has personal responsibility over the Student Government's decisions on campus activity fees.

Chancellor Khosla has personal responsibility for ensuring that the Student Government follows the law in allocating campus activity fees.  He is a proper defendant under *Ex parte Young*, because he has "a specific connection" to the Media Disqualification.  *L.A. Cty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992).  The Chancellor has comprehensive power over student government, including its very existence.  "Chancellors have authority to authorize or discontinue recognition of student governmental entities as official student governments."  UC Policy on Student Governments ¶ 61.00.  In particular, the Chancellor is personally responsible for ensuring that the Student Government follows the law in expending campus activity fees:

> Chancellors are responsible for the fiscal soundness of student governments, and are responsible in addition for maintaining fiscal accountability over compulsory campus-based student fees…. In the discharge of these responsibilities, Chancellors may conduct audits of the finances of student governments, exercise control over expenditures of their funds when and to the extent necessary to maintain the financial solvency of student governments, and where required may take action to ensure that any financial or business activity under the control of student governments is operated in accordance with sound business practices and is *consistent with legal requirements* and University policies and procedures.

*Id.* ¶ 67.00 (emphasis added).

In these circumstances, Chancellor Khosla has a direct connection to the Media Disqualification, far more immediate than "a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision."  *Coal. to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012).  If the University of California's president was a proper defendant in a challenge to statewide "admission criteria of the university of which he is president," *id.*, then the Chancellor is a proper defendant in a challenge to the actions of a student government for which he has direct responsibility.

1

2

**B. The Media Disqualification violates the Free Press Clause by selectively targeting the student press with a burden not imposed on other student organizations.**

3

4

5

6

7

8

9

The Media Disqualification targeted the press.  By contending the Free Press Clause does not apply because the Media Disqualification concerns a "subsidy" instead of a "tax," Defendants exalt form over substance and semantics over principle.  The "State cannot foreclose the exercise of constitutional rights by mere labels." *NAACP v. Button*, 371 U.S. 415, 429 (1963).  The Media Disqualification is unconstitutional because it openly discriminates against the press, which the Free Press Clause prohibits the government from doing at any level for any reason.

10

11

12

13

14

15

In substance, Defendants categorically excluded student media from revenue that remains available to other organizations.  Having made such revenue generally available, Defendants may not selectively target the press by disqualifying it from a generally applicable program.  In doing so, they unconstitutionally "singled out the press for special treatment." *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 582 (1983).

16

17

18

19

20

21

22

23

24

25

26

In principle, there is no credible distinction between differential taxation of the press and differential disqualification from a subsidy.  Tax exemptions and deductions are subsidies just as much as direct payments.  *Leathers v. Medlock*, 499 U.S. 439, 451 n.3 (1991) (noting that "tax exemptions and tax deductibility are a form of subsidy"); *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 544 (1983) ("A tax exemption has much the same effect as a cash grant," and "[d]eductible contributions are similar to cash grants"); *In re Tam*, 808 F.3d 1321, 1350 (Fed. Cir. 2015) (recognizing that "tax exemptions or deductions were a form of subsidy for First Amendment analysis").  If the government cannot selectively tax the press, it cannot selectively deny the press a tax exemption.  The selective denial of a tax exemption to the press is no different from selective disqualification

27

28

from a general subsidy.[3]  Therefore, the government cannot selectively disqualify the press from a generally available subsidy.

That principle is exemplified in *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987), which applied *Minneapolis Star* in striking down a differential tax exemption scheme.  *Id.* at 229.  In doing so, the Court rejected the contention that the scheme represented a permissible "denial of participation in a tax exemption or other subsidy scheme."  *Id.* at 237 (Scalia, J., dissenting).  Under *Minneapolis Star* and *Ragland*, the government may not single out the press for selective denial of a general tax exemption, and therefore it may not selectively disqualify the press from a generally available subsidy.

In approving a "tax of general applicability" that happened to fall on "a large number of cable operators" but not print media, the Court reaffirmed that government may not "single out the press" compared to non-press organizations. *Leathers*, 499 U.S. at 447, 449 (citing *Minneapolis Star*, 460 U.S. at 585). The Media Disqualification singles out the press and remains unconstitutional under *Leathers*.  Indeed, the Media Disqualification is "structured so as to raise suspicion that it was intended" to "interfere with [*The Koala*'s] First Amendment activities," given the close proximity between *The Koala*'s publication of controversial content and the Student Government's decision that "selected a narrow group to bear fully the burden" of disqualification from campus activity funding.  *Id.* at 448.

