1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

| THE KOALA, | CASE NO. 16cv1296 JM(BLM) |
|---|---|
| Plaintiff, | ORDER GRANTING MOTION TO DISMISS |
| v. | |
| PRADEEP KHOSLA; DANIEL JUAREZ; and JUSTIN PENNISH, | |
| Defendants. | |

11

12

13

14

15

16      Defendants Pradeep Khosla, Daniel Juarez and Justin Pennish move to dismiss

17  the Second Amended Complaint ("SAC") for failure to state a claim.  Plaintiff The

18  Koala opposes the motion to dismiss.  Having carefully considered the court record,

19  pertinent legal authorities, and the arguments of counsel, the court grants the motion

20  to dismiss without leave to amend.

21                                           **BACKGROUND**

22  Introduction

23      Alleging that its First Amendment rights were violated, The Koala seeks

24  declaratory and injunctive relief to compel Defendants to provide/restore funding to

25  support their print media publication.  The Koala is an unincorporated, expressive

26  student association and registered student organization ("RSO") of the University of

27  California San Diego ("UCSD").  Defendant Pradeep Khosla ("Chancellor") is the

28  Chancellor of UCSD and responsible for the organization, operation, and internal

administration of the campus.  Defendant Daniel Juarez ("President") is the President of the Associated Students of UCSD ("Associated Students").  The Associated Students is the official student government for UCSD.  Defendant Justin Pennish ("Financial Controller ") is the Financial Controller of Associated Students and responsible for the allocation and expenditure of funds.  All Defendants are sued in their official capacities.  The Koala seeks "declaratory and injunctive relief to restore [its] eligibility to seek funding for [its print] publications."  Plaintiff's claims arise from the following generally described allegations.

The Associated Students

The Associated Students is a student government organization of UCSD.  The mission of the Associated Students is to "exercise the rights and responsibilities of students to participate in the governance of the University; to manage, invest and maintain the assets of the Association; to create and execute programs which serve the collective interests of the undergraduate population; and to advocate for students within the University, the community, the state, and the nation."  (Plaintiff's Request for Judicial Notice ("RJN"),  ¶¶ 5, 7).

UCSD collects campus activity fees from its students and allocates the income to Associated Students.  Following UCSD policy, Associated Students is to provide "financial and other tangible support for student activities and organizations … to further discussion among students of the broadest range of ideas," and "to stimulate on-campus discussion and debate on a wide range of issues from a variety of viewpoints."  The funding decisions "must be viewpoint-neutral in their nature; that is, they must be based upon considerations which do not include approval or disapproval of the viewpoint of the Registered Campus Organization or any of its related programs or activities."  (RJN ¶ 7).

The President and Financial Controller make initial funding recommendations to the legislative branch of the Associated Students, referred to as the Senate.  The Senate is tasked with representing "the interests and opinions of the UCSD

undergraduates" and is responsible for "writ[ing] and maintain[ing] the rules, policies and procedures." (RJN, No. 8, Art. VII, §4).

For the 2015-2016 academic year, budgeted revenues of Associated Students were about $3.7 million. Of that amount, the office of Student Organizations was allocated about $432,000. Prior to the Senate's November 18, 2015 amendment to the Standing Rules, RSOs like The Koala could receive up to a maximum of $1,000 per quarter for print media costs. The 2015-2016 budget contained a $17,000 line item for these printed media costs. The Funding Guide also noted that the receipt of funding was not guaranteed and that all media organizations "may not be fully funded in every circumstance for budgetary or other reasons." While ten or more RSOs requested print media funding between 2010 and 2013, for the Fall of 2015 only two RSOs applied for funding. Plaintiff was one of those and received $634 in funding for the Fall of 2015 and was approved for $453 for the Winter of 2016.

On November 18, 2015, the Senate, on a 22-2 vote, passed the Media Act. Among other things, the Media Act eliminated funding for all printed media, a funding source for RSOs like Plaintiff. It is this decision that gives rise to Plaintiff's request to restore or provide access to funding.

Plaintiff's Claims

The Koala, a satirical student newspaper at UCSD, publishes on average two to three publications per year. (Cart Decl. ¶2). The publications are available in print and on-line. According to Plaintiff, the publications's content has provoked significant controversy over the years. On November 16, 2015, Plaintiff published an article entitled "UCSD Unveils New Dangerous Space on Campus." (The "Safe Places Article"). The article satirized the concept of "safe places" on college campuses, referencing ethnic and sexist stereotypes and employing racial epithets. Following publication of the article, both on the internet and in print, UCSD received numerous comments and complaints about the article's perceived offensiveness. (SAC ¶¶67-76).

