

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

FILED

NOV 25 2019

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| THE KOALA, an unincorporated student association, | No. 17-55380 |
| Plaintiff - Appellant, | D.C. No. 3:16-cv-01296-JM-BLM U.S. District Court for Southern California, San Diego |
| v. | |
| PRADEEP KHOSLA, in his official capacity as Chancellor of the University of California, San Diego; et al., | **MANDATE** |
| Defendants - Appellees. | |

The judgment of this Court, entered July 24, 2019, takes effect this date.

This constitutes the formal mandate of this Court issued pursuant to Rule

41(a) of the Federal Rules of Appellate Procedure.

FOR THE COURT:

MOLLY C. DWYER
CLERK OF COURT

By: Craig Westbrooke
Deputy Clerk
Ninth Circuit Rule 27-7

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| THE KOALA, an unincorporated student association, | No. 17-55380 |
| *Plaintiff-Appellant*, | D.C. No. 3:16-cv-01296-JM-BLM |
| v. | |
| PRADEEP KHOSLA, in his official capacity as Chancellor of the University of California, San Diego; DANIEL JUAREZ, in his official capacity as President of the Associated Students of the University of California, San Diego; JUSTIN PENNISH, in his official capacity as Financial Controller of the Associated Students of the University of California, San Diego, | OPINION |
| *Defendants-Appellees.* | |

Appeal from the United States District Court
for the Southern District of California
Jeffrey T. Miller, District Judge, Presiding

Argued and Submitted June 8, 2018
Pasadena, California

Filed July 24, 2019

Before:  Raymond C. Fisher and Morgan Christen, Circuit Judges, and Edward F. Shea,[*] District Judge.

Opinion by Judge Christen;
Concurrence by Judge Fisher

## SUMMARY[**]

### Civil Rights

The panel reversed in part and vacated in part the district court's dismissal of a complaint in an action brought by *The Koala*, a registered student organization at the University of California, San Diego, alleging that the student government's passage of the Media Act, which eliminated registered student organization funding for all print media, violated *The Koala*'s First Amendment rights.

*The Koala* alleged that the student government passed the Media Act two days after *The Koala* published an article in its newspaper satirizing the concept of "safe spaces" and "trigger warnings" on college campuses.  The article generated numerous complaints from students and administrators and prompted the University to publicly denounce the article's offensive language.

---

[*] The Honorable Edward F. Shea, United States District Judge for the Eastern District of Washington, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

In reversing the district court's dismissal, the panel held that the Eleventh Amendment did not bar *The Koala*'s claims for prospective injunctive relief.  The panel held that accepting the allegations in the Second Amended Complaint as true, the Complaint did not run afoul of the sovereign immunity doctrine because *The Koala* sought only a return of eligibility to apply for funding, not an order directing the state to fund it.  Moreover, the panel noted that because the compulsory activity fees collected by the University are remitted to the associated student government for reallocation, the suit's outcome would not increase or decrease the overall financial burden on the state; it would affect only which student organizations could apply for student activity fees and, potentially, how the total student activity fund was distributed.

In vacating the district court's dismissal of the Free Press Clause claim, the panel held that where a complaint alleges that the State singled out the press by withholding a subsidy in response to disfavored speech, the complaint alleges a viable Free Press Clause cause of action.  The panel held that the Second Amended Complaint's Free Press Clause claim was sufficient to survive defendants' motion to dismiss because it alleged that the Media Act was passed for the express purpose of silencing a newspaper, *and* that defendants singled out *The Koala* for a disparate financial burden.

The panel vacated the district court's dismissal of *The Koala*'s freedom of speech claim, which alleged that defendants violated its First Amendment right to free speech by creating a limited public forum consisting of the student activity fund, and then closing a portion of the forum for the purpose of denying *The Koala* access to it.  The district court

determined that the media funds category of the student activity fund was a limited public forum that the University was free to close. The panel held that the student activity fund was the relevant forum for purposes of assessing the permissibility of defendants' actions and that the district court analyzed the sufficiency of *The Koala*'s complaint using an incorrect framework. The panel remanded for consideration of *The Koala*'s free speech claim in light of the panel's forum definition.

The panel held that the Second Amended Complaint sufficiently alleged a claim for First Amendment retaliation. The panel was unpersuaded by defendants' argument that the government's motive is irrelevant when it enacts a content-neutral rule of general applicability. First, the panel determined the Media Act discriminated based on the identity of the speaker because rather than applying to all registered student organizations, the Act applied only to media organizations and singled them out for disfavored access to student activity fee funding. Moreover, *The Koala* alleged that at least one other student organization continued to receive funding for its print media. Second, the panel held that it was bound by *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 864 (9th Cir. 2016), which emphasized that motive was a necessary element of a retaliation claim and which provided a framework for analyzing such a claim. Applying that framework, the panel held that *The Koala*'s article was clearly protected speech, the Media Act chilled *The Koala*'s speech and *The Koala* adequately alleged a nexus between its speech and the alleged retaliatory conduct.

Concurring in the result and in all but part II of the opinion, Judge Fisher would hold that the complaint,

irrespective of censorial motive, adequately alleged a claim under the Free Press Clause on the theory that the defendants singled out the press for disparate treatment.

## COUNSEL

John David Loy (argued), ACLU Foundation of San Diego & Imperial Counties, San Diego, California; Ryan T. Darby, The Law Office of Ryan T. Darby, San Diego, California; for Plaintiff-Appellant.

William John Carroll (argued), Matthew W. Callahan, and Jean-Paul P. Cart, Schiff Hardin LLP, San Francisco, California, for Defendants-Appellees.

Jean-Paul Jassy and Kevin L. Vick, Jassy Vick Carolan LLP, Los Angeles, California; Samantha Harris, Vice President of Policy Research, Foundation for Individual Rights in Education (FIRE), Philadelphia, Pennsylvania; Ilya Shapiro, Cato Institute, Washington, D.C.; for Amici Curiae Foundation for Individual Rights in Education and Cato Institute.

Judy Endejan and Garvey Schubert Barer, Seattle, Washington, for Amici Curiae the Student Press Law Center, American Society of News Editors, Associated Press Media Editors, Association of Alternative Newsmedia, College Media Association, First Amendment Coalition, Reporters Committee for Freedom of the Press, and Society of Professional Journalists.

## OPINION

CHRISTEN, Circuit Judge:

Plaintiff-Appellant *The Koala* is an unincorporated registered student organization ("RSO") at the University of California, San Diego ("UCSD") that publishes a newspaper featuring art and satirical writing. In 2015, *The Koala* published an article satirizing the concept of "safe spaces" on campus, generating numerous complaints from students and administrators and prompting UCSD to publicly denounce the article's offensive language. Two days later, the UCSD student government passed the Media Act, which eliminated RSO funding for all print media, including *The Koala*. In response, *The Koala* brought this action for declaratory and injunctive relief, alleging that the passage of the Media Act violated its First Amendment rights. Defendants moved to dismiss.

The district court concluded that *The Koala*'s lawsuit was barred by the Eleventh Amendment. Alternatively, it concluded that the Media Act did not violate the Free Press Clause of the First Amendment because the Act was content neutral, viewpoint neutral, and applied uniformly to all RSOs. The district court also dismissed *The Koala*'s Free Speech Clause claims on the merits, concluding that the media funds category of RSO funding was a limited public forum that UCSD was free to close. Finally, the district court ruled that *The Koala* failed to state a First Amendment retaliation claim because the court concluded that a facially neutral legislative enactment cannot be the basis for a claim of retaliation. *The Koala* appeals.

We reverse the district court's order, vacate its judgment, and remand for further proceedings consistent with this opinion.