In a case about disqualifying the student press from seeking a source of revenue, the Third Circuit rejected the contention that *Minneapolis Star* and

---

[3]  In *Regan*, the Court upheld the "the prohibition against substantial lobbying by § 501(c)(3) organizations," because "Congress has merely refused to pay for the lobbying" through tax deductions, and in that context, a "decision not to subsidize the exercise of a fundamental right does not infringe the right."  461 U.S. at 545, 549.  That language does not apply here, because *Regan* did not address a rule targeting the press, which the Free Press Clause does not allow, even if government may selectively subsidize speakers in other contexts.

*Ragland* "are inapposite because they concerned laws that required publications to pay taxes, rather than laws that deprived the publications of a source of revenue," because "this difference is insignificant for present purposes." *Pitt News v. Pappert*, 379 F.3d 96, 111 (3d Cir. 2004).  As the court recognized, "the Supreme Court's cases concerning disparate taxation of the media" prohibit "other types of disparate financial burdens" on the press, and "whether those burdens take the form of taxes or some other form is unimportant." *Id.* at 111-12.  Therefore, "courts must be wary that taxes, regulatory laws, and *other laws* that impose financial burdens are not used to undermine freedom of the press and freedom of speech." *Id.* at 110 (emphasis added).  That principle follows from Supreme Court precedent and destroys Defendants' position.

It is no answer to suggest that denial of a "source of revenue" is not a "burden" on the press.  *Id.* at 111.  To disqualify publications from a source of revenue burdens them by requiring them to seek alternative funding.  It is constitutionally insignificant whether the targeted revenue derives from "alcoholic beverage advertising," *id.* at 101, campus activity fees, or any other source.  The principle remains the same—the government may not selectively target the press.

It is also no answer that "the government is not required to subsidize media activities."  MTD at 25.  The government is not constitutionally required to tax organizations or exempt them from taxes.  But once it does so, the Free Press Clause prohibits the government from treating the press differently from other organizations, and there is no principled reason to distinguish tax exemptions from subsidies in this context.

Though a university may not have to fund student speech at all, the Free Press Clause prohibits Defendants from "singling out a subsidy to a student publication for reduction or elimination" while continuing to support other student organizations.  MTD at 25.  As with selective taxation and selective denial of tax exemptions, the selective disqualification of the press from generally available

funds "can operate as effectively as a censor to check critical comment by the press." *Minneapolis Star*, 460 U.S. at 585. Indeed, the facts here exemplify that concern, where the Media Disqualification closely followed the publication of controversial content. "If government were free to suppress disfavored speech by preventing potential speakers from being paid, there would not be much left of the First Amendment." *Pitt News*, 379 F.3d at 106. That principle covers payment from tax exemptions, advertising, campus activity fees, or any other source.

This case does not require a choice between providing "a subsidy to a student publication" and "awarding scholarships, funding research, enhancing campus safety, or … other priorities." MTD at 25. Campus activity fees are paid to the Student Government for student activities, not to the university's general budget for scholarships, research, or other expenses. *See* UC Policy on Compulsory Campus-Based Student Fees ¶¶ 81.10, 82.00.

In any event, a university need not fund student speech on the same basis as "awarding scholarships" or "funding research." MTD at 25. As acknowledged in university policy, the speech of student organizations is private speech not attributable to the university. FAC ¶¶ 26-27; *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 834-35 (1995); *Widmar v. Vincent*, 454 U.S. 263, 274 (1981). By contrast, the university's scholarship and research funding decisions represent government speech. *See Rosenberger*, 515 U.S. at 833 ("When the University determines the content of the education it provides, it is the University speaking."); *Widmar*, 454 U.S. at 276 (university may "determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study"); *Badger Catholic, Inc. v. Walsh*, 620 F.3d 775, 780 (7th Cir. 2010) ("Choosing which programs to support and which not, whether by having a department of philosophy but not a seminary, or by granting scholarships to study theology but not prepare for the ministry, is a form of government speech."). A university is free to spend what and how it wishes on its own speech

without regard to any funding for student speech.  *See Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2246 (2015).  But since the university has chosen to fund private speech, Defendants cannot disqualify the press from otherwise available funding.