The Koala alleges that numerous individuals submitted "Bias Incident Report

Forms" complaining about the November 16th Safe Places Article. The reports cited by Plaintiff were uniformly critical of the Safe Places Article, generally citing the mocking, sexist, and racist language used in the Safe Places Article and urging that The Koala not be supported by UCSD. Id. On November 18, 2015, UCSD released a statement denouncing the publication and its use of "offensive and hurtful language." (SAC ¶73). At the Associated Students Legislative Committee ("Committee") meeting, held immediately before the general meeting on November 18, 2015, the Committee discussed the Media Act. At this meeting, officials with the Associated Students discussed whether print media publications should receive any funding and ultimately recommended passage of the Media Act. That evening, the Associated Students held its regular meeting where the Vice Chancellor of Student Affairs read the official statement denouncing The Koala for its article, several speakers objected to continued funding of The Koala, and Defendant Juarez supported the Media Act. The Media Act was then adopted by the Senate of Associated Students, eliminating funding for all print media publications. (SAC ¶¶76-81).

The Koala alleges that the passage of the Media Act "was substantially motivated by discrimination or retaliation against The Koala because of the viewpoint of its speech." (SAC ¶88). On November 19, 2015, various UCSD officials received notice that the Associated Students "adopted a blanket restriction on a type of student organization expenditure it will not fund. For example, some student governments do not accept funding requests for equipment, travel, and food. The student government at SDSU [San Diego State University] does not accept requests for publications. Last night, AS voted to do the same." (SAC ¶90).

After enactment of the Media Act, The Koala continued to publish both on social media and in print. The Koala spent $423 to publish in print its fall 2015 issue and $384 on the spring 2016 issue. (SAC ¶100). In light of the lack of funding for print media, The Koala represents that it will publish three, instead of six, issues per year. (SAC ¶101).

In broad brush, Plaintiff contends that the above generally described conduct states claims for (1) Violation of the First Amendment, freedom of the press; (2) Violation of the First Amendment, freedom of speech - expulsion from forum; (3) Violation of the First Amendment, freedom of speech - viewpoint discrimination; and (4) Violation of the First Amendment, freedom of speech - retaliation.  Plaintiff seeks declarative and injunctive relief to restore its eligibility to seek funding for its print publication.  Plaintiff also seeks to enjoin enforcement of the Media Act as well as an award of costs and attorney's fees pursuant to Fed.R.Civ.P. 54 and 42 U.S.C. §1988.

On November 1, 2016, the court denied The Koala's motion for preliminary injunctive relief and granted Defendants' motion to dismiss the complaint with leave to amend (the "Order").[1]  On November 15, 2016, The Koala filed the SAC and added the First Amendment retaliation claim.

## DISCUSSION

**Legal Standards**

Federal Rule of Civil Procedure 12(b)(6) dismissal is proper only in "extraordinary" cases. United States v. Redwood City, 640 F.2d 963, 966 (9th Cir. 1981).  Courts should grant 12(b)(6) relief only where a plaintiff's complaint lacks a "cognizable legal theory" or sufficient facts to support a cognizable legal theory. Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1990).  Courts should dismiss a complaint for failure to state a claim when the factual allegations are insufficient "to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (the complaint's allegations must "plausibly suggest[]" that the pleader is entitled to relief); Ashcroft v. Iqbal, 556 U.S. 662 (2009) (under Rule 8(a), well-pleaded facts must do more than permit the court to infer the mere possibility of misconduct).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. at 678.  Thus, "threadbare recitals of the elements of a cause of action,

---

[1] The court incorporates the Order as if fully set forth herein.

supported by mere conclusory statements, do not suffice." Id. The defect must appear on the face of the complaint itself. Thus, courts may not consider extraneous material in testing its legal adequacy. Levine v. Diamanthuset, Inc., 950 F.2d 1478, 1482 (9th Cir. 1991). The courts may, however, consider material properly submitted as part of the complaint. Hal Roach Studios, Inc. v. Richard Feiner and Co., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989).

Finally, courts must construe the complaint in the light most favorable to the plaintiff. Concha v. London, 62 F.3d 1493, 1500 (9th Cir. 1995), cert. dismissed, 116 S. Ct. 1710 (1996). Accordingly, courts must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them. Holden v. Hagopian, 978 F.2d 1115, 1118 (9th Cir. 1992). However, conclusory allegations of law and unwarranted inferences are insufficient to defeat a Rule 12(b)(6) motion. In Re Syntex Corp. Sec. Litig., 95 F.3d 922, 926 (9th Cir. 1996).