## FACTUAL BACKGROUND

The Associated Students is the student government organization at UCSD. Students at UCSD pay compulsory student fees, and the university remits a portion to the Associated Students for reallocation to RSOs, creating a source of funding for various student activities. UCSD allows the Associated Students to distribute student activity funds, but the university mandates that the allocation be consistent with its educational policy goals. UCSD's Policy on Compulsory Campus-Based Student Fees states that "[t]he University's educational purposes are served when reallocations by [the Associated Students] . . . to support [RSOs] and [RSO]-related programs and activities are made: (1) to provide opportunities for the educational benefits and personal and social enrichment that derive from participation in extracurricular programs and activities; and (2) to stimulate on-campus discussion and debate on a wide range of issues from a variety of viewpoints."

The Associated Students distributes a funding guide explaining how to apply for student activity funding. For the 2015–16 academic year, the funding guide stated that the Associated Students' distribution guidelines were intended to "promote the equitable allocation of student fees and sustainable growth of student organizations[.]" The funding guide also explained that RSOs could request funding from seven different categories: (1) programming funds; (2) operating funds; (3) tournament and competition funds;

(4) annual event funds; (5) media funds; (6) interest-free programming loans; and (7) Associated Students grants.

The remaining sections of the 2015–16 funding guide were dedicated to explaining those categories. Under media funds, the guide stated that the Associated Students would allocate funding on a "content-neutral basis" and that neither the Associated Students nor UCSD would be "responsible for the content of student media publications."

According to the funding guide, RSOs like *The Koala* could receive up to $1,000 per quarter for media costs, and the Associated Students' budget earmarked $25,000 for RSOs seeking print media funding during the 2015–16 academic year.

In November 2015, *The Koala* published an article entitled "UCSD Unveils New Dangerous Space on Campus." The article satirized the concepts of "trigger warnings" and "safe places" on college campuses, employing ethnic and sexist stereotypes and racial epithets.

Following the article's publication, the Associated Students received numerous comments and complaints about its offensive language. The article also prompted students to file "Bias Incident Report Forms" with UCSD, which the administration redirected to *The Koala*. A different RSO suggested that the administrator who approved the newspaper's funding should resign, but a UCSD official explained that "[*The*] *Koala* gets no University funding[.] The Associated Students [funds] them. Pressure should [be] brought to that organization to end the madness." A representative of that RSO replied "this is news to me, we will get on it asap."

In the following days, UCSD released a statement by Chancellor Khosla that "strongly denounce[d] [*T*]*he Koala* publication and the offensive and hurtful language it cho[se] to publish." The statement described *The Koala* as "profoundly repugnant, repulsive, attacking[,] and cruel," notified readers that the UCSD administration did "not provide any financial support for [*T*]*he Koala*," and "call[ed] on all students, faculty, staff[,] and community members to join [the administration] in condemning [*The Koala*'s] publication and other hurtful acts."

The Associated Students held a regularly scheduled meeting on the same day the Chancellor issued his statement. The Vice Chancellor of Student Affairs attended the meeting and read Chancellor Khosla's statement, and a member of the Associated Students introduced the Media Act. Consideration of the Media Act was not listed on the Associated Students' agenda prior to the day of the meeting, but after some discussion and debate, it was approved. The Media Act eliminated the media funds category from the student activity funding available to RSOs.

*The Koala* lost $452.80 in campus activity fee funding when the Media Act was passed. The loss of funds prevented *The Koala* from publishing an issue planned for the 2015–16 winter quarter and three of the six issues planned for the remainder of the academic year. *The Koala* alleges that the Associated Students continues to provide financial support for at least one student-run, student-initiated newspaper, *The Collective Voice*.

*The Koala* continues to publish issues online, but it asserts several reasons why online publication is not a suitable alternative for publishing in print: (1) *The Koala* attracted

student artists prior to the Media Act because it was the only newspaper on campus that dedicated its cover to student artwork; (2) *The Koala* contends that it is now unable to offer artists the same control in digital format because end users can change the display, color, and shading; and (3) *The Koala* more easily reached its intended audience when it published in print because it distributed each paper issue on campus, by hand. In sum, *The Koala* contends that publishing online hinders its ability to reach and engage with its intended audience.

## PROCEDURAL BACKGROUND

*The Koala*'s initial complaint alleged that defendants are engaged in an ongoing violation of its First Amendment rights, and *The Koala* sought to enjoin them from "categorically refusing to provide campus activity fee funding for the publication of student print media[.]" *The Koala* moved for a preliminary injunction, and amended its complaint. Defendants moved to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6). The district court denied the motion for a preliminary injunction and granted defendants' motion to dismiss. In doing so, the court concluded that the Eleventh Amendment barred the amended complaint because a "request to provide/restore funding from the state" was "[a]t the heart" of *The Koala*'s claims. It acknowledged, however, that further amendment might correct this deficiency and granted *The Koala* leave to amend. The court also noted that although *The Koala*'s briefing argued a claim for retaliation under the First Amendment, the amended complaint did not actually include a retaliation claim.

*The Koala*'s second amended complaint ("SAC") is the operative pleading in this case.  It alleges that defendants are engaged in a continuing violation of the First Amendment's Free Press Clause because the Media Act impermissibly singled out and financially burdened the *The Koala*.  *The Koala*'s Free Speech Clause claim alleges that defendants created a limited public forum for the speech of all RSOs when they instituted a program allowing RSOs to apply for campus activity funding.  Because the Media Act expelled *The Koala* from this forum in response to the "Dangerous Space" article, *The Koala* contends that the Media Act amounted to viewpoint discrimination.  Finally, the SAC includes a First Amendment retaliation claim that the "Dangerous Space" article was a substantial motivating factor in the decision to defund print media.[1]

*The Koala* requested an injunction preventing defendants' continued enforcement of the Media Act, a declaratory judgment that defendants violated *The Koala*'s First Amendment rights, and an award of attorneys' fees and costs. Notably, in place of *The Koala*'s prior request for an order restoring activity funding, the SAC seeks only eligibility to apply for student activity funding.

---

[1] Although neither party appears to explicitly raise or develop this issue, we note that as a matter of policy the Associated Students "are official units of the University exercising authorities concerning student affairs by delegations from The Regents, the President, and the Chancellors[.]"  Thus, for the purposes of the present motion, the SAC pleads the requisite state action for each of *The Koala*'s First Amendment claims.  *See Gay & Lesbian Students Ass'n v. Gohn*, 850 F.2d 361, 365 (8th Cir. 1988) (finding state action where Student Senate was a "creation[] of the State" and university retained "final say over Senate funding decisions").

Defendants renewed their motion to dismiss, and the district court granted the motion with prejudice. *The Koala* timely appealed. We have jurisdiction under 28 U.S.C. § 1291, and we reverse the district court's order granting defendants' motion to dismiss and vacate the district court's judgment.

## STANDARDS OF REVIEW

We review de novo "a dismissal on the basis of sovereign immunity or for failure to state a claim upon which relief can be granted." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 864 (9th Cir. 2016).

When evaluating the sufficiency of a pleading under Fed. R. Civ. P. 12(b)(6), we review only the allegations in the complaint and any attachments or documents incorporated by reference. *See United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003). We "accept the complaint's well-pleaded factual allegations as true, and construe all inferences in the plaintiff's favor[.]" *Ariz. Students'*, 824 F.3d at 864. Ultimately, we must determine if these materials present "sufficient factual matter . . . to state a claim to relief that is plausible on its face." *OSU Student All. v. Ray*, 699 F.3d 1053, 1061 (9th Cir. 2012) (alteration in original) (internal quotation marks omitted).

## DISCUSSION

### I. The Eleventh Amendment does not bar *The Koala*'s claims.

The Eleventh Amendment provides that the power of the federal judiciary "shall not be construed to extend to any suit

in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Supreme Court has explained that this provision "stand[s]" for the "presupposition" that "each State is a sovereign entity in our federal system" and "that 'it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent.'" *Seminole Tribe of Fl. v. Florida*, 517 U.S. 44, 54 (1996) (quoting *Hans v. Louisiana*, 134 U.S. 1, 13 (1890)) (one alteration omitted). Thus, the Eleventh Amendment generally prevents a state and state government actors from being sued in federal court without the state's consent. *See Cardenas v. Anzai*, 311 F.3d 929, 934 (9th Cir. 2002).