Nothing cited by Defendants changes that necessary conclusion.  In *Christian Legal Soc'y v. Martinez*, 561 U.S. 661 (2010), the Court did not address selective targeting of the press.  Instead, the Court held a university could require student organizations to "accept all comers" as a condition of receiving official recognition, a matter not at issue here.  *Id.* at 696.  In that context, the Court "distinguished between policies that require action and those that withhold benefits" and noted the university was "dangling the carrot of subsidy, not wielding the stick of prohibition," by enforcing a rule that applied equally to all student groups.  *Id.* at 682-83.  That language does not immunize Defendants from violating the Free Press Clause by targeting the student press.[4]

The decision in *Wis. Interscholastic Athletic Ass'n v. Gannett Co.*, 658 F.3d 614 (7th Cir. 2011) ("*WIAA*"), also has nothing to do with this case.  In *WIAA*, the government was acting in its proprietary capacity "as the creator and disseminator of content."  *Id.* at 624.  In those circumstances, the government could grant an exclusive license for streaming "high school tournament games," which did not prohibit the media from reporting on the games.  *Id.* at 627.  Here, by contrast,

---

[4]  Defendants quote language about "refusal to fund a protected activity" that does not appear in *Christian Legal Soc'y*.  MTD at 23.  That language derives from *Harris v. McRae*, 448 U.S. 297, 317 n.19 (1980), which was not a First Amendment case, much less a Free Press case.  In *Harris*, the Court held only that the government was not required to pay for abortions from Medicaid funding.  It did not address selective targeting of the press.  The Court quoted the same language in upholding restrictions on the use of government funds.  *Rust v. Sullivan*, 500 U.S. 173, 193 (1991).  However, in *Rust*, "the government did not create a program to encourage private speech but instead used private speakers to transmit specific information pertaining to its own program."  *Rosenberger*, 515 U.S. at 833.  Here, Defendants disburse campus activity fees to encourage private speech.  In doing so, Defendants may not target the press.

1  Defendants are not acting in a proprietary capacity.  Instead, they are administering
2  a generally available program from which they have expelled the press.

3    Defendants cannot evade the merits by alluding to the number of student
4  press organizations or the amounts they have received.  First Amendment questions
5  do not turn on the amount in controversy.  As the Supreme Court has long held, "it
6  is proper to take alarm at the first experiment on our liberties."  *Sch. Dist. of*
7  *Abington Twp. v. Schempp*, 374 U.S. 203, 225 (1963).  Defendants' position cannot
8  be confined to the university context.  In any setting, university or otherwise, "the
9  very selection of the press for special treatment threatens the press not only with the
10  current *differential* treatment, but with the possibility of subsequent differentially
11  *more burdensome* treatment."  *Minneapolis Star*, 460 U.S. at 589 (emphasis in
12  original).  For example, a state or local government might disqualify the press from
13  receiving a critical tax exemption or direct grant otherwise available to businesses.
14  Defendants make a distinction without a difference by claiming the former violates
15  the Free Press Clause but the latter does not.  In both cases, governments can "use
16  these powers to threaten media entities," which is exactly what the Media
17  Disqualification does.  MTD at 24.  The Media Disqualification violates the Free
18  Press Clause.

19  **C. The Media Disqualification violates the Free Speech Clause by**
20  **selectively expelling the student press from a forum that remains**
   **open to other student organizations.**

21    The Free Speech Clause prohibits expelling the student press from a forum
22  that remains open to other student organizations.  Contrary to Defendants'
23  assertions, the relevant forum is funding for speech of all student organizations.
24  That forum remains open, because Defendants did not cut off all student
25  organizations, only a disfavored few.  Defendants cannot expel speakers for whom
26  the forum is designed, and the Media Disqualification was neither reasonable nor
27  viewpoint neutral.  The Student Government's motive is relevant, and *The Koala*
28  states a claim for retaliation.

1

**1. By university policy, the forum is funding for speech of all registered student organizations, and that forum remains open after expulsion of the student press.**

2

3      By the university's own definition, the relevant forum is funding for speech

4   of all registered student organizations, not merely "print publications."  MTD at 11.