**The Eleventh Amendment**

Before turning to The Koala's First Amendment claims, the court must determine whether those claims are barred by the Eleventh Amendment. The Eleventh Amendment provides:

> "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

The Eleventh Amendment extends to suits by citizens against their own States. Board of Trustees of the Univ of Alabama v Garrett, 531 U.S. 356, 363 (2001). The ultimate guarantee of the Eleventh Amendment is that non-consenting States or their agencies may not be sued by private individuals in federal court. Id. Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and "act[s] pursuant to a valid grant of constitutional authority." Kimel v. Florida Bd. of Regents, 528 U.S. 62, 73 (2000).

Under the doctrine developed in Ex parte Young, 209 U.S. 123, 166 (1908),

actions brought against state officials to enjoin them from continuing to enforce allegedly unconstitutional state laws are not necessarily deemed actions against the state and are, therefore, not barred by the Eleventh Amendment.  The Supreme Court recognizes that the "general criterion for determining when a suit is in fact against the sovereign is the effect of the relief sought."  Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 107 (1984).  The doctrine rests on the premise, or "fiction," "that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes. The doctrine is limited to that precise situation, and does not apply 'when 'the state is the real, substantial party in interest [] as when the  'judgment sought would expend itself on the public treasury or domain, or interfere with public administration.'"  Id. "Naming state officials as defendants rather than the state itself will not avoid the Eleventh Amendment when the state is the real party in interest.  The state is the real party in interest when the judgment would tap the state's treasury or restrain or compel government action."  Almond Hill Sch. v. U.S. Dep't of Agric., 768 F.2d 1030, 1033 (9th Cir. 1985).

   "Ex parte Young cannot be used to obtain an injunction requiring the payment of funds from the State's treasury."  Virginia Office for Protection and Advocacy v. Stewart, 563 U.S. 247, 256-57 (2011).  Prospective financial consequences to the state are acceptable, and do not interfere with a state's Eleventh Amendment rights, where the fiscal effects "are necessarily incident to compliance with prospective orders." Almond Hill, 768 F.2d at 1034.  The Koala, in an artful effort to avoid the Eleventh Amendment bar, claims it simply seeks to restore its eligibility to seek funding for its print publication, (SAC ¶4), as if it is not really interested in tapping state funds. However, equity does not stoop to pick up pins, and this case is more than an academic exercise.  Here, Ex parte Young does not apply because The Koala seeks to directly tap the state treasury by requiring funds derived from the student activity fees to be allocated for its print media publication costs.

1    The court concludes, for the below stated reasons, that the Koala's First

2    Amendment rights were not violated by the passage of the Media Act, and that the

3    relief requested in the SAC constitutes a claim against the state treasury and

4    impermissibly interferes with the state's administration of UCSD.  Ex parte Young

5    does not apply under the circumstances of this case.  Accordingly, the court dismisses

6    the SAC for lack of jurisdiction under the Eleventh Amendment.

7        In sum, The Koala's claims are barred by the Eleventh Amendment.

8    **The First Amendment Claims**

9        The issue presented is whether the passage of the Media Act by the Senate of the

10   Associated Students, uniformly eliminating funding for all print media publications,

11   violated The Koala's First Amendment rights to freedom of speech or of the press.  The

12   court concludes that the Media Act does not violate The Koala's First Amendment

13   rights.[2]

14       The standard by which limitations on First Amendment rights are evaluated

15   depends on the character of the forum at issue.  Perry Educ. Ass'n v. Perry Local

16   Educators' Ass'n, 460 U.S. 37, 46 (1983).  The Supreme Court "has adopted a forum

17   analysis as a means of determining when the Government's interest in limiting the use

18   of its property to its intended purpose outweighs the interest of those wishing to use the

19   property for other purposes." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473

20   U.S. 788, 800 (1985).  The court initially looks to the nature of the forum to balance

21   the government's interest against the rights granted by the First Amendment.

22       While the parties dispute the precise definition of the relevant forum for

23   purposes of a First Amendment analysis, both parties assert that the forum is a limited

24   public forum.[3]  In a limited public forum, the government is not obligated to allow

25

26       [2] There is no dispute amongst the parties that The Koala, a RSO, was engaged
27   in protected speech by publishing the Safe Places Article.