Nevertheless, under the principle established in *Ex parte Young*, 209 U.S. 123 (1908), private individuals may sue state officials in federal court for *prospective* relief from ongoing violations of federal law, as opposed to money damages, without running afoul of the doctrine of sovereign immunity. *See Va. Office of Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254–55 (2011). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (alteration in original) (quoting *Idaho v. Coeur d'Alene Tribe of Id.*, 521 U.S. 261, 296 (1997)).

We applied this principle in *Arizona Students'*, a case involving claims similar to *The Koala*'s, and concluded that a public university's student government's First Amendment

"claim for prospective injunctive relief and related declaratory relief [was] not barred by sovereign immunity," even though the effect of the relief sought in that case would likely restore the student government's funding. 824 F.3d at 865.

Here, the district court acknowledged the exception to sovereign immunity established by *Ex parte Young* and its progeny but observed that "*Ex parte Young* cannot be used to obtain an injunction requiring the payment of funds from the State's treasury." (quoting *Stewart*, 563 U.S. at 256–57). Despite the fact that the SAC sought only restoration of *The Koala*'s eligibility to receive funds, the district court ruled that the Eleventh Amendment prohibited *The Koala*'s claims because it viewed the SAC as "an artful effort to avoid the Eleventh Amendment bar" and concluded that the SAC "seeks to directly tap the state treasury." We disagree for two reasons.

First, we are constrained to review only the allegations in the SAC and any documents attached to it or incorporated by reference, and we must accept all well-pleaded allegations as true. *See N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1094 (9th Cir. 2011). The implications of this rule lead to "the well-established doctrine that an amended pleading supersedes the original pleading." *Ferdik v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir. 1992). Thus, whether *The Koala* originally sought an injunction directing the restoration of funding is of no moment at this stage in the proceedings. We must accept as true that *The Koala* seeks only a return of eligibility to apply for funding, not an order directing the state to fund it. Accordingly, the SAC does not run afoul of the sovereign immunity doctrine. The express

relief requested by the SAC requires that we reverse the district court's order.

Second, even if the *The Koala*'s desired remedy would result in the return of its student activity fee funding, the rule announced in *Ex parte Young* allows federal jurisdiction where prospective relief remedying an alleged violation of federal law may result in the expenditure of state funds. *See Cardenas*, 311 F.3d at 938; *see also K.W. ex rel. D.W. v. Armstrong*, 789 F.3d 962, 974 (9th Cir. 2015) (holding that plaintiffs' request for injunctive relief was not barred by the Eleventh Amendment even though relief would require the state to "reinstat[e] social assistance benefits prospectively" because "the injunction d[id] not compensate class members for any loss of services that occurred prior to the date it was entered").

Finally, we note that the doctrine of sovereign immunity asks whether a state "will be legally required to satisfy any monetary judgment[.]" *Sato v. Orange Cty. Dep't of Educ.*, 861 F.3d 923, 929 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 459 (2017). That concern is not presented by the facts of this case because UCSD's existing policy requires that it collect a compulsory activity fee from each student and remit a percentage of the total to the Associated Students for reallocation to RSOs. The outcome of this lawsuit will not increase or decrease the overall financial burden on the state; it will affect only which RSOs may apply for student activity fees and, potentially, how the total student activity fund is distributed. We are satisfied that the relief *The Koala* seeks is consistent with the *Ex parte Young* doctrine and not barred by the Eleventh Amendment.

## II.    Freedom of the Press

*The Koala* argues that enforcement of the Media Act violates the First Amendment's Free Press Clause because it targets the student press for a financial burden. More specifically, *The Koala* contends that any state action that "singles out" the press by imposing a financial burden or withdrawing a previously allocated revenue source is unconstitutional unless there is a compelling government interest justifying the action. The SAC also alleges that the Media Act was "substantially motivated by discrimination" against *The Koala*, that UCSD implemented the Media Act just two days after *The Koala* published its "Dangerous Space" article, that it did so "in order to deprive *The Koala* of eligibility to seek campus activity fee funding," and that at least one other student-run newspaper continues to receive activity fee funding. Defendants counter that access to the student activity fund is more accurately characterized as a government subsidy than the imposition of a financial burden like a tax, and that the Media Act does not implicate the Free Press Clause because it is applied to all RSOs.

The Supreme Court has made clear that "the States and the Federal Government can subject newspapers to generally applicable economic regulations without creating constitutional problems," *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 581 (1983), but "[a]bsent a compelling justification, the government may not exercise its taxing power to single out the press." *Leathers v. Medlock*, 499 U.S. 439, 447 (1991). The rationale for this rule is not difficult to discern: "[a] power to tax differentially, as opposed to a power to tax generally, gives a government a powerful weapon against the taxpayer selected." *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 228 (1987)

(quoting *Minneapolis Star*, 460 U.S. at 585). Taxes that are "seen to be a deliberate and calculated device . . . to limit the circulation of information" or are enacted "with the plain purpose of penalizing the publishers" of newspapers are the most egregious example of this type of impermissible government censorship. *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250–51 (1936); *see also Leathers*, 499 U.S. at 453. In *Grosjean*, the Supreme Court held that the Louisiana legislature unconstitutionally burdened the press by enacting a law "with the plain purpose of penalizing" newspapers that had criticized Senator Huey Long, thereby "curtailing the[ir] circulation." *Id.*; *see also Minneapolis Star*, 460 U.S. at 580. The Supreme Court reaffirmed *Grosjean*'s holding in *Leathers*, reiterating that a tax violates the Free Press Clause if it is "directed at . . . particular ideas." 499 U.S. at 453.

Supreme Court case law establishes that it is sufficient to show the government acted with the intent to burden the press in order to plead a viable Free Press Clause claim, but it is not necessary to show invidious intent; where differential taxation of the press burdens the special interests protected by the First Amendment, it is presumptively unconstitutional. *See Minneapolis Star*, 460 U.S. at 585. The government must offer a "compelling justification" for a taxation scheme that, on its face, treats the press differently. *See Leathers*, 499 U.S. at 447. Indeed, in *Minneapolis Star*, the Court specifically disclaimed reliance on *Grosjean* because the record did not show that the government acted for the purpose of burdening the press. *See* 460 U.S. at 580. Nevertheless, because the Minnesota legislature enacted a use-tax exemption for print newspapers that resulted in one newspaper paying two-thirds of the revenue raised statewide, the Court found a violation of the Free Press Clause. *Id.* at

592 ("Illicit legislative intent is not the *sine qua non* of a violation of the First Amendment").[2]

In addition to Supreme Court cases addressing the imposition of taxes or the elimination of tax credits, the Third Circuit ruled more broadly that the government may violate the Free Press Clause if it imposes financial burdens on the press through other means. *See Pitt News v. Pappert*, 379 F.3d 96, 110 (3d Cir. 2004). In *Pitt News*, the state prohibited alcohol advertisements in media affiliated with universities, colleges, or other educational institutions, thereby depriving the student press of advertising income. *Id.* at 101–02. Pennsylvania argued the law was permissible because it did not impose a tax, *id.* at 111, but the Third Circuit disagreed. Building on *Leathers*, *Arkansas Writers'*, and *Minneapolis Star*, the Third Circuit concluded that the distinction between taxes and other financial burdens was immaterial because "[t]he threat to the First Amendment arises from the imposition of financial burdens that may have the effect of influencing or suppressing speech, and whether those burdens take the form of taxes or some other form is unimportant." *Id.* at 111–12.

Our concurring colleague suggests that we should end our legal inquiry here. Because the SAC alleges that defendants acted to single out *The Koala* for disfavored treatment, the concurrence concludes the SAC sufficiently alleges a Free

---

[2] Black's Law Dictionary defines "*sine qua non*" as follows: "without which not. An indispensable condition or thing; something on which something else necessarily depends." (11th ed. 2019).