5   University policy provides for the use of "campus-based student fees to support

6   Registered Campus Organizations and Registered Campus Organization-related

7   programs and activities" in order "to stimulate on-campus discussion and debate on

8   a wide range of issues from a variety of viewpoints."  UC Policy on Compulsory

9   Campus-Based Student Fees ¶ 86.20; *see also* UC Policy on Student Governments

10   ¶ 61.13 (student governments provide "financial and other tangible support for

11   student activities and organizations … to further discussion among students of the

12   broadest range of ideas."); UC Policy on Compulsory Campus-Based Student Fees

13   ¶ 86.30 (referring to "support of Registered Campus Organizations and Registered

14   Campus Organization-related programs and activities from compulsory campus-

15   based student fees").  The forum therefore includes all registered student

16   organizations, without limit.

17      While perhaps the government may "close a limited public forum," MTD at

18   13, that is not what Defendants did.  The Media Disqualification did not close the

19   forum, because it remains open to student speech.  *See* FAC ¶¶ 31, 72; *Demmon v.*

20   *Loudoun Cty. Pub. Sch.*, 342 F. Supp. 2d 474, 479 (E.D. Va. 2004) ("Closing a

21   forum entails removing all expressive activity and censoring all new speech.

22   The forum would have been 'closed' had the school removed all of the inscribed

23   bricks.  Accordingly, the Court holds that the Defendants have not sufficiently

24   'closed' the forum to render the case moot, because the bricks bearing the secular

25   symbols remain, while bricks from an allegedly religious viewpoint have been

26   excluded.") (citation omitted); *cf. OSU Student All.*, 699 F.3d at 1063 ("To destroy

27   the designation of a public forum, the government must … consistently apply a

28   policy specifically designed to maintain a forum as non-public.").  The Media

1  Disqualification expelled only the student press, not "all private parties," from the

2  forum.  MTD at 13.  Therefore, the forum remains open.

3      In noting that a forum definition "focuse[s] on the access sought by the

4  speaker," the Supreme Court did not assist Defendants in their attempt to

5  mischaracterize the relevant forum.  *Cornelius v. NAACP Legal Def. & Educ. Fund,*

6  *Inc.*, 473 U.S. 788, 801 (1985).  The issue in *Cornelius* was whether certain

7  advocacy organizations could enter the Combined Federal Campaign ("CFC") if

8  they were not "voluntary, charitable, health and welfare agencies that provide or

9  support direct health and welfare services."  *Id.* at 795.  The Court held "the

10  relevant forum" was the CFC.  *Id.* at 801.  Here, the "access sought" by *The Koala*

11  is to resume participating in the campus activity fee program in which it long

12  participated, from which the student press was recently expelled.  FAC ¶¶ 36, 66,

13  73.  The "relevant forum" is therefore the campus activity fee program, which

14  remains open.

15          **2.  The government may not selectively expel speakers from a**
             **forum designed for their speech.**

16

17      Though campus activity funding is a limited public forum, *Rosenberger*, 515

18  U.S. at 829, Defendants cannot selectively expel the student press from a forum

19  designed for the speech of student organizations.  As the Supreme Court has held,

20  the "constitutional right of access" to a limited public forum extends to "entities of

21  similar character" to those allowed to participate in the forum.  *Perry Educ. Ass'n v.*

22  *Perry Local Educators' Ass'n*, 460 U.S. 37, 48 (1983); *see also Ark. Educ.*

23  *Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998) ("If the government

24  excludes a speaker who falls within the class to which a designated public forum is

25  made generally available, its action is subject to strict scrutiny.").[5]  For example,

---

26  [5]  As used in *Forbes*, "designated public forum" includes a forum for student
groups.  523 U.S. at 679 ("[T]he government creates a designated public forum

27  when it makes its property generally available to a certain class of speakers, as the
university made its facilities generally available to student groups in *Widmar*.").

28  (Footnote continues on next page.)

                 16cv1296 JM (BLM)

while a school district may restrict access to the one union that currently represents teachers, it would not be allowed to exclude two unions that both represented teachers. *Perry*, 460 U.S. at 48. Therefore, "once a limited forum has been created, entities of a 'similar character' to those allowed access may not be excluded," in light of "the purpose of the limited forum." *Am. Civ. Liberties Union v. Mote*, 423 F.3d 438, 444 (4th Cir. 2005).