28       [3] The court notes that Plaintiff describes the relevant form as a "limited public
     forum," (SAC ¶29), and proposes to define the forum as one "to support the speech of
     registered campus organizations." (Oppo. at p.17:4-5). The court further notes that the

persons to engage in every type of speech.  Good News Club v. Milford Central School, 533 U.S. 98, 106(2001).  Rather, the government may create a limited public forum for "use by certain groups or dedicated solely to the discussion of certain subjects." Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 470 (2009); Good News Club, 533 U.S. at 102–03 (finding that a public school created a limited public forum when it opened its building after hours for public meetings, subject to the permission of the administration). The government may restrict speech in a limited public forum as long as the restrictions do "not discriminate against speech on the basis of viewpoint" and are "reasonable in light of the purpose served by the forum." Id. at 106–07; Seattle Mideast Awareness Campaign v. King Cty., 781 F.3d 489, 499 (9th Cir. 2015) (Unlike a traditional or designated public forum where government action must be narrowly tailored to serve compelling state interests, government actions in a limited public forum only need to be "reasonable in light of the purpose of the forum.").  To identify the relevant limited public forum for purposes of a First Amendment analysis, the court focuses "on the access sought by the speaker." Cornelius, 473 U.S. at 801.  As Plaintiff seeks to restore access for print media funding, the court agrees with Defendants that, based upon the SAC's allegations, the relevant forum consists of Associated Students' funding of student print publications.

Having defined the limited public forum at issue, the court looks to the actions taken to close the forum to all RSOs receiving print media funding.  "In a limited public forum, restrictions that are viewpoint neutral and reasonable in light of the purpose served by the forum are permissible." DiLoreto v. Downy Unif. Sch. Dist. Bd. of Ed., 196 F.3d 958, 965 (9th Cir. 1999) (citing Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 829 (1995)).  Rather than address the alleged restrictions in the context of viewpoint neutrality and reasonableness, Plaintiff largely responds "that it is unreasonable to expel student print publications from a forum

precise definition is less determinative than whether the Media Act is viewpoint neutral and reasonable in light of the purpose of the forum.

16cv1296

designed to support student speech, because student print publications serve precisely the same purposes as other groups that continue to receive campus activity fees." (Oppo at p.17:16-19).  This case is unlike <u>Rosenberger</u> where the university provided student activity funds for numerous campus publications but not to Christian-themed publications. The Supreme Court found that the government in a limited public forum may not engage in viewpoint discrimination, "an egregious form of content discrimination."  515 U.S. at 829.

Here, there is no doubt that the elimination of funding for all print publications is viewpoint neutral.  As noted in <u>Perry</u>, other than a traditional public forum, the "state is not required to retain the open character of the facility." 460 U.S. at 46; <u>DiLoreto</u>, 196 F.3d at 970 ("The government has an inherent right to control its property, which includes the right to close a previously open forum."); <u>Currier v. Potter</u>, 379 F.3d 716, 728 (9th Cir. 2004) (in the case of a designated public forum, the government may close the forum whenever it wants).  The Associated Students could close the forum whenever it decided to do so.  Furthermore, the budgetary determinations and priorities set by the Associated Students, as reflected in the Media Act, appear reasonable in light of its mandate to (1) provide students with the educational benefits of participating in student government; (2) provide a forum for the discussion of issues and ideas of interest to students; (3) provide financial and other tangible support for student activities and organizations on a viewpoint-neutral basis in order to foster a sense of community and to further discussion among students of the broadest range of ideas; (4) communicate the views of the students.  (Plaintiff's Exh. 1, §61.10).[4]

The Koala also argues that the First Amendment dictates that it cannot be excluded from the receipt of funding because Associated Students provide funding to other student groups.  This argument is not persuasive.  In constructing this argument,

---

[4] It is not the role of the court to substitute its judgment about budgetary matters for that of the Senate of the Associated Students.  That is particularly true where the public entity maintains the discretion to close a limited public forum.  <u>See DeLoreto</u>, 196 F.3d at 970 ("The government has an inherent right to control its property, which includes the right to close a previously open forum.").

The Koala contends that the limited public forum at issue should be defined as the funding of all campus organizations that support events, concerts, initiatives, newspapers, or other forms of speech.  (Oppo. at p.12:3-11; SAC ¶ 31; Exh. 5).  Such an expansive definition of the forum is not supported by the SAC's allegations. Plaintiff directly attributes the alleged harm suffered by the Koala to the Media Act, and not some other source.