Press Clause violation.[3]    But as the concurrence acknowledges, the Supreme Court has never applied the *Minneapolis Star* line of disparate taxation cases to a factual situation in which the government singled out a newspaper by withdrawing a subsidy, as opposed to imposing a tax. Defendants argue that the Court's Free Speech case law establishes a "fundamental distinction" between withholding government subsidies and the imposition of other financial burdens, like taxes.    The concurrence contends that we analyze the implications of the tax-subsidy difference *sua sponte*, but at the 12(b)(6) stage, the question is whether the SAC states a claim for which relief may be granted, and the legal distinction between subsidies and other forms of financial burdens was a centerpiece of the defendants' argument on appeal.    Specifically, they argue that the *Minneapolis Star* line of cases is inapplicable to *The Koala*'s Free Press Clause claim.

First, we agree that the government generally enjoys broad discretion in granting or denying subsidies.    The Supreme Court has said that "[a] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right."    *Rust v. Sullivan*, 500 U.S. 173, 192–93 (1991) (quoting *Regan v. Taxation With Rep. of Wash.*, 461 U.S. 540, 549 (1983)) (upholding conditions on Title X healthcare funds prohibiting providers from discussing "abortion as a lawful option"); *see also United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 212 (2003) (rejecting Free

---

[3] Though *The Koala* has not addressed it on appeal, the SAC alleges that the financial burden imposed upon *The Koala* was not limited to revocation of student activity funds.    The SAC also alleges that defendants denied *The Koala* access to a crowd-funding platform sponsored by UCSD.

Speech challenge to federal statute conditioning library funding on the installation of software that blocked pornographic websites, and observing "[a] refusal to fund protected activity, without more, cannot be equated with the imposition of a penalty on that activity." (internal quotation marks omitted)).

Though the Supreme Court has not addressed whether the withdrawal of a press subsidy violates the First Amendment, other Supreme Court case law teaches that the government can violate the First Amendment by withholding benefits for a censorious purpose, at least in the Free Speech Clause context. *See Regan*, 461 U.S. at 548 (finding no Free Speech Clause violation, but cautioning "[t]he case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to 'aim[] at the suppression of dangerous ideas.'") (second alteration in original) (quoting *Cammarano v. United States*, 358 U.S. 498, 513 (1959)). In *Cammarano*, the Court found no constitutional violation where the denial of a tax deduction for "sums expended to promote or defeat legislation was plainly not 'aimed at the suppression of dangerous ideas.'" 358 U.S. at 515 (quoting *Speiser v. Randall*, 357 U.S. 513, 518–19 (1958) (cautioning that withholding a tax exemption "to claimants who engage in certain forms of speech is in effect to penalize them for such speech."). Likewise, in *Perry v. Sindermann*, the Court warned that "if the government could deny a benefit to a person because of his constitutionally protected speech . . . [it] would allow the government to 'produce a result which [it] could not command directly.'" 408 U.S. 593, 597 (1972) (third alteration in original) (quoting *Speiser*, 357 U.S. at 526). Finally, though the Court found no First Amendment violation in *National Endowment for the Arts v. Finley*, the Court conspicuously continued to stake out the rule that the

government may not "leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints" that might "'ai[m] at the suppression of dangerous ideas[.]'" 524 U.S. 569, 587 (1998) (quoting *Regan*, 461 U.S. at 550) (first alteration in original). The *Speiser-Perry-Regan-Finley* line of cases reflects the Supreme Court's continued cautionary admonition that the First Amendment will not tolerate the administration of subsidy programs with a censorious purpose.

We see no reason why the rule articulated in the Free Speech cases cited above—that the government may not withhold benefits for a censorious purpose—should not apply when the state singles out and burdens the press by revoking a subsidy, particularly where, as here, the record includes unusually compelling allegations that the government acted with discriminatory intent.[4]

The concurrence contends that the *Minneapolis Star* line of cases, standing on their own, are enough to resolve this

---

[4] The Fourth Circuit explicitly found such a violation of the Free Press Clause in *Joyner v. Whiting*, 477 F.2d 456, 458 (4th Cir. 1973). *Joyner* considered whether the First Amendment precluded a college president from unilaterally revoking student activity fee funding earmarked for a student newspaper in response to a controversial editorial. *Id.* at 459–60. The court reasoned from the principle that "[a] college, acting 'as the instrumentality of the State, may not restrict speech . . . simply because it finds the views expressed by any group to be abhorrent.'" *Id.* at 460 (second alteration in original) (quoting *Healy v. James*, 408 U.S. 169, 180, 187 (1972)). The Fourth Circuit ruled that, "if a college has a student newspaper, its publication cannot be suppressed because college officials dislike its editorial comment[,]" *id.*, and held that "the president's irrevocable withdrawal of financial support from [the newspaper] . . . abridge[d] the freedom of the press in violation of the First Amendment." *Id.* at 458.

case without any consideration of defendants' censorious motivation—yet the concurrence acknowledges that this case presents "circumstances raising a strong suspicion as to the state's censorial motives." Concurrence at 46.[5]  Because the SAC so clearly alleges that defendants acted with a censorious purpose, we need not decide whether *Minneapolis Star*'s reasoning suffices.  The Supreme Court's subsidy cases provide a ready rule of decision: where a complaint alleges that the state singled out the press by withholding a subsidy in response to disfavored speech, the complaint alleges a viable Free Press Clause cause of action.

The SAC's Free Press Clause claim is sufficient to survive defendants' motion to dismiss because it alleges that the Media Act was passed for the express purpose of silencing a newspaper, *Grosjean*, 297 U.S. at 251, *and* that defendants singled out *The Koala* for a disparate financial burden, *Minneapolis Star*, 460 U.S. at 585; *see also Pitt News*, 379 F.3d at 110.  Although student activity fee funding can be likened to a subsidy, we conclude that the SAC sufficiently alleges a violation of the Free Press Clause, and we reverse the district court's order dismissing *The Koala*'s Free Press Clause claim.

## III.    Freedom of Speech

*The Koala* also argues that defendants violated its First Amendment right to free speech by creating a limited public forum consisting of the student activity fund, and then closing

---

[5] The concurrence argues that it would not compel the government to maintain subsidies once they are granted, but the only way the concurrence distinguishes this case is to point to strong evidence of censorious purpose.  *See* Concurrence at 45.

*a portion of the forum* for the purpose of denying *The Koala* access to it.   Defendants disagree about the scope of the limited public forum they created, and also argue that, however the forum's contours are defined, they were free to close it.   *See Seattle Mideast Awareness Campaign v. King Cty.*, 781 F.3d 489, 496 (9th Cir. 2015) [hereinafter *SeaMAC*] (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46 (1983)) (observing that the state may close a designated public forum "whenever it chooses").

"Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities."   *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800 (1985); *see Greer v. Spock*, 424 U.S. 828, 836 (1976) ("The guarantees of the First Amendment have never meant that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.") (internal quotation marks omitted).  The government, like any landowner, has the power to control access to its private property, *id.*, and courts will not entertain First Amendment challenges where there is no indication that the government intended to grant public access to a particular property.  *See Perry Educ.*, 460 U.S. at 47 ("If by policy or by practice the . . . School District ha[d] opened its mail system for indiscriminate use by the general public, then [plaintiff] could justifiably argue a public forum ha[d] been created . . . . [However,] there is no indication in the record that the school mailboxes and interschool delivery system are open for use by the general public.").

In keeping with these black-letter principles, we use a forum analysis to evaluate government restrictions on purely private speech that occurs on government property. *See Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018). We are concerned with three types of fora: (1) the traditional forum; (2) the designated public forum; and (3) the limited forum.[6] *See id.* The government's ability to restrict speech differs "depending on the character of the property at issue." *Perry Educ.*, 460 U.S. at 44.