In particular, "a University may not exclude certain student speakers from meeting space or university funding otherwise available on a generalized basis to students and student groups." *Warren v. Fairfax Cty.*, 196 F.3d 186, 193–94 (4th Cir. 1999). Here, the forum exists to fund speech of student groups and foster debate. Because student media fall squarely within that definition and purpose, Defendants cannot expel them from the forum, even if the expulsion was not motivated by viewpoint.[6]

Defendants mistakenly rely on cases that concerned the content of individual publications, not the question whether the government may selectively expel speakers from a forum designed for their speech. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 270-71 (1988) (newspaper produced by journalism class was "supervised learning experience" rather than public forum, because it was "part of the school curriculum" and "a school may in its capacity as publisher" control content); *Planned Parenthood of S. Nev., Inc. v. Clark Cty. Sch. Dist.*, 941 F.2d 817, 819-20, 830 (9th Cir. 1991) (when school is acting "in its capacity as

---

(Footnote continued from previous page.)

Though the Court otherwise held such a forum is a "limited public forum," *Rosenberger*, 515 U.S. at 829, the principle remains the same regardless of terminology. *See Warren v. Fairfax Cty.*, 196 F.3d 186, 193 (4th Cir. 1999).

[6] This legal theory need not have been stated in the complaint, because it is based on the facts pleaded. *Johnson v. City of Shelby*, 135 S. Ct. 346, 347 (2014); *Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008). In any event, the Court must grant leave to amend if necessary.

publisher," newspapers and yearbooks "published as part of the school district curriculum" are not public forums, where school retained "editorial control"); *Husain v. Springer*, 494 F.3d 108, 126 (2d Cir. 2007) (nullification of student election improperly based on newspaper's viewpoint); *Kincaid v. Gibson*, 236 F.3d 342, 354-55 (6th Cir. 2001) (whether yearbook was "limited public forum" or "nonpublic forum," officials violated First Amendment by confiscating it).

Other cases cited by Defendants also did not address selective expulsion of speakers from a forum designed for their speech. *Am. Freedom Def. Initiative v. King Cty.*, 796 F.3d 1165, 1168 (9th Cir. 2015) (upholding rejection of advertisement under pre-existing "transit advertising policy"); *Seattle Mideast Awareness Campaign v. King Cty.*, 781 F.3d 489, 493 (9th Cir. 2015) (approving pre-existing "policy restricting advertising content") ("*SeaMAC*"); *Flint*, 488 F.3d at 836 (upholding expenditure limit in student election campaign); *Bloedorn v. Grube*, 631 F.3d 1218, 1225 (11th Cir. 2011) (upholding university policies regulating access and conduct of "outside, non-sponsored speakers"); *Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of Chi.*, 45 F.3d 1144, 1147 (7th Cir. 1995) (discussing forum status of "diorama display cases"); *Gay Guardian Newspaper v. Ohoopee Reg'l Library Sys.*, 235 F. Supp. 2d 1362, 1371 (S.D. Ga. 2002) (allowing library to "remov[e] all private speech from its lobby"). Here, by contrast, Defendants selectively expelled the student press from a forum designed to support student speech. By doing so, they violated the First Amendment.

### 3. The Media Disqualification is unreasonable because the student press serves the university's own purposes for a forum designed for student speech.

The expulsion of the student press from a forum designed for student speech was unreasonable "in light of the purposes served by the forum." *Rosenberger*, 515 U.S. at 829. Under the First Amendment, reasonableness "requires more of a showing than does the traditional rational basis test," and it is not sufficient that "the regulation is rationally related to a legitimate governmental objective, as might

be the case for the typical exercise of the government's police power." *Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204, 1215 (9th Cir. 1996) (holding "it is not reasonable to allow employees to post materials around the office on all sorts of subjects, and forbid only the posting of religious information and materials"). The Media Disqualification fails the First Amendment test for reasonableness, because student media serve the same purposes as student groups that continue to receive campus activity fees.