The Koala heavily relies on Cornelius in arguing that the relevant limited public forum consists of all student expressive organizations.  In doing so, The Koala hopes to avoid the consequences of a forum closure analysis predicated upon a forum limited to student print publication.  In Cornelius, the Supreme Court decided whether the federal government violated the First Amendment right to speech when it excluded legal defense and political advocacy organizations from participating in the Combined Federal Campaign ("CFC"). The CFC, by Executive Order, was a charity drive aimed at federal employees and participation in the CFC was limited to organizations that provided direct health and welfare benefits to individuals.  The CFC was an annual drive conducted in the workplace through volunteer federal employees distributing literature and information for making charitable contributions.  Participating organizations limited their fundraising efforts to a 30-word statement submitted for inclusion in CFC literature distributed to federal employees.

Initially, the Cornelius court had to define the relevant forum: whether the forum was defined as the federal workplace, as urged by the excluded organizations, or the CFC.  The Supreme Court held that because the excluded organizations sought access to the CFC, the CFC was the relevant forum, observing that when limited access is sought "a more tailored approach to ascertaining the perimeters of a forum within the confines of . . . government property [is appropriate]."  473 U.S. at 801.[5]  Cornelius does not support The Koalas's argument that the limited public forum here is greater

---

[5] Ultimately, the Supreme Court held the respondent organizations were properly excluded from the limited public forum using a reasonableness standard.

than student print media publication.  The Koala seeks funding for its print publications through this action and nothing more.  It is not seeking to carve out a physical location on campus for a reading of its publication or to participate in a speakers' bureau.  It is not seeking charitable contributions on campus or endorsement of any point of view. It is merely seeking the restoration of a modest sum of money derived from student activity fees to subsidize its print publications.  The relevant forum has thus been defined and consists of Associated Students' funding of student print publications.

The Koala also appears to argue that Rosenberger and Tucker v. State of Cal. Dep't of Educ., 97 F.3d 1204, 1215 (9th Cir. 1996) require a finding of something more than "reasonableness" when restricting speech in a forum that goes beyond the traditional rational basis test. (Oppo. at p.17:7-15).  As applied to the present case, the argument is not persuasive.  Rosenberger and Tucker are both viewpoint discrimination cases that do not turn on the reasonableness of the discrimination.  In Rosenberger, the defendant university provided student activity funding to numerous student publications but not to Christian themed publications.  As noted by the Supreme Court, such "viewpoint discrimination [] is presumed impermissible." 515 U.S. at 829.  Here, in contrast, the denial of funding for all print publications applies across the board, without regard to viewpoint or content.

In sum, the court concludes that the Media Act does not violate the Freedom of Speech clause of the First Amendment.  The court dismisses the First and Second causes of action without leave to amend.

**Motivation**

At the heart of The Koala's complaint is the allegation that the adoption of the Media Act "was substantially adopted by discrimination or retaliation against The Koala because of the viewpoint of its speech." (Oppo. at p.5:3-5).  In support of this argument, The Koala relies upon numerous negative comments made by the public, students, and individuals associated with UCSD to support its claims.  For example, an unidentified complaint received by UCSD stated "The Koala is a newspaper that is

solely meant to cause hatred. . . . Stop the Koala," (SAC ¶61); the Vice chancellor for Equity, Diversity, and Inclusion stated, prior to publication of the Safe Places article, that The Koala crossed the free speech line and that she would like "to do something about it," (SAC ¶62); UCSD received numerous complaints to the effect that the Safe Places article published by The Koala is "explicitly racist," UCSD needs to stop funding The Koala, the Safe Places Article is racist and sexist, The Koala "is ruining the campus climate and making me and other students feel unsafe," "defund the Koala," UCSD is not overseeing The Koala's hateful rhetoric, (SAC ¶67); one student requested that UCSD "cease funding for this awful publication," (SAC ¶71); and Defendant Juarez spoke in favor of the Media Act, (SAC ¶¶82, 85).

While The Koala repeatedly refers to comments of the public, students, and UCSD related individuals as motivation for enactment of the Media Act, there is a paucity of allegations that any Associated Student Senator was motivated to support or oppose passage of the Media Act because of such negative comments. UCSD President Suvonnasupa is alleged to have stated at the time of the legislative committee meeting on November 18, 2015, "The question is do we fund media at all? It expresses an opinion of that group. Should student fees be used to fund these events?"; Defendant Juarez stated "Objectivity does not exist, I'm really upset what has come out of this publication;' Senator Roberts stated, "We nix them now does not mean that others who are funded by this cannot find alleyways to find different ways of funding. But we should nix this media funding now;" Senator Pennish stated, "I think alternative funding needs to be secured. It shouldn't be to pull funding away because some groups benefit and are positive to the campus;" Senator Hunter stated: "Is there a way to receive a list of current orgs who use this funding? By cutting media funding, we will also be cutting other publication. To say it was allocated in funding and back out, it won't look good on our point;" and Senator Vu stated: "Campus climate has gotten so bad across the country. I feel like this should happen so we can represents our