Traditional public fora are defined as properties that by history and tradition have been open for public speech. *See SeaMAC*, 781 F.3d at 496. Traditional public fora include "parks, streets, sidewalks, and the like[.]" *Minn. Voters All.*, 138 S. Ct. at 1885. Designated public fora are properties that are not traditionally open for public speech, but the government has made them "'generally available' for 'expressive use by the general public or by a particular class of speakers.'" *SeaMAC*, 781 F.3d at 496 (quoting *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677–78 (1998)). Examples of designated public fora include university meeting facilities, school board meetings, and municipal theaters. *See Perry Educ.*, 460 U.S. at 45 (collecting cases). In both of these types of fora, the government may impose reasonable time, place, and manner restrictions on speech, but content-based restrictions must be viewpoint neutral and satisfy strict scrutiny review. *Minn. Voters All.*, 138 S. Ct. at 1885.

---

[6] In *SeaMAC*, we noted that fora in the third category have "sometimes been labeled 'nonpublic' forums" but concluded that "[t]he label doesn't matter, because the same level of First Amendment scrutiny applies to all forums that aren't traditional or designated public forums." 781 F.3d at 496 n.2 (internal citations omitted).

Both parties agree that, whatever its scope, the forum at issue in this case is a limited public forum.  The classic example of a limited public forum is a government property characterized by selective access based on the speaker or subject matter.  *See SeaMAC*, 781 F.3d at 497.  In this type of forum, the government may regulate speech so long as the restriction is reasonable and viewpoint neutral.  *Id*. at 496. The government creates limited public fora, and we have said that it may close such limited fora "whenever it chooses." *See id.*[7]

The parties in this case disagree about what constitutes the limited public forum.  *The Koala* contends that the relevant forum in this case is the total student activity fund available to RSOs.  It argues that the media funds category is merely an administrative device established by the Associated Students to facilitate its allocation of the total student activity fund.  *The Koala* reasons that the relevant forum should be defined by the policy pursuant to which the forum was created, and UCSD's Policy on Compulsory Campus-Based Student Fees unambiguously created a single funding program for the speech of all RSOs.  Defendants counter that the relevant forum is limited to the media funds category of the student activity fund, primarily because *The Koala* applied for that category of student activity fee funding.

---

[7] Although our observation that the government may close a limited public forum "whenever it chooses" is perhaps a stronger statement of the law than those embraced by our sister Circuits, it is consistent with cases from other Circuits holding that, just because the government opens a limited forum, it is not required to retain or maintain it indefinitely.  *See, e.g.*, *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 323 (D.C. Cir. 2018); *Verlo v. Martinez*, 820 F.3d 1113, 1129 (10th Cir. 2016); *Satawa v. Macomb Cty. R. Comm'n*, 689 F.3d 506, 517 (6th Cir. 2012).

Alternatively, defendants maintain that even if the relevant forum is defined as the total pool of student activity fee funds, the Media Act was a reasonable restriction on speech.

*Cornelius v. NAACP Legal Defense and Educational Fund*, 473 U.S. 788 (1985), is key to our analysis because it illustrates how the Supreme Court identifies the boundaries of fora that are not physical spaces. In *Cornelius*, two legal defense funds were denied access to a federal workforce charitable fundraising campaign established by a series of executive orders. *Id.* at 790–92. The campaign limited participation to charitable organizations that provided direct health and welfare services, and excluded those that participated in lobbying. *Id.* at 792–95. Because of these limits, the defense funds were not allowed to be designated as beneficiaries of the charitable campaign, and they challenged this restriction as a denial of their First Amendment rights. *Id.* at 793.

The government argued that the fundraising program was not a forum at all, because it was not a physical space. *Id.* at 800. Looking to the rule that had emerged from the Court's earlier case law, the defense funds argued that the forum should be defined by the space to which the speaker sought access. *Id.* at 801. Because the defense funds did not seek access to a physical work space—the defense funds wanted to be deemed eligible to receive employee donations in the charitable campaign, not access to federal office space—they argued that the relevant forum was the fundraising campaign itself. *Id.*

The Supreme Court agreed with respondents that the forum need not be a physical space and declared the charitable campaign to be the relevant forum. *Id.* But the

defense funds had also argued that the charitable campaign should be open to *all* types of charitable organizations, and the Court disagreed with that part of the funds' argument. *Id.* at 804. The Court determined the contours of the charitable campaign forum by looking to what the government intended when it created the campaign:

> in defining the forum we have focused on the access sought by the speaker. When speakers seek general access to public property, the forum encompasses that property. In cases in which limited access is sought, our cases have taken a more tailored approach to ascertaining the perimeter of a forum within the confines of the government property.

*Cornelius*, 473 U.S. at 801 (citing *Greer*, 424 U.S. at 836) (holding that Fort Dix, a military installation, was not a public forum)).

After considering the executive orders that created the campaign, the Court rejected the legal defense funds' contention that the government "created a limited public forum for use by all charitable organizations to solicit funds from federal employees" because "neither its practice nor its policy [was] consistent with [that] intent." *Id.* at 804.

Limited fora may be established through policy or practice, *see id.* at 791–93 (examining executive orders establishing charitable fund for federal workers); *see also Widmar v. Vincent*, 454 U.S. 263, 277 (1981) (concluding that a university created a limited public forum by adopting an express policy allowing its meeting facilities to be used by student groups), but the government does not create a limited

public forum by inaction. *See Cornelius*, 473 U.S. at 802. Here, as in *Cornelius*, we address "a forum more in a metaphysical than in a spatial or geographic sense[.]" *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995) (noting that a university student activity fund is a metaphysical forum). To define its contours, we consider the policy by which the forum was created. *See Cornelius*, 473 U.S. at 802. A limited public forum is a forum government has intentionally opened to certain groups or topics, *see id.*, and where there is an express policy, it establishes the nature and purpose of the forum.**[8]** *SeaMAC*, 781 F.3d at 497; *see Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 223, 230 (2000) (observing the University of Wisconsin created a forum for a student activity fund, and that it did so to "enhance the educational experience of its students [in a manner] consistent with the University's mission").

Because designated or limited public fora are by definition created by the state for particular purposes, *see, e.g.*, *Minn. Voters All.*, 138 S. Ct. at 1886 (concluding that a polling place is a limited public forum because it is "government-controlled property set aside for the sole purpose of voting"), it follows that where an express policy creates a metaphysical forum, the policy itself defines the forum's scope.

The allegations in the SAC, and in the documents incorporated by reference into the SAC, support the conclusion that defendants created a limited public forum

---

**[8]** In a related context, we have held that "[w]e look first to the terms of any policy the government has adopted to govern access to the forum" when determining the *type* of forum at issue. *SeaMAC*, 781 F.3d at 497.

encompassing all student activity funding, not one constrained to only media funds.  Most saliently, UCSD's policy goals for allocating student activity fees were: "(1) to provide opportunities for the educational benefits and personal and social enrichment that derive from participation in extracurricular programs and activities; and (2) to stimulate on-campus discussion and debate on a wide range of issues from a variety of viewpoints."  There is no UCSD policy statement that separately establishes the category of media funds, and although the Associated Students apportions the total available activity funds into seven categories, we are persuaded that these categories merely facilitate the grant approval process.  The guidelines to the Associated Students' allocation process explain how RSOs may apply for funding; they do not contain a separate statement of purpose for each category of funding.  In fact, UCSD mandates that the Associated Students' process for reallocating student fees be consistent with UCSD's overall educational policy goal of providing opportunities for the educational benefit of its students and stimulating on-campus discussion.  Because a limited public forum is one that "the government intentionally has opened to certain groups or to certain topics," *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 965 (9th Cir. 1999), and UCSD established a policy addressing all of the funds available for allocation by the Associated Students, we conclude the relevant forum is the student activity fund in its entirety.