The Court need not second guess the university's "educational priorities" for "extracurricular activities." MTD at 22. The Media Disqualification is inconsistent with the university's own priorities. Like other groups funded by campus activity fees, *see* FAC ¶¶ 31, 72, the student press both "stimulate[s] on-campus discussion and debate on a wide range of issues from a variety of viewpoints," and "provide[s] opportunities for the educational benefits and personal and social enrichment that derive from participation in extracurricular programs and activities." UC Policy on Compulsory Campus-Based Student Fees ¶ 86.20. Defendants cannot invoke any "latitude in adopting a funding policy" when the Media Disqualification is inconsistent with the university's own policy. *Tipton v. Univ. of Haw.*, 15 F.3d 922, 926 (9th Cir. 1994). Therefore, it is unreasonable to expel the student press from a forum for which it fulfills the stated purposes as much as other student groups. *Cf. Transportation Alternatives, Inc. v. City of New York*, 218 F. Supp. 2d 423, 440 (S.D.N.Y. 2002) (striking down "different fees" for similar events as "irrational when measured against the asserted justification for the regulation").

To contend the Media Disqualification is "by definition reasonable," MTD at 21, is to assert a tautology that cannot undermine the First Amendment. *See OSU Student All.*, 699 F.3d at 1063 (rejecting as "circular" government's contention "that the policy placed a limitation on the forum, and that the limitation on the forum in turn justified the policy"). Nor can Defendants claim they were permissibly "redefining" the forum. Even making the doubtful assumption

Defendants could reasonably expel certain subject matter, such as race, from a forum designed for robust debate on numerous topics, that is not what the Media Disqualification does.  Instead, the Media Disqualification unreasonably expels certain speakers from a forum that remains open to other student speakers and unlimited as to subject matter.  The Media Disqualification remains unconstitutional no matter how it is characterized.

### 4. Under controlling precedent, the Media Disqualification is unconstitutional if motivated by viewpoint discrimination, notwithstanding its superficial neutrality.

The Media Disqualification was also unconstitutionally motivated by viewpoint.  The Supreme Court has foreclosed Defendants' contention that there is no "imperative under the Free Speech Clause to examine the government's motives" in this case.  MTD at 20.  As the Court recently confirmed, "facially content neutral" laws "will be considered content-based regulations of speech" if they "cannot be justified without reference to the content of the regulated speech" or "were adopted by the government because of disagreement with the message [the speech] conveys."  *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015); *see also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 645 (1994) ("[E]ven a regulation neutral on its face may be content based if its manifest purpose is to regulate speech because of the message it conveys."); *U.S. v. Swisher*, 811 F.3d 299, 313 (9th Cir. 2016) ("Laws that are facially content-neutral, but 'cannot be justified without reference to the content of the regulated speech, or that were adopted by the government because of disagreement with the message [the speech] conveys,' are also content-based.") (quoting *Reed*, 135 S. Ct. at 2227); *cf. Goldberg v. Town of Rocky Hill*, 973 F.2d 70, 75 (2d Cir. 1992) ("Developments in federal law over the last 30 years have tied the constitutionality of many types of municipal legislation directly to the purpose and motive of the legislators.") (citing free speech and equal protection cases).

The Court has applied that principle to a nonpublic forum and therefore a limited public forum.  *See SeaMAC*, 781 F.3d at 496 n.2 (same standards apply to limited and nonpublic forums).  In *Cornelius*, the Court held that ostensibly "reasonable grounds," if any, "for limiting access to a nonpublic forum … will not save a regulation that is in reality a facade for viewpoint-based discrimination," and superficially valid "justifications cannot save an exclusion that is in fact based on the desire to suppress a particular point of view."  473 U.S. at 811-12.  The Court rejected the government's contention that "a decision to exclude all advocacy groups, regardless of political or philosophical orientation, is by definition viewpoint neutral," because superficially valid "justifications cannot save an exclusion that is in fact based on the desire to suppress a particular point of view." *Id.*  The Court then remanded on "the issue whether the Government excluded respondents because it disagreed with their viewpoints."  *Id.* at 812.

By doing so, the Court destroyed Defendants' position that a superficially neutral "forum restriction" is immunized from review for viewpoint discrimination.  MTD at 15.  In *Cornelius*, the Court accepted that "the Government's posited justifications … appear to be reasonable."  473 U.S. at 811.  If superficial validity were sufficient, the Court's decision would have ended there.  But it did not.  Instead, the Court allowed plaintiffs to claim that their exclusion "was impermissibly motivated by a desire to suppress a particular point of view."  *Id.* at 812-13.  Therefore, *The Koala* may do the same in this case.