1   constituents." (SAC ¶85).[6]

2       Assuming the truth of these allegations and reasonable inferences derived from

3   the allegations, as this court must, the court concludes that the motivation of the

4   Associated Students in enacting the Media Act does not invalidate a content-neutral

5   regulation of speech in a limited public forum.  In Grossbaum v. Indianapolis-Marion

6   Cty. Bldg. Auth., 100 F.3d 1287 (7th Cir. 1996) ("Grossbaum II"), the Seventh Circuit

7   confirmed the constitutionality of a municipal policy that prohibited all private

8   displays, religious or otherwise, in the lobby of a municipal building.  One year earlier,

9   in Grossbaum v. Indianapolis-Marion Cty. Bldg. Auth., 63 F.3d 581 (7th Cir. 1995)

10  ("Grossbaum I"), the Seventh Circuit, in a dispute between the same parties, concluded

11  that the then existing municipal policy prohibiting religious displays but not other

12  forms of private displays violated the First Amendment's Free Speech Clause.

13  Grossbaum II, 100 F.3d at 1290.

14      In Grossbaum II, plaintiff alleged a claim of retaliation and viewpoint

15  discrimination under the First Amendment.  To support his claim for unconstitutional

16  motive, plaintiff demonstrated that the new policy was enacted in response to

17  Grossbaum I and argued that the new policy was a pretext for viewpoint discrimination

18  (while the stated purpose of the new policy was to avoid disrupting lobby traffic, there

19  was no history of the displays disrupting traffic), based upon the statements of

20  municipal board members whose intent was to ban all religious displays.

21      The Seventh Circuit analyzed the role motive plays under various constitutional

22  provisions and persuasively concluded that in a First Amendment Free Speech case

23  motive plays no role in assessing a content-neutral regulation of speech in a limited

24  public forum.  A content-neutral regulation is one that is both viewpoint-neutral and

25  subject-neutral.  Id. at 1297.  Noting that a content-neutral regulation makes no

26

27      [6] The court notes that these allegations do not show or suggest that "university
    officials colluded with student government to disqualify student newspapers from
28  seeking campus activity funds." (Oppo. at p.1:4-5).  Rather, the discussion revolved
    around whether media funding was justified for any of the few remaining RSO
    publications.

distinction based upon the communicative nature or impact of the speech, all viewpoints and subjects are treated equally.  The Seventh Circuit concluded that "content-neutral speech regulation in nonpublic fora pass constitutional muster regardless of motive." Id. at 1299.  This conclusion was supported by citation to Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753 (1995) wherein the Supreme noted that "content-neutral regulations are free from motive inquiries even in public forum cases" and further suggested in United States v. O'Brien, 391 U.S. 367, 383 (1968), where the Supreme Court noted that, in Free Speech Clause cases, "an otherwise constitutional statute [will not be found unconstitutional] on the basis of an alleged illicit legislative motive."

The Koala argues that the Media Act violates the First Amendment because it was singled out as the target of the Media Act and members of the community and UCSD related individuals lambasted the Safe Places Article as racist and sexist, thereby establishing that the Media Act is a content-based regulation of speech.  The Koala erroneously relies upon Cornelius for the proposition that assertion of "reasonable grounds," if any, "for limiting access to a nonpublic forum . . . will not save a regulation that is in reality a facade for viewpoint-based discrimination," and superficially valid "justifications cannot save an exclusion that is in fact based on the desire to suppress a particular point of view." 473 U.S. at 811-12.  The difficulty with this argument is that Cornelius is a viewpoint discrimination case, not a content-neutral case.

In sum, the court grants the motion to dismiss the First and Second causes of action without leave to amend.

**Retaliation**

The SAC alleges that Defendants violated The Koala's First Amendment rights when Defendants eliminated funding for print publications in retaliation for its publication of the Safe Spaces Article.  This claim fails for several reasons.  First, as discussed in Grossbaum II, permitting a retaliation claim under the present

circumstances would unreasonably extend the retaliation doctrine.  100 F.3d at 1294-95.  While a First Amendment retaliation claim generally depends on motive, in Free Speech cases the "Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."  O'Brien, 391 U.S. at 383.