This conclusion is consistent with the way the Supreme Court has defined fora in university settings.  *Rosenberger*, for example, concerned the University of Virginia's student activity fund, established "to support a broad range of extracurricular student activities that [were] related to the educational purpose of the University."  515 U.S. at 824

(internal quotation marks omitted).  The Court defined the entire student activity fund as limited public forum.  *Id.* at 830.  Similarly, in *Christian Legal Society v. Martinez*, the University of California, Hastings College of Law created a "Registered Student Organization" (RSO) program whereby RSOs were eligible to seek financial assistance from the law school, and the Court defined the relevant forum as Hastings' RSO program writ large.  561 U.S. 661, 669–70, 689 (2010).

Defendants' reliance on our ruling in *Flint v. Dennison*, 488 F.3d 816 (9th Cir. 2007), is misplaced.  In *Flint*, the plaintiff twice exceeded the spending cap for a student government election and was removed from office.  *Id*. at 822.  The plaintiff then brought a complaint against the university alleging the spending cap was an unconstitutional abridgment of free speech.  *Id.*  We defined the relevant forum as the student election rather than the entire university campus after reviewing the student government's Constitution and bylaws and determining that the student government bylaws specifically created a separate student election forum to provide "an educational experience for the student candidates and student voters."  *Id*. at 833.  Here, UCSD's written policy memorializes its intent to broadly fund activities that serve its educational mission by facilitating participation in extracurricular programs and activities, and stimulating on-campus discussion and debate.

Defendants argue that the Media Act amounts to a forum closure of the media funds category, and that they were free to close this limited forum.  We agree that a government is not obligated to indefinitely maintain a limited public form, *see SeaMAC*, 781 F.3d at 496, but we know of no case in which the government has been allowed to define a forum one way at its inception, then redefine it in response to speech

it deems offensive and close only the portion of the forum where that speech occurs. If the government could define the contours of a limited public forum one way at is inception, then redefine its scope in response to speech it disfavors, the government would be free to zero-in and selectively silence any voice or perspective.[9] UCSD's newly defined forum, proposed *ex post* during contentious litigation around sensitive cultural and political topics, runs the real risk of silencing divergent views by slicing off just enough of an existing forum (the student activity fund) to isolate offensive speech, then closing the redefined forum (the Media Funds category of the student activity fund) under the guise of content neutrality.

Amici offer an analogy that illustrates this point:

> If the appropriate forum in this case is "Associated Students' funding of student print publications," then the appropriate forum when a college decides to stop funding religious student groups might be considered "Associated Students' funding of religious

---

[9] As the Second Circuit has observed:

> *all* the circuits that have considered the issue have determined that, at the very least, when a public university creates or subsidizes a student newspaper and imposes no *ex ante* restrictions on the content that the newspaper may contain, neither the school nor its officials may interfere with the viewpoints expressed in the publication without running afoul of the First Amendment.

*Husain v. Springer*, 494 F.3d 108, 124 (2d Cir. 2007).

> student groups." If this is true, then the case
> of a de-funded religious group would be
> properly construed to be a forum closure
> case[.]

Brief of Amicus Curiae The Student Press Law Center, et al.
at 23. The Supreme Court's decision in *Rosenberger*
forecloses such a result. 515 U.S. at 844.

We conclude that the student activity fund is the relevant
forum for purposes of assessing the permissibility of
defendants' actions. Because the district court came to a
different conclusion, it analyzed the sufficiency of *The
Koala*'s complaint using an incorrect framework. We
therefore vacate its order granting defendants' motion to
dismiss and remand for consideration of *The Koala*'s Free
Speech claims in light of our forum definition.[10]

### IV. The complaint sufficiently alleged a claim for First Amendment Retaliation.

In addition to its Free Press and Free Speech claims, the
SAC includes a separate First Amendment claim arguing that
defendants passed the Media Act in retaliation for, and with
the intent to silence, *The Koala*'s satirical content.

---

[10] Defendants' separate argument, that the relevant forum must be
defined as the media funds because *The Koala* cannot show it was denied
access to any other category of funding other than media funds, boils
down to a restatement of its view that the relevant forum must be defined
as the space to which *The Koala* sought access. Defendants apply this test
without regard to context. For the reasons explained, we are persuaded
that *The Koala* sought access to a grant from the student activity fund, and
that the media funds category was adopted as an administrative
convenience, not as a separate forum.

Defendants argue that the government's motive is irrelevant when it enacts a content-neutral rule of general applicability.

We are not persuaded by defendants' argument. First, the Media Act does not apply to all RSOs; it bans all *media organizations* from obtaining student activity fee funding. The Media Act discriminates based on the identity of the speaker—here media organizations—and singles them out for disfavored access to student activity fee funding. Further, the SAC alleges that at least one other student organization continues to receive funding for its print media.

Second, we are bound by our prior decision in *Arizona Students'*. 824 F.3d at 862. There, we addressed a retaliation claim from an organization representing students at each of Arizona's three public universities. *Id.* The students alleged that the Arizona Board of Regents had withdrawn their student activity fee funding in retaliation for the students' support of a controversial statewide ballot measure. *Id.* at 863. The Regents initially voted to cease collecting student activity fees on behalf of the student government organizations and not to disburse those it had already collected. *Id.* Later, the Regents changed the mandatory student activity fee to an opt-in fee and required the student associations to reimburse the administration for the costs of collection. *Id.* The student associations brought suit, alleging that they lost their only source of income as a result of the retaliatory action. *See Ariz. Students'*, 824 F.3d at 863.

The district court dismissed the students' retaliation claim, but we reversed. *Id.* at 862. We began by recognizing the elements of a First Amendment retaliation claim: a plaintiff must show "(1) it engaged in constitutionally protected activity; (2) the defendant's actions would chill a

person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct—i.e., that there was a nexus between the defendant's actions and an intent to chill speech." *Ariz. Students'*, 824 F.3d at 867 (internal quotation marks omitted).  At the pleading stage, the complaint must simply allege "plausible circumstances connecting the defendant's retaliatory intent to the suppressive conduct[,]" and motive may be shown with direct or circumstantial evidence.  *Id*. at 870.

After laying out this basic framework, we emphasized that "motive [is] a necessary element" of a retaliation claim, *id.* at 866, and held that "[o]therwise lawful government action may nonetheless be unlawful if motivated by retaliation for having engaged in activity protected under the First Amendment."  *Id.* at 869 (quoting *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016)).

Neither party disputes that *The Koala*'s "Dangerous Space" article satisfies the first element of a retaliation claim, because it was clearly protected speech.  Second, *The Koala* alleges that the Media Act eliminated its ability to seek funding for printing and distributing its student newspaper, which caused *The Koala* to stop publishing in print entirely. *The Koala* thus adequately alleges that the Media Act would chill a person of ordinary firmness from continuing to engage in the protected activity and also that the Media Act did, in fact, chill *The Koala*'s speech in this instance.  That *The Koala* continues to publish its newspaper online does not change this outcome.  A "plaintiff is not required to demonstrate that its speech was actually suppressed or inhibited."  *Ariz. Students'*, 824 F.3d at 867.  Moreover, for the reasons explained, *The Koala* sufficiently alleged that the

Media Act burdened its speech because it considers the paper version of its publication to be a more effective means of communicating with its audience.

Finally, *The Koala* alleges its publication of the "Dangerous Space" article was the motivating factor that prompted the Associated Students to pass the Media Act, thereby adequately alleging a nexus between *The Koala*'s speech and the Associated Students' allegedly retaliatory conduct. The SAC alleges close temporal proximity between the "Dangerous Space" article and UCSD's release of a statement from the Chancellor that "strongly denounce[d] [*T*]*he Koala* publication and the offensive and hurtful language it cho[se] to publish." The Chancellor allegedly described *The Koala* as "profoundly repugnant, repulsive, attacking[,] and cruel[,]" the SAC alleges that a UCSD administrator encouraged an RSO to "pressure" the Associated Students to defund *The Koala*, and the Executive Vice Chancellor of Academic Affairs allegedly made a statement that strongly suggested *The Koala* was indeed being singled out for special treatment: "Let's not ditch the good ones worthy of this funding and work actively on finding ways to encourage and help them financially." At this early stage of the litigation, we take these allegations as true and construe them in the light most favorable to *The Koala*.