In making the blanket assertion that superficially "content-neutral speech regulations in nonpublic fora pass constitutional muster regardless of motive," MTD at 16 (quoting *Grossbaum v. Indianapolis-Marion Cty. Bldg. Auth.*, 100 F.3d 1287, 1299 (7th Cir. 1996)), Defendants needlessly push *Grossbaum* into conflict with *Reed* and *Cornelius*.  On its facts, *Grossbaum* does not go so far.  Instead, it is properly understood as a case about closing a forum, not selectively expelling speakers from a forum.  *Grossbaum* involved a forum for "exhibiting displays in

the lobby" of a government building.  100 F.3d at 1290.  After the court struck

down a rule against religious displays, the plaintiff challenged a policy "that

prohibits *all* private displays, religious or otherwise."  *Id.* (emphasis in original).

The policy "closed the forum to everyone" by "prohibit[ing] all private uses of the

lobby."  *Grossbaum v. Indianapolis-Marion Cty. Bldg. Auth.*, 909 F. Supp. 1187,

1189 (S.D. Ind. 1995), *aff'd*, 100 F.3d 1287 (7th Cir. 1996).  Therefore, *Grossbaum*

addressed closure of an entire forum, which is not the case here.  Instead, this Court

must follow *Reed* and *Cornelius*, which require examination of the government's

motive for any restriction on speech short of closing an entire forum.

　　　*Cornelius* cannot be plausibly ignored on the ground that "the government

was distinguishing among groups based on the content of their messages," while

the Media Disqualification is superficially content-neutral.  *Grossbaum*, 100 F.3d at

1298.  Any restriction on speech short of closing the forum is susceptible to abuse

as a "facade for viewpoint-based discrimination" and a means for "shutting out

some viewpoints."  *Id.*  For example, a Democrat in charge of a forum open to

multiple subjects might object to speech favoring Republicans and ban politics

from the forum to cover the targeting of Republicans.  To accept Defendants'

position would immunize such discrimination, which cannot be the case.  Instead,

*Grossbaum* must be limited to its facts of closing a forum.

　　　Other cases cited by Defendants are also irrelevant because they concerned

closure of an entire forum instead of selective expulsion from the forum.  *See, e.g.,*

*DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 970 (9th Cir.

1999) (referring to "closing the forum … the right to close a previously open forum

… close the forum"); *Sons of Confederate Veterans, Va. Div. v. City of Lexington,*

*Va.*, 722 F.3d 224, 231-32 (4th Cir. 2013) (city "closed a designated public forum

… to all private speakers.").  Defendants did not "exclude all private speech from

the limited public forum" of funding for registered student organizations.  MTD at

1   18.  Instead, they unconstitutionally expelled the student press from a forum that

2   remains open to other student groups.

3        Defendants find no comfort in *U.S. v. O'Brien*, 391 U.S. 367 (1968).  In that

4   case, the Court addressed only regulations of expressive conduct, such as burning a

5   draft card, in which "'speech' and 'nonspeech' elements are combined in the same

6   course of conduct."  *Id.* at 376.  *O'Brien* does not apply to restrictions on pure

7   speech such as "the written or spoken word."  *Tex. v. Johnson*, 491 U.S. 397, 406

8   (1989); *see also Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1059 (9th Cir.

9   2010) (*O'Brien* applies "less stringent test" to restrictions on "expressive conduct"

10  than "regulations of pure speech"); *U.S. v. Hamilton*, 699 F.3d 356, 369 (4th Cir.

11  2012) ("expressive conduct is not entitled to the same degree of protection under

12  the First Amendment as is pure speech").  Here, Defendants attacked the written

13  word by expelling the student press from a forum designed to support the speech of

14  student organizations.  Therefore, *O'Brien* does not apply, and the Court must

15  determine if the Media Disqualification was motivated by viewpoint discrimination.