Second, recognizing a retaliation claim based on a content-neutral regulation would significantly chill the rights of the citizenry and interested parties from commenting upon or proposing legislation, rules, or policies.  In virtually every local, state, and federal jurisdiction where regulations are proposed and adopted by legislative, regulatory, or administrative bodies, the public and interested parties make wide-ranging comments -- some illuminating and helpful, and others not.  To invalidate a content and viewpoint neutral rule or policy based upon negative comments of the public or interested parties made prior to the adoption of the regulation would undermine the "the fundamental importance of the free flow of ideas and opinions on matters of public interest."  Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 50 (1988).  Rather than promoting the free flow of ideas embodied in the First Amendment, regulators and legislators would be incentivized to limit participation and dissent and entertain only one-sided views concerning proposed legislation.  Otherwise, even the most beneficial regulation or policy could fail because of negative, hateful, or spiteful comments made by concerned or interested parties.

Finally, The Koala's reliance on Ariz. Students' Ass'n v. Ariz. Bd. Of Regents, 824 F.3d 858, 867 (9th Cir. 2016) to establish a First Amendment retaliation claim is misplaced.  Ariz. Students is a straight-forward First Amendment retaliation case that does not involve the reallocation of public funds or use of public property.  The primary purpose of the Arizona Student's Association ("ASA') is political, that "is to advocate for the affordability, accessibility, and quality of public higher education in Arizona."  Id. at 862.  The Arizona Board of Regents ("ABOR") is a state board whose members are appointment by the Governor.  In 1998 students at Arizona's three public universities voted to impose a $1 per semester fee on themselves to support ASA's

1  advocacy efforts.  The Regents agreed to collect the fee and pass it on to ASA.

2  Consistent with its mission, the ASA co-drafted and supported Proposition 204,

3  a state ballot initiative that would increase public funding for education.  The Governor

4  and the ABOR opposed Proposition 204.  The ABOR then voted to suspend collection

5  of the student activity fee in alleged retaliation of ASA's support of Proposition 204.

6  The ABOR's decision resulted in the loss of ASA's only source of income.  The Ninth

7  Circuit concluded that ASA stated a retaliation claim because (1) the ASA engaged in

8  a protected activity; (2) the elimination of all funding by ABOR made it impossible to

9  continue its activities; and (3) ASA's support for Proposition 204 was the reason for

10 the deprivation of funds.[7]

11 The First Amendment retaliation test identified in Ariz. Students does not apply

12 to the present case for two reasons.  First, the Media Act reflects a content neutral

13 policy of general applicability affecting all RSOs seeking media publication funds.[8]

14 In Ariz. Students, ABOR specifically targeted a funding source only available to ASA,

15 and no other student-related organization.  ASA was singled out for special treatment

16 when ABOR suspended collection of the ASA fee. In broad brush, "courts will not

17 sustain a retaliation claim where a plaintiff challenges only the enactment of a

18 prospective, generally applicable rule."  Grossbaum II, 100 F.3d at 1295.  As noted by

19 the Seventh Circuit:

20         Executive and legislative branches of government must not be paralyzed
           by the prospect of a retaliation claim (and the attendant fact-based motive
21         inquiry whenever they make new policy that is arguably in response to
           someone's speech or lawsuit. Suppose, for example, that a group of drug
22         addicts successfully sues to get disability benefits for their addiction and
           Congress subsequently amends the law to prohibit benefits to drug
23         addicts. No one would reasonably suggest that Congress's motives would

24         _____

25         [7] "To bring a First Amendment retaliation claim, the plaintiff must allege that (1)
           it engaged in constitutionally protected activity; (2) the defendant's actions would "chill
26         a person of ordinary firmness" from continuing to engage in the protected activity; and
           (3) the protected activity was a substantial motivating factor in the defendant's
27         conduct—i.e., that there was a nexus between the defendant's actions and an intent to
           chill speech." Ariz. Students, 824 F.3d at 858.

28         [8] Approximately ten RSOs received funding for printed media costs between
           2010 and 2013, and two RSOs for Fall 2015.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

then be subject to a retaliation inquiry just because it acted in response to the addicts' success in the courts.

Id. The remedy for the unequal application of a statute, rule or policy impacting speech is a First Amendment retaliation claim. However, the remedy available to challenge the substance of the statute, rule, or policy is to bring a facial challenge, like The Koala has here. Id.; see Planned Parenthood of Kan. & Mid-Missouri v. Moser, 747 F.3d 814, 842 (9th Cir. 2014) (citing Bogan v. Scott-Harris, 523 U.S. 44 (1998) ("[T]he Supreme Court has reiterated in the context of a First Amendment retaliation claim that a court cannot inquire into a legislator's motives.")). "In other words, retaliation doctrine protects citizens against those individualized, discretionary government actions where the government's coercive power is greatest, not against government rules that affect both majority and minority alike." Grossbaum II, 100 F.3d at 1296.