The district court cited the Seventh Circuit's decision in *Grossbaum v. Indianapolis-Marion County Building Authority*, which held that "content-neutral speech regulations in nonpublic fora pass constitutional muster regardless of motive[.]" 100 F.3d 1287, 1299 (7th Cir. 1996). *Grossbaum* is neither controlling nor analogous. In *Grossbaum*, the Seventh Circuit upheld a government building authority's

decision to "prohibit[] *all* private displays, religious or otherwise[,]" because the building authority entirely closed the subject forum. *Id.* at 1289–91. Because the Seventh Circuit approved the closure of an entire forum, it declined to consider the government's motivation. But as we have explained, the Media Act only closed part of the broader limited public forum created by the student activity fund. On these facts, the SAC plausibly alleges the elements necessary to plead a First Amendment retaliation claim.

We are sensitive to the challenges facing educational institutions seeking to steer a difficult course between free expression and civil discourse. Nevertheless, we are equally mindful of that fact that, in the university setting, "the State acts against a backdrop and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." *Rosenberger*, 515 U.S. at 835. We conclude that the Eleventh Amendment does not bar plaintiffs' suit. Because we further conclude that *The Koala*'s complaint adequately states claims for violations of the Free Press Clause, the Free Speech Clause, and First Amendment retaliation, we vacate the district court's order granting the second motion to dismiss and remand for further proceedings consistent with this opinion.

**REVERSED, VACATED, AND REMANDED.**

FISHER, Circuit Judge, concurring:

I concur in the result and in all but part II of the opinion. Regarding the *Koala*'s Free Press Clause claim, I agree with the majority's conclusion that the complaint states a claim, but my analysis differs from the majority's in two ways. First, the majority concludes the second amended complaint states a claim under the Free Press Clause on a theory – improper censorial purpose – that the complaint does not advance, the *Koala* does not rely on and the parties have not briefed. Op. at 20–22. Although I agree with the majority that a censorial purpose theory would be viable here if raised, I would prefer not resolve the Free Press Clause issue on a theory that it has not been pled, relied on or briefed.[1]

Second, the opinion declines to decide whether the complaint states a Free Press Clause claim on the theory that the *Koala does* advance – its theory that the Media Act violates the Free Press Clause because, irrespective of censorial purpose, it singles out the press for a disparate financial burden. Op. at 21–22. I recognize that this presents a novel issue. Nevertheless, because the issue is fairly presented, I would resolve the parties' disagreement about whether the discriminatory administration of a subsidy program can be challenged on a "singling out" theory under the Free Press Clause – a theory that does not require proof of censorial purpose. Accordingly, I write separately to explain

---

[1] As the majority opinion points out, the complaint does allege that the defendants acted with a censorial purpose. Op. at 16. The complaint, however, relies on these allegations in connection with the *Koala*'s Free Speech Clause claim, not with respect to its Free Press Clause claim. The *Koala*'s Free Press Clause claim relies on a singling out theory, not censorial purpose.

why, in my view, the *Koala has* adequately stated a Free Press Clause claim on a singling out theory.[2]

I

The Supreme Court has not had occasion to address when discrimination against the press in connection with a subsidy program violates the Free Press Clause. That clause states that "Congress shall make no law . . . abridging the freedom of . . . the press." U.S. Const. amend. I.

The Court has, however, addressed discrimination against the press in connection with the imposition of taxes, identifying at least four circumstances in which taxation of the press is constitutionally suspect: (1) when a tax has "an improper censorial motive," *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 228 (1987); *see Leathers v. Medlock*, 499 U.S. 439, 444–45 (1991); *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936); (2) when a tax "singles out the press as a whole" for special treatment, *Arkansas Writers' Project*, 481 U.S. at 229; *see Leathers*, 499 U.S. at 445–46; (3) when a tax "targets a small number of speakers," *Leathers*, 499 U.S. at 447, or "individual members of the press," *Arkansas Writers' Project*, 481 U.S. at 228; and (4) when a tax "discriminates on the basis of the

---

[2] I do not, as the majority opinion suggests, fault the majority for "analyz[ing] the implications of the tax-subsidy difference." Op. at 19. In my view, the majority quite properly focuses on that issue. My concern is simply that the majority opinion resolves the adequacy of the Free Press Clause allegations on a legal theory that the complaint does not allege and upon which the *Koala* does not rely – censorial purpose – while simultaneously failing to address the theory upon which the complaint and the *Koala do* rely – the theory that the defendants, irrespective of censorial purpose, impermissibly singled out of the press for disparate treatment.

content of taxpayer speech," *Leathers*, 499 U.S. at 447.  As relevant here, the second and third of these types of discrimination do not require proof of censorial purpose.  As the Court explained in *Leathers*, "direct evidence of improper censorial motive is [not] required in order to invalidate a differential tax on First Amendment grounds:  'Illicit legislative intent is not the *sine qua non* of a violation of the First Amendment.'"  *Id.* at 445 (quoting *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 592 (1983)).[3]

The Third Circuit, moreover, has held that the second and third of these types of discrimination – singling out the press as a whole or targeting a small number of speakers – apply not only to "disparate taxation" but also to "laws that impose other types of disparate financial burdens."  *Pitt News v. Pappert*, 379 F.3d 96, 111 (3d Cir. 2004).  The court reasoned that "[t]he threat to the First Amendment arises from the imposition of financial burdens that may have the effect of influencing or suppressing speech, and whether those burdens take the form of taxes or some other form is unimportant."  *Id.* at 111–12.  The court therefore applied these principles to a state law preventing college newspapers from collecting revenue from the advertisement of alcoholic beverages.

Here, both sides rely on *Pitt News*.  Thus, for purposes of my analysis, I assume that the Court's cases regarding singling out the press as a whole or targeting individual

---

[3] Although the Court has said that "the institutional press" enjoys no "constitutional privilege beyond that of other speakers," *Citizens United v. FEC*, 558 U.S. 310, 352 (2010) (quoting *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 691 (1990) (Scalia, J., dissenting)), it has long treated discrimination against the press as constitutionally suspect.

members of the press apply not only to disparate taxation but also to "laws that impose other types of disparate financial burdens." *Id.* at 111.[4]

## II

Where the parties disagree, however, is over whether these principles extend from the imposition of taxes and other financial burdens to disparate treatment under a subsidy program.  The defendants point out that the government is under no obligation to subsidize the exercise of constitutional rights.  *See, e.g.*, *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 355 (2009) (although "[t]he First Amendment prohibits government from 'abridging the freedom of speech,'" it does not require the government to "promote that speech"); *Rust v. Sullivan*, 500 U.S. 173, 193 (1991); *Leathers*, 499 U.S. at 450 ("[A] legislature is not required to subsidize First Amendment rights through a tax exemption or tax deduction."); *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549 (1983) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right."); *Harris v. McRae*, 448 U.S. 297, 317 n.19 (1980) ("A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity.").  They argue, moreover, that the *rationale* behind the singling out theory – the recognition that selective taxation can be used to coerce or destroy the press – does not extend to the denial or withdrawal of a government subsidy:

---

[4] "In order to justify such differential taxation, the State must show that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Arkansas Writers' Project*, 481 U.S. at 231.