16       In doing so, the Court inquires "into such circumstantial and direct evidence

17  of intent as may be available," as in any discrimination case.  *Esperanza Peace &*

18  *Justice Ctr. v. City of San Antonio*, 316 F. Supp. 2d 433, 451 (W.D. Tex. 2001)

19  (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252,

20  266 (1977)); *cf. Tanner v. McCall*, 625 F.2d 1183, 1193 (5th Cir. 1980) ("Although

21  *Arlington Heights* and *Davis* were equal protection cases, the same burden of proof

22  has been imposed in first amendment cases.").  The infliction of collateral damage

23  through overdiscrimination is no more a defense to viewpoint discrimination than

24  to racial discrimination.  In both cases, the government has attempted to cloak its

25  invidious purpose in disingenuous neutrality.

26       It is no answer to suggest motive is irrelevant to a "legislative enactment."

27  MTD at 19 n.10.  A student government is not a "legislature."  In disbursing

28  campus activity fees by delegation from the Regents under the Chancellor's

1   oversight, students act as functionaries, not legislators.  *See Flint*, 488 F.3d at 827

2   ("student officeholders are not the equivalent of elected political officeholders,"

3   because student government is primarily "an educational tool" and "a creature of

4   the Board of Regents," and although student government "has certain powers to

5   distribute funds among student groups, it simply does not follow that [student

6   government] is akin to a political government").  In any event, *Reed* forecloses the

7   assertion that motive is irrelevant to the constitutionality of the Media

8   Disqualification.  Because Defendants do not dispute that the facts pleaded make a

9   plausible case of viewpoint discrimination, the motion to dismiss must be denied.

10
11   ### 5.  The Media Disqualification amounts to retaliation against *The Koala* under cover of superficial neutrality.

12       The facts pleaded state a claim for retaliation as well as viewpoint

13   discrimination.  Even if "[o]therwise lawful," the Media Disqualification was

14   "unlawful if motivated by retaliation for having engaged in activity protected under

15   the First Amendment.  A state, division of the state, or state official may not

16   retaliate against a person by depriving him of a valuable government benefit that

17   that person previously enjoyed, conditioning receipt of a government benefit on a

18   promise to limit speech, or refusing to grant a benefit on the basis of speech," even

19   if the plaintiff "has no independent or affirmative right to that government benefit."

20   *Ariz. Students Ass'n*, 824 F.3d at 869 (citation and quotation marks omitted).

21       To claim such retaliation, the plaintiff must plead "(1) it engaged in

22   constitutionally protected activity; (2) the defendant's actions would 'chill a person

23   of ordinary firmness' from continuing to engage in the protected activity; and (3)

24   the protected activity was a substantial motivating factor in the defendant's

25   conduct—i.e., that there was a nexus between the defendant's actions and an intent

26   to chill speech."  *Id.* at 867.  The complaint easily meets that standard.

27       On the facts pleaded, *The Koala* engaged in protected speech that offended

28   the Student Government, which retaliated by disqualifying all student media from

1   campus activity fee funding to disguise its underlying intent to target *The Koala*.[7]
2   As the Ninth Circuit held, "the collection and remittance of funds is a valuable
3   government benefit, and a change in policy undertaken for retaliatory purposes that
4   results in the deprivation of those funds implicates the First Amendment." *Id.* at
5   870.   Defendants do not dispute "the complaint alleges plausible circumstances
6   connecting the defendant's retaliatory intent to the suppressive conduct." *Id.* at
7   870.  By stripping campus activity funding, the Media Disqualification created a
8   chilling effect "by threatening or causing pecuniary harm" or "withholding a
9   license, right, or benefit." *Id.* at 868.  *The Koala* "is not required to demonstrate
10  that its speech was actually suppressed or inhibited." *Id.* at 867.  Accordingly, *The
11  Koala* states a claim for retaliation in violation of the First Amendment.

## CONCLUSION

For the foregoing reasons, the Court is respectfully requested to deny the
motion to dismiss or in the alternative grant leave to amend.


Dated:  August 29, 2016                    Respectfully submitted,

                                           By:   **s/David Loy**
                                                 David Loy
                                                 davidloy@aclusandiego.org

                                                 Ryan T. Darby
                                                 Attorneys for Plaintiff

---

[7]  As explained above, *Grossbaum* is limited to forum closure, and its language
about "retaliation," 100 F.3d at 1295, does not apply to this case, in which
Defendants selectively expelled student media from a forum that remains open.