Second, ABOR's conduct in refusing to collect the fees that the students imposed on themselves to fund the political and educational efforts of ASA hindered ASA's ability to disseminate its message. Here, in contrast, The Koala continues to publish on the internet and has issued at least two printed publications since the Media Act eliminated funding for print media. In light of the viewpoint neutral and universal applicability of the Media Act to RSOs, The Koala fails to state a claim for retaliation under the First Amendment.

In sum, the court dismisses the Fourth Cause of Action for retaliation without leave to amend.

**The Free Press Claim**

The Koala contends that Defendants violated the Free Press Clause of the First Amendment by eliminating funding for print media publications. In constructing its argument, The Koala contends that the selective taxation and selective disqualification from revenue cases provide compelling authority that the Senate of Associated Students cannot uniformly reduce or eliminate funding for print media publications. This argument is unavailing.

The Supreme Court has applied the Free Press Clause in striking discriminatory

taxes and other laws that impose special financial burdens on the media.  In <u>Minnesota Star &Tribune Co. v. Minnesota Commr. of Revenue</u>, 460 U.S. 575 (1983) the Star Tribune challenged a use tax implemented by the State of Minnesota in 1971.  The use tax applied to the cost of paper and ink products consumed in the production of a publication.  The Supreme Court held that a "tax that burdens rights protected by the First Amendment cannot stand unless the burden is necessary to achieve an overriding governmental interest."  <u>Id.</u> at 582.  There, unlike a sales tax, the use tax "singled out the press for special treatment."  <u>Id.</u>  While acknowledging that any tax imposes some burden on the press, the Supreme Court emphasized that cases involving economic regulation of the press survive scrutiny only where such regulation is of general applicability to all business.   The concern about the freedom of the press and assessment of taxes dates back to the time of the Federalist papers.  The Supreme Court noted the well-founded fear of special use taxes on the press:

> A power to tax differentially, as opposed to a power to tax generally, gives a government a powerful weapon against the taxpayer selected. When the State imposes a generally applicable tax, there is little cause for concern. We need not fear that a government will destroy a selected group of taxpayers by burdensome taxation if it must impose the same burden on the rest of its constituency.

<u>Id.</u> at 585.[9]

Another authority relied upon by The Koala, <u>Pitt News v. Pappert</u>, 379 F.3d 96 (3rd Cir. 2004), addressed the constitutionality of a law that banned advertisers from paying for alcoholic beverage advertising in media affiliated with a university or college.   The Pitt News is a certified student organization at the University of Pittsburgh.   The Pitt News received approximately $17,000 a year from such advertising.  After enactment of the law, The Pitt News lost this source of funding and sought judicial relief.    Applying <u>Minnesota Star</u>, the Third Circuit held that the challenged statute was presumptively unconstitutional because it targeted and imposed special financial burdens on the media.  As such, the Commonwealth had to show that

---

[9] The Supreme Court noted that the motives of the legislature in passing the use tax were irrelevant to the First Amendment issues.  <u>Id.</u> at 585

the law was necessary to achieve '"an overriding government interest" and "an interest of compelling importance.'" Id. at 110-11 (quoting Minnesota Star, 460 U.S. at 585). As there was no showing that the statute was necessary to discourage underage drinking or abusive drinking, the statute did not pass constitutional muster.

The court concludes the Media Act does not raise the constitutional concerns identified in Minnesota Star and Pitt News because the Media Act is content neutral and applies uniformly to all RSOs. The Koala's argument that it cannot be deprived of funding where non-media print funding is available to other RSOs is, in essence, an argument that the First Amendment guarantees funding of print media. See Harris v. McRae, 448 U.S. 297, 317 n.19 (1980) ("A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity."). This is not the case where a tax was specifically levied on the press, or the university banned alcoholic advertising in college newspapers. See Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221, 228 (1987) (the rationale supporting the Free Press Clause cases repeatedly refer to the coercive power to tax and the legitimate role played by the Free Press Clause in shielding the press from the discriminatory exercise of the potentially destructive power to tax). The First Amendment provides measured protections against selective taxes, penalties, policies and regulations that threaten the press. The reallocation of funds under Media Act does not implicate such protections and fails to state a claim under the Free Press Clause.

In sum, the court grants the motion to dismiss all claims without leave to amend.

DATED:  February 28, 2017

_____
Hon. Jeffrey T. Miller
United States District Judge

cc:        All parties

16cv1296