> The rationale running through the Free Press Clause cases repeatedly refers to the coercive power to tax, and the legitimate role played by the Free Press Clause in shielding the press from the discriminatory exercise of the potentially destructive power to tax. . . . Similar concerns arise where the government "unjustifiably imposes a financial burden on a particular segment of the media," *Pitt News v. Pappert*, 379 F.3d 96, 109 (3d Cir. 2004), or where it singles out the press with costly and burdensome regulations, penalties, or fines. . . . The potential threats posed by such taxes, penalties, regulations, and fines do not exist with regard to the administration of government subsidies such as the campus activity funds at issue here. . . . Nothing in the Free Press Clause jurisprudence suggests that it was intended to promote, guarantee, or protect affirmative government assistance to the press. . . . Simply put, the power to subsidize is not the power to destroy.

Answering Brief at 21–23. The defendants emphasize that "no court has construed the Free Press Clause to create a 'protected classification' for the press, guaranteeing 'the press' access to every subsidy program the government makes available to any person or entity who might also engage in expressive activity." *Id.* at 23. Nor, the defendants argue, can the *Koala* "contend that the Free Press Clause compels the government to maintain subsidies, once they are granted, and to continue to maintain them, apparently indefinitely." *Id.* at 25.

The defendants' arguments are not persuasive. First, it does not follow from the fact that the government has no duty to subsidize the press that the government may *discriminate* against the press in administering subsidies. The Court has held, for instance, that a state may not "discriminate invidiously in its subsidies in such a way as to 'aim[ ] at the suppression of dangerous ideas.'" *Regan*, 461 U.S. at 548 (alteration in original) (quoting *Cammarano v. United States*, 358 U.S. 498, 513 (1959)); *cf. Perry v. Sindermann*, 408 U.S. 593, 597 (1972). The right not to subsidize does not include the unfettered right to discriminate.

Second, the defendants overstate matters when they argue that the rationale underlying the Court's tax cases does not extend to the denial or withdrawal of a subsidy. To be sure, in some instances the denial or withdrawal of a subsidy may be less coercive than the imposition of a tax. In *Regan*, the Court noted that, "although government may not place obstacles in the path of a person's exercise of freedom of speech, it need not remove those not of its own creation." 461 U.S. at 549–50 (alterations omitted) (quoting *Harris*, 448 U.S. at 316). The Court observed that "[c]onstitutional concerns are greatest when the State attempts to impose its will by force of law." *Id.* at 550 (alteration in original) (quoting *Maher v. Roe*, 432 U.S. 464, 476 (1977)). The government's "power to encourage . . . is necessarily far broader." *Id.* (quoting *Maher*, 432 U.S. at 476).

In my view, however, this is a difference in degree, not a difference in kind. The tax-subsidy distinction goes only so far. *See, e.g.*, *Leathers*, 499 U.S. at 450 n.3 (describing tax exemptions and deductions as "a form of subsidy" administered through the tax system (quoting *Regan*, 461 U.S. at 544)). At least in some circumstances, "[t]he

selective administration of government subsidies presents as much potential for abuse as selective imposition of taxes, regulations, penalties, or fines."  Reply Brief at 8.  This may be "especially true for the student press."  *Id.*  Thus, the defendants' contention that the government enjoys carte blanche to single out the press for differential treatment under a subsidy program, so long as it neither manifests a censorial purpose nor facially discriminates based on content, is unpersuasive.

### III

Here, the complaint adequately alleges a Free Press Clause claim on a singling out theory.  First, the complaint plausibly alleges that the Media Act singled out the press from a generally available funding program.[5]  It alleges that "[t]he Student Government . . . disqualified student organizations that publish print newspapers from eligibility to seek funding designed to support the speech of student organizations while continuing to treat other student organizations as eligible to seek such funding."  SAC ¶ 2.

---

[5] The majority opinion appears to misstate the theory upon which the *Koala* relies.  As I read it, the complaint alleges that the defendants violated the Free Press Clause by singling out the student press *as a whole*, not by singling out "*The Koala* [alone] for disfavored treatment." Op. at 18.  *See* SAC ¶ 109 ("Defendants violated and are continuing to violate the Free Press Clause of the First Amendment by adopting and enforcing the Media Disqualification and thus excluding *The Koala* and other student print publications from eligibility to seek campus activity fee funding for the publication of student print newspapers, while continuing to treat other student organizations as eligible to seek campus activity fee funding . . . ."); Opening Brief at 28 ("As pleaded in the SAC, the Media Disqualification violates the Free Press Clause on its face because it imposes a financial burden on the student press by selectively disqualifying it from an otherwise available source of revenue.").

Significantly, the complaint does not allege that the defendants excluded the student press from a narrow, targeted subsidy program, but rather that they excluded the student press, and solely the student press, from a widespread funding program upon which student organizations broadly rely. According to the complaint, the Student Government collected $3,704,964 in campus activity fees during the 2015–16 school year and allocated $432,236 to fund student organizations, including $25,000 earmarked for print media organizations. SAC ¶ 34. The defendants then excluded the press alone from this broad-based funding program.

Second, the complaint plausibly alleges that this funding program plays an outsized role in the financial lives of student organizations. It alleges, for example, that the Media Act "materially hindered *The Koala*'s ability to publish, preventing it from publishing a planned issue during the winter quarter of the 2015–16 academic year and limiting it to three issues instead of the planned six during the [subsequent] academic year." SAC ¶ 101. It alleges that the university also precluded the *Koala* from participating in "a crowdfunding platform for student and campus projects." SAC ¶ 103.

Under these circumstances, the withdrawal of a subsidy raises many of the same concerns as the imposition of a tax. As the Third Circuit explained in *Pitt News*, schemes singling out the press, or individual members of the press, "are suspect because they can easily be used as a way of controlling or suppressing speech." 379 F.3d at 112. "Government can attempt to cow the media in general by singling it out for special financial burdens," or it can "seek to control, weaken, or destroy a disfavored segment of the media by targeting that segment." *Id.* at 110. As the Court recognized in *Leathers*,

even the threat of disparate financial treatment can operate "as effectively as a censor" in suppressing disfavored expression. 499 U.S. at 446 (quoting *Minneapolis Star*, 460 U.S. at 585). These concerns apply here as well. The defendants' actions materially weakened the *Koala*, and it requires little imagination to suppose that the funding decision challenged here had a profound chilling effect on the expressive activities of other organizations that depend on student activity fee funding.

Third, the principle that taxes singling out the press are constitutionally suspect responds to the practical concern that a censorial purpose may be difficult to prove. Under a singling out theory, a tax is suspect when, although evidence of censorial motive is lacking, it "is structured so as to raise suspicion that it was intended" as "a purposeful attempt to interfere with [an entity's] First Amendment activities." *Leathers*, 499 U.S. at 448. Here, the complaint plainly raises these concerns. It alleges that, although the Media Act "was in form directed at eligibility to seek funding for any student print media," it was "in fact substantially motivated by discrimination or retaliation against *The Koala* because of the viewpoint of its speech." SAC ¶ 88. The timing of the Media Act, as well as contemporary statements by student and university leaders, strongly suggest a hidden censorial motive.

For these reasons, I would hold that the complaint, irrespective of censorial motive, adequately alleges a claim under the Free Press Clause on the theory that the defendants singled out the press for disparate treatment. This conclusion does not, as the defendants contend, broadly interfere with a government's discretion to administer subsidy programs. I would not "prevent the government from ever eliminating, or

even reducing, subsidies to a media recipient, unless it can demonstrate a compelling government interest."  Answering Brief at 21.  I would not read the Free Press Clause as creating "a 'protected classification' for the press, guaranteeing 'the press' access to every subsidy program the government makes available to any person or entity who might also engage in expressive activity," or as requiring "affirmative government assistance to the press."  *Id.* at 23–24.  Nor would I read the Free Press Clause as compelling "the government to maintain subsidies, once they are granted, and to continue to maintain them, apparently indefinitely." *Id.* at 25.  We have in this case the selective withdrawal of the student press, and solely the student press, from a broad-based funding program, under circumstances raising a strong suspicion as to the state's censorial motives.  Under these circumstances, I would hold that the complaint adequately states a claim under the Free Press Clause.